# EXHIBIT 1

Insert name of court, branch court, if any, and its address:

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ORANGE

700 Civic Center Drive, West
Santa Ana, California   92701

**PEOPLE OF THE STATE OF CALIFORNIA**

**DEFENDANT:**   MAC MEEKIN, KEITH ALAN   [X] Present   ☐ Not Present

[X] **JUDGMENT OF COMMITMENT TO:**   [X] STATE PRISON   ☐ COUNTY JAIL
☐ **ORDER GRANTING PROBATION**   ☐ **AND MINUTE ORDER**

FOR COURT USE ONLY

# FILED

MAY 02 1986

GARY L. GRANVILLE, County Clerk

By _____ DEPUTY

CASE NUMBER:
C58236

| Date of hearing: 04-25-86 | Dept. No.: 47 | Judge: F. P. BRISENO | Clerk: S. Jural K. Story | Reporter: Lynda Crawford |
|---|---|---|---|---|
| Counsel for People: Ed Munoz | | Counsel for defendant: Don Scoles, Dep. P.D. | | Probation Officer: Dudley Moore |

1. Defendant was convicted of the commission of the following crime on (Date): 04-25-86

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | 187 PC | Murder | 2nd | Plea |

2. Defendant ☐ was arraigned   [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

   a. [X] Sentences defendant to State Prison for the term prescribed by law. *(15 years to life)*

   b. ☐ Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: _____

   c. ☐ Sentences defendant to County Jail for the period of (Specify number of days): _____

   d. ☐ Suspends imposition of sentence and defendant is placed on probation for the period of: _____
       ☐ upon conditions set forth in attachment 3d.

4. ☐ Defendant, convicted of more than one count, shall

   a. ☐ serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
|---|---|---|
| | | |

   b. ☐ serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. ☐ concurrently.   b. ☐ consecutively.

   c. ☐ as set forth below or in attachment 5c.

6. Execution of sentence is

   a. ☐ stayed on the following count: _____ pending appeal, with the stay to become permanent
       when the sentence is completed as to count: _____

   b. ☐ suspended and defendant is placed on probation for the period of: _____
       ☐ upon conditions set forth in attachment 6b.

7. ☐ No allegation to enhance punishment was made in count: _____

8. ☐ It was alleged

   a. ☐ Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
       in count: _____ ☐ and allegation stricken as to count: _____

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

Form Approved by the
Judicial Council of California
Effective July 1, 1976

**JUDGMENT-COMMITMENT**

Pen C. 644. 969c. 969d. 1203. 1213.5.
3024. 12022. 12022.5.

F0182-432 (R 7/76)

b. ☐ Defendant used a firearm: count: _____ and allegation _____ en as to count: _____

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): _____

9. ☐ The Court finds the defendant

a. ☐ **was** armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of
(1) ☐ Pen C. 3024 as to count: _____ ☐ but strikes the finding as to count: _____
(2) ☐ Pen C. 12022 as to count: _____ ☐ but strikes the finding as to count: _____
(3) ☐ Pen C. 1203 (Specify weapon): _____
as to count: _____ ☐ but strikes the finding as to count: _____

b. ☐ was **not** armed at the time of commission or attempted commission of the crime within the meaning of
(1) ☐ Pen C. 3024 as to count: _____
(2) ☐ Pen C. 12022 as to count: _____
(3) ☐ Pen C. 1203 as to count: _____

c. ☐ **did** use a firearm as to count: _____ ☐ but strikes the finding as to count: _____
(1) ☐ The use was one use for the following counts: . _____ The additional penalty shall
run consecutively to the sentence on the last count to be served.

d. ☐ did **not** use a firearm as to count: _____

e. ☐ **was** armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
the finding.

f. ☐ was **not** armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☐ as set forth in
attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|
| | | | | |

11. The court finds defendant   a. ☐ is ☐ is not an habitual criminal under Pen C. 644a.
b. ☐ is ☐ is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): **04-25-86** , and defendant was held in custody, through and including
the date of pronouncement of sentence for (Total no. of days): **318** as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| 1 | 212 days + 106 days goodtime/worktime. | |

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days). _____ ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered ☒ at the earliest convenient time ☐ after 48 hours, excluding Saturdays, Sundays and holidays
[Pen C. 1203c] into the custody of the Director of Corrections at
(1) ☐ California Institution for Women—Frontera         (3) ☐ California Institution for Men—Chino
(2) ☐ California Men's Facility—Vacaville                (4) ☒ Other: California Youth Authority

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168. pursuant to Sectio

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them. 1731.5

16. ☐ Other (See attachment 16)                                                                            W&I.

Dated: APR 3 0 1986  F. P. BRISENO                    _JP Busene_
                        (Type or print name)              (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: __5__

**CLERK'S CERTIFICATE**
I hereby certify that the foregoing is a correct copy of the original on file in my office.

[Seal]                                                  Clerk of the superior Court

                                    By _Maria Nolles_ _____ Deputy

# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )     CDC Number D-30728
                      )
KEITH MACMWEEKIN )
                      )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 14, 2006

8:55 A.M.

PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner

OTHERS PRESENT:
Mr. David Spowart, Attorney for Inmate
Mr. Ted Burnett, Deputy District Attorney,
Orange County

Mr. Keith Macmweekin, Inmate, not present

CORRECTIONS TO THE DECISION HAVE BEEN MADE

          _____    No      See Review of Hearing
          _____    Yes     Transcript Memorandum

**J. Farncomb**             **Peters Shorthand Reporting**

ii

## INDEX

|                                          | PAGE |
| ---------------------------------------- | ---- |
| Proceedings..............................| 1    |
| Case Factors.............................| 3    |
| Pre-Commitment Factors...................| 8    |
| Post-Commitment Factors..................| 18   |
| Parole Plans.............................| 10   |
| Closing Statements.......................| 21   |
| Recess...................................| 35   |
| Decision.................................| 36   |
| Adjournment..............................| 44   |
| Transcriber Certification................| 45   |

--oOo--

1

1        P R O C E E D I N G S

2            PRESIDING COMMISSIONER ST. JULIEN:    It is

3    8:55 A.M.    This is a Subsequent Parole

4    Consideration Hearing for Keith Macmweekin,

5    M-A-C-M-W-E-E-K-I-N.    Oh, do you want to turn it

6    off for a minute?

7            DEPUTY COMMISSIONER MEJIA:    Just one

8    minute, I have to --

9                    (Off Record)

10           DEPUTY COMMISSIONER MEJIA:    We're back on

11   record.

12           PRESIDING COMMISSIONER ST. JULIEN:    Okay,

13   and Mr. Spowart just left the room for a minute,

14   too, I guess to retrieve some items.    Okay.

15   Mr. Macmweekin's CDC Number is D, as in dog,

16   30728.    Today is March 14, 2006, and we are at

17   the Correctional Training Facility in Soledad.

18   Mr. Macmweekin was received on June 10, 1986,

19   life-term starting the same day.    Count one,

20   murder-second, case number C58236, and that's

21   from Orange County, violation of Penal Code

22   Section 187.    The term received 15 years to

23   life.    Minimum eligible parole date December 27,

24   1994, and this is murder-second.    And my name is

25   Tracey St. Julien, T-R-A-C-E-Y, S-T, capital

26   J-U-L-I-E-N, Commissioner.

27           DEPUTY COMMISSIONER MEJIA:    Rolando

2

1   Mejia, M-E-J-I-A, Deputy Commissioner.

2        **PRESIDING COMMISSIONER ST. JULIEN:**

3   Mr. Burnett.

4        **DEPUTY DISTRICT ATTORNEY BURNETT:**   Ted

5   Burnett, B-U-R-N-E-T-T, Orange County District

6   Attorney's Office.

7        **ATTORNEY SPOWART:**   David Spowart,

8   S-P-O-W-A-R-T, Attorney for Mr. Macmweekin.

9        **PRESIDING COMMISSIONER ST. JULIEN:**   Okay,

10  and Mr. Macmweekin has exercised right to waive

11  his appearance at the Hearing today, so he is

12  not in attendance.  And Mr. Macmweekin signed

13  the BPT Form 1001A, and that is signed and dated

14  today.  Mr. Macmweekin has signed it along with

15  his attorney Mr. Spowart, and the box that is

16  checked says, "I do not personally wish to

17  attend my Hearing but I do wish to be

18  represented by Counsel at the Hearing."  Okay,

19  and Mr. Spowart, Mr. Macmweekin did not waive

20  his appearance because of any ADA issues?

21       **ATTORNEY SPOWART:**   No, no.

22       **PRESIDING COMMISSIONER ST. JULIEN:**   Okay,

23  because if there are any ADA issues we would

24  want to make sure that those have been

25  accommodated.

26       **ATTORNEY SPOWART:**   There is none.

27       **PRESIDING COMMISSIONER ST. JULIEN:**   Okay,

3

1  thank you.  And in regards to that I am looking
2  at Mr. Macmweekin's BPT Form 1073 and that was
3  signed on May 18, 2005, and that the boxes that
4  are checks are "no disabilities identified from
5  the file review and I do not need any help for
6  my Parole Hearing."  Okay, I will read the
7  Summary of the Crime, as it appears in the
8  September 2005 Board Report.  And it states:
9            According to the records of the
10           Las Palmas Police Department, on
11           September 24, 1985, officers
12           responded an apartment on
13           Oglethorpe [phonetic] Avenue, to
14           check on Mrs. Virginia Macmweekin.
15           Officers were previously informed
16           of sounds of a struggle and of a
17           woman screaming have come from the
18           apartment and maintenance
19           personnel and the apartment
20           manager had knocked on the door
21           without any response and had
22           subsequently called the police.
23           Officers arrived at 9:30 in the
24           morning and were informed that a
25           17 year-old boy and his mother
26           lived at that location and that
27           they had been very quiet tenants.

4

```
1       After knocking several times

2       without response and discovering

3       that the deadbolt was in place,

4       officers obtained a passkey and

5       entered the apartment.  They

6       observed signs of a struggle.  The

7       officers opened the door to the

8       master bedroom and observed the

9       victim lying supine on the floor

10      with her head and upper torso

11      covered with loosely piled

12      clothing.  Blood and lacerations

13      were on both of her hands.  High

14      heel shoes were still strapped to

15      her angles but they were off the

16      soles of her feet.  Lifting the

17      clothing from off of her face,

18      officers observed blood in her

19      mouth and noted that her eyes were

20      closed and puffy and that there

21      was a man's necktie around her

22      neck.  Homicide investigators were

23      called to the scene and an autopsy

24      later revealed the cause of death

25      to be strangulation.  The palms of

26      both hands had shallow cuts and

27      the victim's left middle finger
```

1          was broken.  A subsequent

2          investigation revealed the

3          victim's car was missing and that

4          the victim's son, Keith Allen

5          Macmweekin, and that's K-E-I-T-H,

6          had not reported to work.  A

7          witness later indicated that the

8          victim had been having problems

9          with her son regarding his cocaine

10         use and his alcohol abuse.  The

11         witness stated that the victim had

12         kicked her son out of her

13         apartment about a month before,

14         but had let him come back.  The

15         witness stated that the victim and

16         her son each had a bad temper and

17         that they would argue and have

18         fistfights.  And then on

19         September 26, 1985, immigrations

20         officers stopped Macmweekin as he

21         attempted to the United States

22         from Mexico.  He was detained and

23         subsequently transported to the

24         Las Palmas Police Department where

25         he gave a written confession.

26   And the confession follows.  In the prisoner's

27   version of the Board Report the prisoner stated:

6

```
 1          Between the hours of 7:00 and
 2          5:00 A.M., on September 23 and 24,
 3          1985, the inmate had consumed 16
 4          eight-ounce bottles of beer, smoked
 5          two joints of marijuana and snorted
 6          one and a half grams of cocaine.
 7          Macmweekin and his mother argued
 8          daily, particularly about his abuse
 9          of drugs and alcohol, his broken
10          down car, her alcoholism, her
11          boyfriends and her sexual behavior
12          regardless of his presence.  On
13          that morning he returned at about
14          5:00 A.M. to sleep on the couch.
15          He could not get to sleep until
16          about 6:00 A.M.  His mother
17          awakened him about 7:00 urging him
18          to go to work.  They had an
19          argument. The argument became
20          physical.  He was very tried and
21          angry at his mother for yelling at
22          him.  He backed into the kitchen
23          and picked up a knife from the
24          table, warned his mother to back
25          off and stated again that he wasn't
26          going to work.  His mother tried to
27          take the knife away from him.  He
```

```
1        backed up against the wall and a
2        mirror fell down on his foot.  He
3        bent down and somehow cut into his
4        mother's side.  She screamed and he
5        threw the knife away.  She began
6        beating him on the face.  He said
7        at this point, quote, I went for
8        her neck; I don't know why, end
9        quote.  He stated he killed her
10       with both hands not knowing if she
11       was dead yet and decided to put her
12       out of her misery, and that's also
13       in quotes.  He therefore took a
14       necktie, knotted it around her neck
15       and strangled her until she no
16       longer moved.  He then dragged her
17       to her bedroom and after realizing
18       that she was dead covered her face
19       with clothing.  He stated then that
20       he went to her purse and took her
21       wallet, grabbed some clothes and
22       disconnected the phone in order to
23       prevent her from calling the police
24       if she was still alive.  He went
25       out the front door, locking it
26       behind him, and took her vehicle.
27       He went looking for a friend in Los
```

8

```
 1           Angeles, who ultimately advised him
 2           to go to Mexico.  And at some later
 3           point he decided to turn himself
 4           in.
 5    Okay, and Mr. Macmweekin's family life.
 6           ATTORNEY SPOWART:  Commissioner, before
 7    you go any further, --
 8           PRESIDING COMMISSIONER ST. JULIEN:  Uh
 9    huh.
10           ATTORNEY SPOWART:  -- my client gave me a
11    statement regarding the crime.
12           PRESIDING COMMISSIONER ST. JULIEN:  Oh,
13    okay.
14           ATTORNEY SPOWART:  He said that he has
15    read this (indiscernible).
16           PRESIDING COMMISSIONER ST. JULIEN:  Okay,
17    would you like to read that.
18           ATTORNEY SPOWART:
19           "For correction of record, I would
20           like to provide to this Panel
21           today with a correction of
22           Statement of Facts for the crime
23           which I committed.  I was awoken
24           that morning by my mother while I
25           was sleeping on the couch.  A
26           verbal argument took place between
27           she and I.  It was during this
```

9

1          argument which I became very upset

2          with her and I went to the kitchen

3          table, picked up the knife and

4          assaulted her with a knife.  The

5          remaining statements, which I made

6          for the record are accurate."

7   That's it.

8          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

9   So, in terms of personal factors, Mr. Macmweekin

10  had been arrested twice as a juvenile, for

11  possession of marijuana and then joy riding, and

12  he was counseled and released.  And

13  Mr. Macmweekin doesn't have any other adult

14  offense other than the commitment crime.

15  Mr. Macmweekin was the youngest of four

16  children.  He was born in 1966.  Apparently

17  Mr. Macmweekin's father William was very

18  abusive, he was an alcoholic and physically

19  abused his wife and children and the parents

20  argued daily.  And all of the inmate's brothers

21  had described the home scene, as a quote

22  unquote, mad house.  Two of the older brothers

23  joined the military and subsequently the parents

24  did divorce.  And the inmate's mother, who he

25  continued to live with, also had a drinking

26  problem and became an alcoholic.  The inmate and

27  his mother and another brother moved to Orange

10

1    County in 1985.  And apparently he felt that he
2    did not have any parental supervision by his
3    mother.  It bothered the inmate that his mother
4    was dating and would bring her boyfriends to the
5    house that they shared.  And apparently they had
6    constant arguments with each other.  The inmate
7    dropped out of high school in 1984 in the 11th
8    grade, and apparently worked at various jobs for
9    about two years.  And then in 1985, when he was
10   in the Orange County Sheriff's custody, he
11   apparently tried to attempt suicide by
12   swallowing two disposable trimming blades, and
13   he did, however, recover from that incident.  In
14   terms of parole plans, the inmate would like to
15   reside with an uncle, Tom Brown, who lives in
16   Westlake, California.  And I'm not sure if this
17   is a viable option, we don't have any letters in
18   the file on behalf of Mr. Macmweekin.  And is
19   that correct, sir?

20        **ATTORNEY SPOWART:**  No.  He was going to
21   live with his brother, but he says that his
22   brother is constantly moving, and he doesn't
23   have -- he has three brothers, and one of them
24   won't talk to him at all and he doesn't know
25   where the other is.  His older brother has
26   always kept in communication with him, but he is
27   constantly moving.  He did provide me with some

11

1    places where he has written for guidance and we

2    might be able to --

3          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

4    And you know bringing that up --

5          ATTORNEY SPOWART:   There was one -- he

6    has looked into the CDC Parole System --

7          PRESIDING COMMISSIONER ST. JULIEN:   Uh

8    huh.

9          ATTORNEY SPOWART:   -- that they have set

10   up.

11         PRESIDING COMMISSIONER ST. JULIEN:   Uh

12   huh.

13         ATTORNEY SPOWART:   Which states right in

14   there that nobody should be denied a parole

15   because he doesn't have a place to live, because

16   they will provide it.

17         PRESIDING COMMISSIONER ST. JULIEN:

18   Right.

19         ATTORNEY SPOWART:   And a --

20         PRESIDING COMMISSIONER ST. JULIEN:   Yeah,

21   I think they do --

22         ATTORNEY SPOWART:   -- he's looked into

23   all this stuff.

24         PRESIDING COMMISSIONER ST. JULIEN:   Okay.

25   And, you know, that reminds me that there is

26   some preliminary questions that I had neglected

27   to ask.  Do you have any additional documents?

12

```
 1          ATTORNEY SPOWART:  Just those in front of
 2     you.
 3          PRESIDING COMMISSIONER ST. JULIEN:  Okay.
 4     And --
 5          ATTORNEY SPOWART:  He's given me a
 6     closing stmt, which he wants me to read.
 7          PRESIDING COMMISSIONER ST. JULIEN:  Wants
 8     you to read, okay.  And then I noticed that you
 9     passed the Exhibit One to --
10          ATTORNEY SPOWART:  I have all of those.
11          PRESIDING COMMISSIONER ST. JULIEN:  Okay.
12     And, Mr. Burnett, do you have all of those as
13     well?
14          DEPUTY DISTRICT ATTORNEY BURNETT:  I
15     believe so, yes.
16          PRESIDING COMMISSIONER ST. JULIEN:  Okay.
17     And, Commissioner Mejia, will we be using any
18     confidential --
19          DEPUTY COMMISSIONER MEJIA:  No, no
20     confidential information.
21          PRESIDING COMMISSIONER ST. JULIEN:  Okay.
22     So these letters are -- the first one is from
23     the Communication Workers of American, CWA,
24     Local 14904, and this is the Southern California
25     Typographical Mailer Union, M-A-I-L-E-R.  And it
26     says that -- I guess Mr. Macmweekin wrote to the
27     Union asking for information about getting work
```

13

1    in the printing industry, and perhaps an

2    apprenticeship program, because the letter says

3    "I must be honest in telling you that an

4    apprenticeship program are presently non-

5    existent as such.  However, this is what I would

6    recommend:  if possible work with a staff person

7    who is an expert in getting a person employed on

8    the outside.  Put together a one-page resume of

9    your printing training and experience that

10   stresses your stronger skills.  Consider finding

11   initial employment in a small shop that is

12   looking for a person, even part-time."  And he

13   says that a small establishment might be the

14   best bet at this point in time for him.  Okay,

15   and then as you mentioned, Mr. Spowart, there is

16   a letter from the Department of Corrections,

17   Parole and Community Services Division, and this

18   letter is giving information on, as you said,

19   the various services that are provided to people

20   on parole.  They have a Community Base Program

21   that provide lodging and meals, counseling, and

22   job services, and substance abuse services.  And

23   I don't know -- does it talk about housing?

24   Lodging, yeah, the Community Base Program

25   provides lodging.  Okay.  And then there is

26   another document that lists many locations of

27   career centers, one-stop centers, and transition

14

1    services.  And there is another document that
2    lists, specifically, Orange County addresses.
3    Now, also for the inmate suggestion would be for
4    him to, and I don't know if he has done this or
5    not, but would be to contact transitional living
6    centers, residential treatment programs, that
7    type of a thing, because he can identify a home
8    that he might want to go to and see what they're
9    procedure is for getting on a waiting list, a
10   bed, or whatever, and how long the program is.
11   I know there are some that are, you know, six
12   months a year, a year and a half, that type of
13   thing, until the individual can get back on his
14   feet and try to rent an apartment on their own.
15   But I would definitely suggest that he needs to
16   have some type of identified transitional home
17   or halfway house that he is intending on going
18   to, because, you know, we naturally don't want
19   to have him not, you know, be paroled without
20   any place to go to. And it is actually part of
21   the decision review that they pretty much insist
22   on the inmate knowing where he is going upon
23   release.
24        **ATTORNEY SPOWART:**  Well, I -- it is my
25   impression that the CDC Program is designed to
26   take care of that.  They state right in there
27   that no one should be denied parole because they

15

1  don't have a place to live or work, because they

2  will --

3          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

4          ATTORNEY SPOWART:   -- make sure that he

5  does.

6          PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

7  but then I think the key word is should.  And if

8  -- I guess these places are, you know, they are

9  fairly easy to contact and get some idea of the

10  services that they offer.  But we need to have

11  some idea of where he is going to go.

12          ATTORNEY SPOWART:  Well, this will be on

13  the record and he will read the record.

14          PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

15  yeah, that's why I'm saying --

16          ATTORNEY SPOWART:  I told him that.

17          PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

18          ATTORNEY SPOWART:  He did -- in regards

19  to that I asked him about AA and NA and he said

20  yeah he knows --

21          PRESIDING COMMISSIONER ST. JULIEN:  Uh

22  huh.

23          ATTORNEY SPOWART:   -- that he is going to

24  have to do that.  He has written them, but he

25  says that he has never gotten an answer.  But he

26  said that this --

27          PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

16

1   and actually in a lot of these homes they do

2   offer substance abuse counseling, as, you know,

3   mentioned in there.  But we would need to see

4   something a little more specific, number one so

5   that the Panel is assured that, as I mentioned

6   before, Mr. Macmweekin isn't, you know, given a

7   parole date and he has no where to go.  And I

8   don't think he goes from the prison gates to the

9   parole officer's office on the same day.  So, he

10  needs -- and there is, you know, a certain

11  amount of work that he needs to do on his own

12  for his own well-being, you know, for his own

13  peace of mind.  I wouldn't think that the inmate

14  would want to be paroled to nowhere.  You know,

15  he has to set up a life for himself as well.

16  And in terms of the employment situation,

17  Title 15 requires that he have a marketable

18  skill.

19          ATTORNEY SPOWART:  He has three.

20          PRESIDING COMMISSIONER ST. JULIEN:  And

21  we will get into that in a minute.

22          ATTORNEY SPOWART:  Okay.

23          PRESIDING COMMISSIONER ST. JULIEN:  He

24  doesn't -- the law does not require him to have

25  a job offer; however, as I'm sure you know and

26  I'm sure he knows, the Panel likes to see job

27  offers, as does the Decision Review Unit and as

17

1    does the Governor.  So whatever he can do to,

2    you know, secure a future for himself, a solid

3    future, I think it will only work in his best

4    interest.  And I know that these things are hard

5    to do from prison and they are very hard,

6    especially if doesn't have any family support

7    out there, but nevertheless any efforts that he

8    makes on his own behalf should only work in his

9    favor.  Commissioner Mejia, do you have anything

10   to add to those comments?

11         **DEPUTY COMMISSIONER MEJIA:**  Yeah, I would

12   suggest that he attend the Pre-Release Program

13   also.  That would give him some more

14   information.

15         **PRESIDING COMMISSIONER ST. JULIEN:**  And I

16   will, also, note for Mr. Macmweekin, that he

17   does not necessarily have to parole in the

18   county of last legal residence.  I notice that

19   he does have letters from places in Orange

20   County.  If he wants to parole to Orange County

21   that's fine; if he can identify other

22   residential options or other employment options

23   that would be more viable for him in another

24   county that's also acceptable by the Board.  The

25   Board wants people on parole to succeed, and if

26   that means paroling to another county then we

27   usually will definitely take that into

18

1    consideration.  So he shouldn't feel that he

2    limited to geographically, but he has to stay,

3    of course, in California.  But if he can

4    identify another county where he would have

5    better success then we would certainly entertain

6    that.  But anyway in response to our notices, we

7    don't have any letters from individuals in

8    support of Mr. Macmweekin's release.  We do send

9    out 3042 Notices and those are notices that go

10   to law enforcement and the Courts and others.

11   And we have a letter signed by Mr. Burnett from

12   the District Attorney Office of Orange County,

13   and Mr. Burnett is going to speak shortly about

14   their position.  Okay.  I'm not sure that I have

15   anything else right now.  Okay, Commissioner

16   Mejia, do you want to cover post-conviction?

17        **DEPUTY COMMISSIONER MEJIA:**  The last

18   Board Report, Board appearance was September 9,

19   2004.  There was a one-year denial given to him.

20   Recommendations were for him to remain

21   disciplinary free and get self-help.  His

22   custody level is 19 -- classification score is

23   19, custody level is Medium A.  He is currently

24   working as a teacher's aid with an exceptional

25   work reports.  He has a GED.  I've seen some

26   college credits, but I don't know if he got his

27   AA.  He has two Certificates on file:

19

1   Vocational Drafting and Offset Printing.   They
2   were both completed and certification.   Self-
3   help since 1991 in AA, and it's current to 2006.
4   He has done some life skill, and Anger
5   Management.   There are no 115s.   There is one
6   128 in 1991.   No validation or gang affiliation
7   noted.   The psych report dated October 2, 2003,
8   by Dr. Steward.   Steward, S-T, as in Tom,
9   E-W-A-R-D, as David.   And Clinical Assessment in
10  2003, Diagnostic Impressions:   Axis I, cocaine
11  dependence and alcohol abuse in remission;
12  Axis II, deferred; Axis III, deferred; Axis IV,
13  incarceration; GAF of 85; no evidence of mood or
14  thought disorder.   Assessment of Dangerousness,
15  "Mr. Macmweekin presents a well below average
16  risk for violence when compared to the Level II
17  general population of inmates, and if released
18  to the community his potential for violence most
19  likely to be equal to that of the average
20  citizen.   Most significant risk factors which
21  could be a precursor to violence would be if
22  inmate Macmweekin is to return to alcohol or
23  cocaine abuse.   Inmate Macmweekin is competent
24  and responsible for his behavior.   He has
25  demonstrated excellent impulse control, judgment
26  and coping, despite his being in a demanding
27  institutional environment, by remaining without

20

1    a CDC 115s, and conversely, to abide by

2    institutional standards and regulations.  If

3    released to parole, Mr. Macmweekin might find it

4    helpful to be involved in support groups of

5    those who have abuse of drugs and alcohol, and

6    may also find it helpful to participate in

7    counseling.  This need not be a requirement of

8    parole but something that he could seek through

9    the parole officer, if he felt the need to do

10   so.   Inmate Macmweekin, although he has

11   abstained from alcohol and cocaine for 16 years,

12   should undergo random urine testing for alcohol

13   and drug use.  This is not intended as a

14   statement regarding the likelihood of his

15   abusing drugs or alcohol, but creating a system

16   of (indiscernible) for him."  Any additions,

17   Counsel, with regards to presentation?

18        **ATTORNEY SPOWART:**  I think you have

19   covered it.  Did you get that he has upgraded

20   educationally?

21        **DEPUTY COMMISSIONER MEJIA:**

22   (indiscernible - speaking at the same time as

23   the attorney.)

24        **ATTORNEY SPOWART:**  Yeah, and with an

25   honor roll and got his GED.  Okay, I think you

26   covered it all.

27        **DEPUTY COMMISSIONER MEJIA:**  Did he get

21

1  his AA?

2      **ATTORNEY SPOWART:**  I --

3      **DEPUTY COMMISSIONER MEJIA:**  I didn't --

4      **ATTORNEY SPOWART:**  I didn't see it.

5      **DEPUTY COMMISSIONER MEJIA:**  I didn't

6  think he did, I didn't see it.  But he did have

7  some college courses in early 1990s.

8      **ATTORNEY SPOWART:**  Yeah, I saw the thing

9  regarding where he was on the honor roll, but I

10  didn't see anything where he got his --

11      **DEPUTY COMMISSIONER MEJIA:**  I don't think

12  he's got it.

13      **ATTORNEY SPOWART:**  -- got the AA degree.

14      **DEPUTY COMMISSIONER MEJIA:**  I'll return

15  back to the Chair.

16      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

17  Mr. Macmweekin is not here, so we are not able

18  to ask him any questions, either the Panel or

19  the District Attorney or the inmate attorney.

20  So, Mr. Burnett, do you have a closing

21  statement?

22      **DEPUTY DISTRICT ATTORNEY BURNETT:**

23  Certainly, thank you.  First of all I would just

24  like to point out a little bit about the

25  psychological reports, and they always sort of

26  bug me a little bit by the way they word them a

27  lot.  I will note that the inmate when he came

22

 1   in was diagnosed as having an explosive
 2   personality disorder, and then that just sort of
 3   vanished over the years.  And now we are up to
 4   he is just a fine guy because the person that he
 5   killed was his mother, and he doesn't have any
 6   more mothers so he's not going to kill anybody
 7   again.  To me that is just silly.  The fact is
 8   that once he is out there he is going to be
 9   facing the same sort of frustrations that
10   happened to him in this instance, it just could
11   be another person, and for them to say that he
12   is not a risk because the object of his rage,
13   his mother, is already dead just strikes me as
14   absurd.  Now to get into more of the particulars
15   that the Board looks for, I will go ahead and
16   cover the standard type of things.  When you
17   look at this commitment offense it truly is a
18   heinous, atrocious, cruel and callous.  I
19   mentioned in my letter that it is almost
20   unconscionable -- well, it is unconscionable to
21   think that somebody could do this to his own
22   mother based on what her problem with him was;
23   he is under age and drinking, he is smoking
24   marijuana.  He is obviously taking people's cars
25   and getting stopped with marijuana and he's
26   snorting cocaine, and he's refusing to go to
27   work.  This is why he choked his mother to

1    death, after attacking her with a knife and
2    stabbing her.  It is interesting that he has
3    finally admitted, and I don't know if Counsel
4    indicated that he has been admitting for a
5    while, I guess, I don't know that for sure, but
6    I was curious as to just how his mother got the
7    knife wounds on her hands, based on the inmate's
8    version in the report; it made no sense.  Now he
9    admits that he did attack her with a knife that
10   explains how she got the knife wounds, the
11   defensive wounds on her hands.  But this is just
12   another indication of just how horrible this
13   crime was.  It certainly was carried out in a
14   manner that exhibited callous disregard for the
15   life of his mother.  He chokes her to
16   unconsciousness, after stabbing her, then he
17   doesn't back up and say, "my God what am I
18   doing," but he goes and gets a knife, I mean a
19   necktie, wraps it on her -- do you need to
20   change the tape?
21        **DEPUTY COMMISSIONER MEJIA:**  Not yet.
22        **DEPUTY DISTRICT ATTORNEY BURNETT:**
23   Throttles her and then he starts dragging her
24   around the house, throws some clothes on her
25   and, again, the motive for this crime is because
26   he is upset with her because she is getting on
27   his case about the fact that he won't go to

24

1    work.  They obviously had a volatile
2    relationship; lots of people have volatile
3    relationships with their parents and don't end
4    up in this.  So the motive for the crime is very
5    trivial in relationship.  It also, I mean he
6    kills his mother, she is lying dead on the floor
7    and he still doesn't say, "oh, well what have I
8    done," instead what he does is that he goes to
9    purse, steals her wallet, steals her car, splits
10   to Mexico, and we don't know from the Board
11   Report how long he was there, and I don't know,
12   I don't know if he was there for a long time and
13   then came back or if it was short; I don't know
14   if the Board knows.  But that, also, should be
15   considered because murdering her didn't stop him
16   from doing these other criminal acts.  And in
17   particular, I will just draw from the Statement
18   of Facts, as the Board is well aware, he did
19   stab and choke his mother to unconsciousness and
20   then gets that tie and then he unplugs the phone
21   just on the outside chance that maybe he hasn't
22   killed her that he doesn't want her to be able
23   to get help; and this is another despicable
24   thing.  Finally, turning to his previous record,
25   obviously, he was a young man when this
26   happened.  He doesn't have an extensive prior
27   record.  He did have some problems as a juvenile

1    with the marijuana and the joy riding, but let's
2    not ignore the fact that even though he didn't
3    have prior convictions, per se, he obviously was
4    behaving in a criminal way, just the fact that
5    he was drinking was criminal, the marijuana was
6    obviously criminal and the cocaine was criminal,
7    which also indicates that he has had this
8    pattern of criminal behavior that commenced at
9    an early age.  Clearly, he is to be commended
10   because he behaves in prison.  It is the Orange
11   County District Attorney's Office's position
12   that he is simply too unstable to be in other
13   than this type of a controlled environment.  In
14   a prison he behaves well, but you let him out
15   and he is a danger and we oppose releasing him.
16   Thank you.

17        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
18   thank you.  Mr. Spowart.

19        **ATTORNEY SPOWART:**  Yes.  He has a lot of
20   problems.  Juvenile record, two arrests:  One
21   for possession of marijuana, the second for joy
22   riding, and he was counseled and released, no
23   violence; adult convictions, the incident
24   offense only; a stable social history,
25   definitely not.  He had a lot of problems.  His
26   mother and father were alcoholics.  His father
27   died, he was raised by his mother, and he had

26

```
 1    constant problems.  I will get to that in a
 2    second because the D.A. in his closing makes a
 3    lot of statements, but -- in fact, I'm going to
 4    address it right now.  Just look the statement
 5    in the probation officer's report.  Who knew,
 6    who knew -- the D.A. wasn't there, he didn't
 7    know any of this, he was just taking this out of
 8    that the -- who knew about this relationship?
 9    When (indiscernible) information, the probation
10    officer says:  "The probation officer contacted
11    Madeline [phonetic] Brown, mother of the
12    victim," the maternal grandmother.  "Mrs. Brown
13    indicated that her daughter and the defendant
14    were having difficulties."  Now these problems
15    were in relationship to the defendant being into
16    dope, right.  "She related that her daughter did
17    not discuss any particulars, but indicated that
18    they were (indiscernible), but she did not
19    appear overly concerned.  Mrs. Brown indicated
20    that the defendant and his brothers suffered
21    difficult times due to their father and that
22    both the defendant's father and mother abused
23    alcohol.  Mrs. Brown indicated she had no
24    indication that the defendant ever struck his
25    mother in the past, although they had argued.
26    She indicated that the defendant had written to
27    her and apologized for his actions in his
```

27

1   letters, and he recognizes what he did wrong.
2   She indicated that the defendant and his mother
3   were very close and (indiscernible) dependent
4   upon.  She stated the victim was a good person
5   who loved her family.  She stated the defendant
6   had a rough time growing up and it was her
7   belief that he needs help."  She knew both her
8   daughter and her grandson, and she knew -- she
9   had a good idea of what was happening.  So to
10  say that this was a trivial matter -- my client
11  didn't -- you know why he doesn't come in?  He's
12  embarrassed to face you.  He killed his mother,
13  he just -- it's very difficult for him to live
14  with that.  Remorse, yes, just read the psych
15  report, and I'm going to read it to you in a
16  minute.  Motivation, anger brought on by years
17  of stress, years of stress, constant stress.
18  There is no excuse for killing anybody.  There
19  is no excuse for especially killing your mother.
20  But when you read this relationship and how this
21  came, his mother's actions were truly horrible,
22  she didn't deserve to die over it, nobody is
23  going to say that, and my client has to be
24  punished, and he admits that.  But, you know,
25  when you look at the matrix, it depends on where
26  you sit the term based on did you have a close
27  relationship with the victim or did you not have

28

```
 1    a close relationship with the victim.  Did the
 2    victim have anything to do with this, the
 3    argument and goading him on; these are things to
 4    be considered.  It does make a difference; it
 5    does make a difference the circumstances of the
 6    crime.  He was 18 then and he's 39 now.  He has
 7    had -- this is his eight Subsequent, and the
 8    last time he was denied one-year, and he has had
 9    many stipulations.  I asked him why that, and he
10    just doesn't want to come before the Board, he's
11    embarrassed, and he can't talk about it, why he
12    killed his mother.  He doesn't take this
13    lightly, believe me, he does not.  I tried to
14    talk to him today to come in here and talk to
15    you.  His parole plans, he has no family
16    support.  His grandmother, in years gone by he
17    could have lived with his grandmother, but she
18    died.  His brothers, one of them won't talk to
19    him and the other he never knows where he is,
20    and his older brother is constantly moving.  So
21    he doesn't have a -- in the past he gave that.
22    He has looked for places to live, and I told him
23    today that this is going to be a factor, that
24    the Board is going to be concerned about his
25    parole plans.  The guidelines state that a job
26    offer or skills that he has learned while
27    incarcerated that he can put to use on the
```

29

```
 1   streets.  Now, he has three good vocations:
 2   Vocational Drafting, Mechanical Printing, and
 3   Offset Printing.  He has ten years in printing.
 4   How has he done since he's been down?  The D.A.
 5   says that you can't trust him on the outside, he
 6   has to be in a structured environment.  Well, a
 7   structured environment  -- your right, can he
 8   obey the rules in here?  No 115s and only one
 9   128A and that was in '91.  He's been in AA with
10   laudatory chronos; he has completed Life Skills;
11   he has completed Anger Management; he has
12   excellent work reports; he got his GED
13   (indiscernible) Orange County Jail; and he has
14   upgraded educationally at Hartnell College.
15   Now, let's go look at this psych report.  The
16   Commissioner covered it very well, but I just
17   want to go over it again.  Axis I, cocaine
18   dependence and alcohol abuse in remission.  No
19   115s for alcohol or drugs the whole time that he
20   has been down.  Axis II, deferred; Axis III,
21   deferred; and a current GAF very good at 85.
22   Now, I'm always amazed, well, I'm not amazed
23   because I use it the other way, if it hadn't
24   been a good psych report the D.A. would have --
25   if it had been a bad psych report for my client
26   the D.A. would have been saying what a great guy
27   these psychs are.  But this is a good psych
```

1    report, so he is saying it's terrible, so, I'm

2    going to tell you how good it is.  In view of

3    the life-crime, it pretty much states what

4    happened.  "As stated above, he continues to

5    feel sadness and remorse and tears rolled down

6    his eyes during the interview."  He does feel

7    remorse, and I've talked about that, the psych

8    talked to him.  "Inmate Macmweekin has been

9    exemplary in not receiving any 115s during his

10   incarceration, and only one 128 counseling for

11   not reporting the Central Textile Garment

12   Factory.  Giving this reputation for compliance

13   and following regulations, inmate Macmweekin

14   presents a well below average risk for violence

15   when compared to the general level inmate

16   population."  Okay, the D.A. says that he needs

17   to be in here because he will obey the law.

18   He's below this Level II, which is low to begin

19   with.  But what we're interested in is what is

20   he going to do when he gets out on the streets?

21   "If released to the community, inmate

22   Macmweekin's potential for violence is most

23   likely equal to that of the average citizen.

24   The reason for this conclusion is that the

25   object of his rage, his mother, is the sole

26   primary maternal figure in his life since one

27   can realistically only have one mother."  Now,

31

```
 1   let's not trivialize that.  We are talking is he
 2   a danger to the average person in society?  No,
 3   they don't -- this was a special on going for
 4   years of abuse between the two and that's the
 5   issue.  When he gets out he is not going to have
 6   another mother; he's not going to -- the average
 7   person on the street does not fit the category
 8   where he is liable to turn around.  So, that is
 9   not a frivolous statement; that describes how
10   this happened.  "Lastly, he has been
11   incarcerated for most of his adult life without
12   becoming involved in the criminal lifestyle in
13   prison."  This is very important.  This has been
14   a unique and very memorable 16 years of his
15   life, which has caused him great caution and
16   never considering violence.  "Inmate Macmweekin
17   is confident and responsible for his behavior.
18   He has demonstrated excellent impulse control,
19   judgment and coping strategies within a
20   demanding institutional environment, to remain
21   without CDC 115s, and conversely to abide by
22   institutional standards and regulations."  Now,
23   he does state, and this only makes sense, and I
24   talked to my client and he intends to be in AA.
25   "He will find it helpful and he should be tested
26   for drugs and alcohol."  Sure, that's what --
27   this is a good solid psych report.  He didn't
```

32

1    sugar coat it or anything, he says the guy has

2    his problems, and he's overcome them while he's

3    been in here, and if he gets out he has to be in

4    it and he has to be tested.  But as far as his

5    dangerousness to the average person on the

6    street he is no more than average.  He has done

7    the programs while he's been in, and he has an

8    excellent psych report.  Now my client isn't

9    here and he did ask me to read his closing

10   statement --

11        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

12        **ATTORNEY SPOWART:**  -- which I would like

13   to do.  "I wish to convey to this Panel today

14   that I continue to accept full responsibility

15   for the crime that I committed.  In regards to

16   the charge, I plead guilty to the second-degree

17   murder with malice of forethought.  My feelings

18   toward the crime that I committed is that I am

19   so very deeply sorry and saddened for what I

20   did, as I live with this grief each and every

21   day of my life.  I am truly aware that my mother

22   suffered because of my senseless action in which

23   I acted upon an impulse of anger, giving no

24   thought or care to her life or to the pain and

25   grief which I would cause to so many people.  I

26   am aware of all the pain that I caused to my

27   family, relatives and each individual who

33

1   enjoyed a personal relationship with my other.
2   I am so deeply sorry to my mother, to my family
3   and to all the victims that I created because of
4   violent actions that I took on that morning.
5   Had I taken a moment to reflect in the situation
6   and make an attempt to calm myself in the
7   argument through constructive dialogue, this
8   senseless crime could have been avoided and my
9   mother would be alive today.  I have done much
10  personal reflection over these past 19 years and
11  looking at my adolescence years I do recognize
12  that I should have taken the corrective steps
13  and sought out individual therapy and family
14  counseling to deal with feelings from childhood
15  that I kept bottled up inside.  However, I
16  failed to take the imitative at all and chose
17  the path in my life that was reckless and
18  irresponsible, not just for myself but to my
19  parents, my brothers, my relatives, and each
20  individual that I shared a personal relationship
21  with.  For this, too, I am sorry.  I have made
22  attempts over the years to make reparations to
23  each individual that I caused pain and grief.
24  Although apologizes and explanations as to why
25  this all happened may not be enough, I have
26  tried to make them aware of my personal change
27  through the rehabilitive efforts and

34

1    opportunities that have been afforded me.    In

2    reference to my application for parole, it is my

3    hope that my rehabilitive efforts are

4    acknowledge: The individual counseling and

5    psychologist, (indiscernible) return to society,

6    disciplinary free, group meetings, high school

7    diploma and two years of college, marketable job

8    skills -- "

9                    (TAPE 1, SIDE A, ENDS)

10                    (TAPE 1, SIDE B, BEGINS)

11           **DEPUTY COMMISSIONER MEJIA:**  Back on record.

12           **DEPUTY COMMISSIONER MEJIA:**  Yeah, now this last

13    statement that I was reading, I believe this letter

14    was the same one that he read last time.

15           **PRESIDING COMMISSIONER ST. JULIEN:**  It has some

16    additional information.

17           **ATTORNEY SPOWART:**  (indiscernible) he doesn't

18    have them, letters this time.

19           **PRESIDING COMMISSIONER ST. JULIEN:**  Uh huh.

20           **ATTORNEY SPOWART:**  Letters of support from my

21    family, providing housing support, because his brother

22    had moved.  "I am sincere in what I have expressed to

23    this Panel today and I think you for this time in

24    reviewing my application for parole.  Signed Keith

25    Allen Macmweekin."  And with that I would just like

26    to, once again, make the statement how he really has

27    programmed in an excellent manner.  I would ask for no

 1    more than -- if you don't give him a date today, I ask

 2    for no more than a one-year denial, because he is

 3    doing everything that he can.  Thank you.

 4          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay, thank

 5    you very much, sir.  Okay, we will recess for

 6    deliberations.

 7                        **R E C E S S**

 8                          --oOo--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

36

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER MEJIA:   We're back on

4    record for our decision on Mr. Macmweekin's

5    case.   Commissioner, we are on record.

6          PRESIDING COMMISSIONER ST. JULIEN:   Okay.

7    All parties have returned to the room.   The

8    Panel has reviewed all the information received

9    from the public and relied on the following

10   circumstances in concluding that the inmate is

11   not yet suitable for parole and would pose an

12   unreasonable risk of danger to society or a

13   threat to public safety if released from prison.

14   Specifically, as it regards the commitment

15   offense, the offense was carried out in a cruel

16   manner, and this was the murderer of the

17   inmate's mother, Madeline Macmweekin.   And the

18   crime occurred on or about September 24, 1985,

19   and September 24th is the day police officers

20   had discovered the body, and apparently she was

21   killed the night before.   Mrs. Macmweekin was

22   living with her 17 year-old-son at the time, the

23   inmate, Keith.   Apparently they had had a

24   tumultuous relationship in that there were often

25   arguments and some of those arguments had

26   actually even led to physical altercations.   And

27   **KEITH MACMWEEKIN D-30728 DECISION PAGE 1 3/14/06**

37

1    apparently on this day, the inmate had been
2    drinking and using drugs.  He was supposed to go
3    to work that morning and was not inclined to do
4    so.  His mother was trying to encourage him to
5    go to work and there, again, an argument
6    ensured, and apparently the inmate turned -- his
7    attitude turned into a violent rage and he began
8    to struggle with his mother.  He stabbed her; he
9    took a knife from the kitchen and stabbed her.
10    I think, one stab wound was to the waist and
11    there was some defensive wounds on her hands and
12    arms.  And then the inmate proceeded to strangle
13    Mrs. Macmweekin with his hands, and in an effort
14    to, quote unquote, put her out of her misery, he
15    found a necktie, knotted it around her neck and
16    strangled her until she no longer moved.  And
17    this crime, in deed, was carried out in a manner
18    which demonstrates a callous disregard for human
19    suffering, in that to ensure that his mother was
20    dead and could not call for help, the inmate did
21    remove the ability for his mother to use the
22    phone, so that she could not call for any
23    medical help or other types of help, and he left
24    the apartment after taking his mother's money
25    and car.  And the inmate fled to Mexico and was
26    there, I don't think, for very long.  He was
27    **KEITH MACMWEEKIN D-30728 DECISION PAGE 2 3/14/06**

38

1    arrested on May [sic]26th, so I think that was

2    probably just a day or so that he went to

3    Mexico.  However, these circumstances of the

4    crime do show that the inmate did act in a

5    violent rage and murdered his mother.  In terms

6    of a previous record, there are two minor

7    juvenile arrests and no prison time or CYA time.

8    The inmate, however, does have a social history

9    that includes alcohol abuse at a very young age

10   as well as illegal narcotics use.  His

11   programming while in the institution has been

12   very good.  His psychological report, dated

13   October 2, 2003, by Dr. Steward, is favorable,

14   favorable, however, conditional.  The

15   psychologist says that "the inmate would pose a

16   low risk of future dangerousness as long as he

17   abstained from alcohol or illegal narcotics."

18   In terms of parole plans, the inmate definitely

19   needs to work on his parole plans.  He needs to

20   develop violable residential plans, whether it

21   be in transitional housing, a halfway house,

22   that type of thing, with a friend or relative,

23   either one of those options, he needs to get two

24   options and that would serve him well.  If the

25   first option doesn't work out, as it hasn't in

26   the past, in review of the record, at one point

27   **KEITH MACMWEEKIN D-30728 DECISION PAGE 3 3/14/06**

```
 1  in time the inmate was going to live with his
 2  wife, they are now divorced, so that fell
 3  through; he was going to live with his brother,
 4  the brother cannot be located, so that fell
 5  through.  So, I would strongly suggest that the
 6  inmate develop two solid residential plans as
 7  well as continuing his search for acceptable
 8  employment plans.  And those are things, again,
 9  that are difficult to do; however, the effort,
10  any effort that he puts in will be to his avail.
11  And I do note that the letters I think he had
12  today in regards from the Union, are the same
13  that he had before, so he needs to constantly
14  and consistently keep up his search not only for
15  a parole residence, but for viable options in
16  terms of a job to support himself.  In regards
17  to 3042 Notice, we note that the District
18  Attorney of Orange County has expressed
19  opposition to a finding of parole suitability.
20  And we find in our findings that we would
21  certainly have liked the opportunity to discuss
22  with the inmate some of the questions that we
23  had, not only about the crime, but more
24  importantly, I think, about his insight into the
25  crime, what were the triggers, because it is
26  only through an exploration of his insight into
27  KEITH MACMWEEKIN D-30728 DECISION PAGE 4 3/14/06
```

40

```
 1   the causative factors of this crime that the
 2   Board can be assured that the inmate has put
 3   these factors behind him and is not likely to
 4   repeat these actions.  And I, also, noted in the
 5   psychological report that the inmate wanted to
 6   discuss his life and all these issues with the
 7   psychologist and so he apparently does have the
 8   need to discuss these things about himself and I
 9   would like to let him know that at any point in
10   the future the Board would, also, be interested
11   in talking to him about not only his past but
12   his future.  And I would also like to say that
13   the inmate, in terms of parole plans, if he
14   would also develop a relapse prevention program
15   that that would be beneficial to him as well, so
16   that we can be assured that his alcohol and drug
17   use is behind him as well.  Perhaps there is an
18   outside agency like Friends Outside, something
19   like that, that he can contact in terms of
20   guidance as to how he might want to put his
21   future plans together.  And we do note that the
22   inmate demonstrates an ability to recognize that
23   what he did was wrong; however, we don't know if
24   there is any insight there.  And we, again,
25   would like to examine the facts and
26   circumstances of his life and his crime in a
27   KEITH MACMWEEKIN D-30728 DECISION PAGE 5 3/14/06
```

41

1   manner that we can be assured that he

2   understands what prompted him to commit the

3   crime and that he will not do that again.   And

4   we would like to give him some commendations for

5   his prison behavior.   Commissioner Mejia.

6       **DEPUTY COMMISSIONER MEJIA:**   Yes.   He

7   should be commended for being disciplinary free,

8   no 115s, administrative 115s, throughout his

9   incarceration, and only one 128, which was in

10  1991.   He has his GED and has college credits

11  that he has earned through the early '90s.   He

12  has an exemplary work report, and has been in AA

13  consistently since 1991.   And he has two

14  vocations:   Vocational Drafting, and Offset

15  Printing.   Nevertheless --

16      **PRESIDING COMMISSIONER ST. JULIEN:**   Okay,

17  however, those positive aspects of his behavior

18  do not outweigh the factors of unsuitability.

19  And we are going to deny parole for two years.

20  And we are going to do so because we have --

21  it's a separate decision, and we find that the

22  inmate has been convicted of murder, and it is

23  not reasonable to expect that parole would be

24  granted at a Hearing during the next two years.

25  Again, specific reasons for this are the

26  commitment offense; this was the murder of the

27  **KEITH MACMWEEKIN D-30728 DECISION PAGE 6 3/14/06**

42

```
 1  inmate's mother.  Apparently there had been a
 2  tumultuous relationship between the two.  The
 3  mother, apparently, was a heavy drinker;
 4  however, by all accounts she was trying to
 5  encourage her son to work and to not use drugs
 6  or abuse alcohol.  However, on the morning of
 7  the murder, the inmate had been previously
 8  impaired either by drugs or alcohol.  His mother
 9  awakened him to go to work; he refused.  They
10  got into a argument and, apparently, it became
11  physical.  The inmate took a knife and began to
12  stab his mother.  She received stab wounds in
13  the side and then on both hands and she had a
14  broken figure.  The mother was then, at some
15  point in time, dragged into another room.  The
16  inmate strangled her with his hands and then to
17  ensure that the mother was dead and, quote
18  unquote, put out of her misery, the inmate took
19  a man's necktie and strangled her.  And then to
20  ensure that the mother could not call for help,
21  the inmate disconnected the telephone, took some
22  of his own mother's money and car and fled to
23  Mexico.  So, we do find that this was an offense
24  that was carried out in a manner which
25  demonstrates a disregard for human suffering.
26  And in terms of the inmate's past, there were,
27  KEITH MACMWEEKIN D-30728 DECISION PAGE 7 3/14/06
```

43

1   apparently, heavy drinking and illegal narcotics
2   usage at a very young age.  And apparently the
3   inmate has made a tremendous shift.  Earlier
4   records do show that the inmate was quite
5   troubled, depressed and had a suicide attempt.
6   However, hopefully, these issues are behind him.
7   He has been programming very well.  However, do
8   to the severity of this crime, we do find that
9   he does need additional observation and
10  evaluation in a structured environment.
11  Therefore, a longer period of evaluation is
12  required before the Board should find that he is
13  suitable for parole.  We recommend that he
14  remain disciplinary free and, also, if
15  available, he should participate in any self-
16  help programming.  Commissioner Mejia, did you
17  have any comments?
18          **DEPUTY COMMISSIONER MEJIA:**  No further
19  comments, Commissioner.
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  **KEITH MACMWEEKIN D-30728 DECISION PAGE 8 3/14/06**

44

1        PRESIDING COMMISSIONER ST. JULIEN:   Okay,

2   this will conclude the Hearing.   It is

3   10:28 A.M.

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   PAROLE DENIED TWO YEARS

23   THIS DECISION WILL BE FINAL ON:07/12/2006

24   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

25   DATE, THE DECISION IS MODIFIED.

26   KEITH MACMWEEKIN D-30728 DECISION PAGE 9 3/14/06

45

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, J. FARNCOMB, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total One in number and

cover a total of pages numbered 1 - 44, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING of KEITH

MACMWEEKIN, CDC NO. D-30728, on MARCH 14, 2006, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated March 30, 2006, at Sacramento,

California.


J. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**