# EXHIBIT 3



ORANGE COUNTY
**PROBATION DEPARTMENT**
PREPLEA REPORT

SUPERIOR   COURT, Dept./Div. __47__   Time __9 a.m.__

Hearing

| | | | |
|---|---|---|---|
| Defendant's Full Name: | MAC MEEKIN, Keith Alan | | |
| AKA: | | F&S Date: 4-25-86 | |
| Address: | 5600 Orangethorpe #3404 La Palma | c-58236 | A-149378 |
| Present Whereabouts: | OCJ | DPO: Albert Garcia/dw | |
| Telephone: | 670-7846 | Attorney: Public Defender | |

### COURT STATUS

Present Offense __187 PC (Murder)__

Date of Offense __9-24-85__   Arresting Agency __LaPalma PD__

Inf./Comp. Filed __10-31-85__   Guilty by __N/A__   Date of Arrest __9-26-85__

Days in Custody __212__   Codefendants __"__   Date __N/A__

### DESCRIPTION

Age __19__   DOB __11-4-66__   POB __Long Island, NY__   Ethnic Background __Cauc__   Sex __Male__

Height __6'0"__   Weight __160__   Hair __Brown__   Eyes __Hazel__   Complexion _____

Identifying Marks __Scar back of R/hand__   Social Security No. __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__

Date of Arrival in California __1969__   Date of Arrival in Orange County __1985__

FBI __450135EA3__   CII __A08024521__   OCSO __583566__   Operator's License __C5621394__

Expiration Date __1988__

| PRIOR PROBATION GRANTS | | SEE REPORT | | PRIOR PAROLE GRANTS | | |
|---|---|---|---|---|---|---|
| Year | County | Term | Year | State | Term | |

### EMPLOYMENT HISTORY

Last or Present Employer __Pro Pak__   Address _____   City __Santa Fe Springs__

Date Began __9-84__   Date Terminated __9-24-85__   Reason _____

Type of Work _____   Work Phone _____   Salary __$5/hr.__

Previous Employment:

| Dates | | Employer | Type | Salary | Reason Terminated |
|---|---|---|---|---|---|
| From | To | | | | |
| 4 months - age 16 | | Sherman Oaks Printing | Counter Help | Min. wage | |
| 3 months - age 15 | | Construction | Labor | Min. | |

### MARITAL HISTORY

| Present Spouse | Home Address | | DOB | Date & Place of Marriage | Status |
|---|---|---|---|---|---|
| None | | | | | |
| Occupation | | Employment Address | | | |

| Children | Address | DOB | Sex | Other Parent |
|---|---|---|---|---|
| N/A | | | | |

| Previous Marriages | Address | Date Married | Terminated |
|---|---|---|---|
| N/A | | | |

PREPLEA REPORT
~~PRESENTENCE REPORT~~

**CONFIDENTIAL**
Per Sec. 11142 P.C. The Furnishing of this Report, or Information Contained within, to an Unauthorized Person is a misdemeanor.

F0502-1020.8 (A) (8/79)

## FAMILY DATA

Father __William H. MacMeekin__ Age __51__  DOB __Unknown__ POB __New York__  Died _____

Address __14923 Moore Park #303 Sherman Oaks__ Telephone _____ Ethnic Background __Cauc.__

Occupation __Recording engineer__ _____ Religion __Protestant__

Marriage Date __25 years__ Status __Divorced 1984__

Mother __Virginia MacMeekin__ Age _____ DOB _____ POB __New York__  Died __1985__

Address _____ Telephone _____ Ethnic Background __Cauc.__

Occupation _____ Religion __Protestant__

Other Marriages: Father

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|--------------------|
| N/A | | | |

Other Marriages: Mother

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|--------------------|
| N/A | | | |

| Brothers & Sisters | Age | Address | | | | Occupation |
|--------------------|-----|---------|--|--|--|-----------|
| | | No. | Street | City | State | |
| Glenn MacMeekin | 27 | 7340 Millwood #7, Conoga Park – 91304 | | | | |
| Kerry MacMeekin | 25 | 3107 Cobb Cir., Simi Valley – 93065 | | | | |
| William MacMeekin | 23 | 21801 Roscoe Bovd #133, Conoga Park  818/347-1611 | | | | |

| Former Residences | Dates | |
|-------------------|-------|--|
| | From | To |
| New York | Birth | 1968 |
| Tenn. | 1968 | 1969 |
| California | 1969 | Present |

## EDUCATIONAL BACKGROUND

Last attended 1984

Highest grade completed __11th grade__  Where __Canoga Park HS__  Degrees held

## MILITARY RECORD

Branch __N/A__ Dates of Service _____ Service No. _____

Highest rate or rank _____ Type of Discharge _____ Job Classification _____

Duty Assignments _____ Honors & Benefits _____

## PERSONAL INFORMATION

Health __"Fine"__  Health Problems __None__  Organizations–Religion __Protestant__

Hobbies and Interests __Sports__

Habits

Tobacco: __1 pack/day__

Liquor: __12  pack beer/day__

Drugs: __MJ daily 2 X; cocaine daily ¼-½ gram.__

Vehicle License No. _____  Firearms owned / possessed: __Denies__

Type __Fiat Spider__

Color __Burgandy__

Year __1974__

Additional Data:

MAC MEEKIN, Keith Alan

Page 3

COURT STATUS:

On October 31, 1985, a one-count Information was filed against the defendant charging him with one count of violation of Section 187 of the Penal Code (Murder). On March 25, 1986, the matter was continued to April 25, 1986, for a preplea report.

CIRCUMSTANCES OF THE OFFENSE:

Charges were filed against the defendant after he was accused of beating and strangling his mother, Virginia Madeline MacMeekin, with a necktie.

According to records of the La Palma Police Department (DR85-1207), on September 24, 1985, at approximately 9:30 a.m., officers responded to 5600 Orangethorpe, Apartment 3404, to check on the welfare of Virginia Madeline Mac Meekin. Officers had been informed that at approximately 8 a.m., a struggle and a woman screaming had been heard coming from the apartment. Maintenance personnel and the apartment manager had knocked at the door and received no response and observed the front window screen damaged. Officers arrived at the location at approximately 9:35 a.m. Officers were informed by nearby residents that a struggle had been heard coming from the apartment number 3404. A woman had been heard to scream at approximately 8 a.m. by Maria Balter, who subsequently contacted the apartment manager to have the apartment checked. The manager had not received a response after knocking at the door and police were called.

Officers were informed that a 17-year-old boy lived with his mother at the location and that they had been very quiet tenants. Officers went to the apartment front door and knocked several times but received no response. Officers tried the doorknob, but discovered

MAC MEEKIN, Keith Alan                                              Page 4

1  that the dead bolt was in place.  Officers obtained the passkey from
2  the apartment manager and succeeded in unlocking the door.  Officers
3  entered the apartment and identified themselves as police officers
4  but did not receive a response.  Officers immediately observed a
5  bloodstain on the east wall of the entry foyer approximately 5½ feet
6  from the floor above a switch plate.  Officers noted fake flowers
7  laying on the carpet of the living room.  They noted it appeared as
8  if a struggle had appeared in the room.  Officers subsequently
9  observed that the master bedroom door at the end of the hall was closed.
10 Officers subsequently opened the door and observed the victim, Virginia
11 Madeline Mac Meekin, lying in a supine position with her head and
12 upper torso covered with loosely piled clothing.  Officers noted that
13 she was not moving and that her arms were stretched flat on the floor
14 diagonal to her body above her head.  Officers observed blood and
15 what appeared to be lacerations on both her hands.  It was noted she
16 was wearing ankle-strapped high-heeled shoes that were still strapped
17 to her ankles, but the shoes were off the soles of her feet.  Officers
18 checked the victim's right wrist for a pulse and found none and
19 noted that her arm was cold to the touch.  Officers lifted the clothing
20 from her face and observed blood in her mouth and a swollen tongue.
21 Officers also noted that her eyes were closed and puffy and that there
22 was a man's necktie tied with a knot around her neck.

23      Officers exited the master bedroom and looked into the north
24 bedroom.  They observed male clothing to be lying  on the floor and
25 bed and the room appeared to be disheveled.  Officers observed a
26 bloodstain on the carpet of the living room and a small bloodstain on
27 the living room threshold of the east door jamb of the front door.

28

MAC MEEKIN, Keith Alan

1    Officers subsequently called homicide investigators to the scene.

2         A subsequent autopsy by the Orange County Coroner's Office

3    revealed the cause of death to be strangulation.  A subsequent

4    investigation revealed that the victim's 1979 Volkswagen Rabbit was

5    gone, and that the victim's son, Keith Alan Mac Meekin, had not

6    reported for work.  Officers were subsequently contacted by a witness,

7    Martin Kovach, who indicated he had read about his girlfriend's death

8    in the paper.  He indicated that he had dated the victim approximately

9    four months and that they had been very close.  He indicated that the

10   victim was having problems with her son, Keith, regarding his cocaine

11   usage and alcohol abuse.  He indicated that the victim had kicked

12   Keith out approximately a month before, but that she had let him come

13   back.  Mr. Kovach indicated that the victim and her son would fight

14   and argue, and that they both had a bad temper and that they would

15   have fistfights.

16        On September 26, 1985, officers of the Immigration and

17   Naturalization Service stopped the defendant in the suspect vehicle

18   as he attempted to return to the United States from Mexico.  The

19   defendant was detained for La Palma Police.  The defendant was sub-

20   sequently transported to the La Palma Police Department where he made

21   a written confession.  The defendant indicated that he had become

22   involved in an altercation with his mother over her insisting he go

23   to work the morning of the incident.  He stated that she was yelling

24   at him and that they subsequently became involved in an altercation

25   where she pulled his hair and scratched his face.  The defendant

26   indicated that he picked up a knife to make her back up from him, but

27   that she was subsequently cut on the side and that he then grabbed her

28

MAC MEEKIN, Keith Alan

1  by the neck with his hands without knowing what he was doing.  He

2  indicated that he squeezed her throat until she no longer moved.  He

3  said that he subsequently saw blood coming from her mouth and that

4  he panicked.  He stated he went to his room and picked up a necktie

5  and put it around her throat and tightened it until she no longer

6  moved.  He stated that not knowing if she was dead, he pulled her into

7  her bedroom and put some clothing items on her face.  He indicated

8  that he went to her purse and took her wallet, grabbed some clothing,

9  and disconnected the phone.  He indicated that he had disconnected

10 the phone in order to prevent her from calling police if she was still

11 alive.  He indicated he went out the front door, locking it behind

12 him, and took her vehicle.

13 VICTIM INFORMATION:

14        Orange County Coroner's information indicates the victim died

15 of strangulation.  The palms of both the victim's hands had shallow

16 cuts and the left middle finger was broken.

17        The probation officer contacted Madeline Brown, mother of

18 the victim.  Mrs. Brown indicated that her daughter and the defendant

19 were "having difficulties", and that these problems were in relation

20 to the defendant being "into dope".  She related that her daughter did

21 not discuss any particulars with her, but indicated that there were

22 problems but she did not appear overly concerned.  Mrs. Brown indicated

23 that the defendant and his brothers suffered difficult times due to

24 their father, and that both the defendant's father and mother abused

25 alcohol.  Mrs. Brown indicated that she had no indication that the

26 defendant ever struck his mother in the past, although they had argued.

27 She indicated that the defendant has written to her and has apologized

28

MAC MEEKIN, Keith Alan

1   for his actions in his letters and that he recognizes that what he
2   did was wrong.  She indicated that the defendant and his mother were
3   very close and that they only had each other to depend on.  She
4   stated the victim was a "good person" who loved her family.  She
5   stated the defendant had "a rough time growing up" and that it was
6   her belief that he "needs help".  She indicated that it was her belief
7   the defendant should receive some type of "therapy and counseling"
8   wherever he may be incarcerated and that she believes the defendant's
9   exhibition of violence was a "temporary sort of insanity that drove
10   him to anything like that."  She reported that her main concern is
11   that the defendant "be in a place where  he will get help".

12   <u>DEFENDANT'S STATEMENT:</u>

13          The defendant was interviewed at the Orange County Jail and
14   provided an oral statement.  The defendant stated that he had killed
15   his mother, although it had occurred after a night of drinking,
16   smoking marijuana and using cocaine.  He stated that he "argued daily"
17   with his mother, and that part of the ongoing arguments they had
18   had to do with a vehicle he had purchased which had broken down after
19   he purchased it.  He stated, "She used to bicker about things
20   constantly," and ."I couldn't get along with her."  He stated that he
21   tried to stay away from her, but that he "had to stay by her",
22   because she had bad knees and could not do some things for herself.
23   He stated, "We couldn't stand each other, but I couldn't leave her."
24   He stated that there was not much contact with other members of the
25   family and that he was "the only son around".  He stated their
26   relationship was "almost like a 24-hour argument", as they used to
27   ride to work together and worked next to each other.

28

1    The defendant reported that the night prior to the killing he
2    had been drinking alcohol, smoking marijuana and using cocaine until
3    approximately 5 a.m.  He reported he would go to his friend, Dave
4    Molina's, almost daily in order to get away from his mother.  He
5    stated that at 5 a.m. he went home and had not been able to fall
6    asleep until almost 6 a.m.  He stated he slept on the couch in the
7    living room and that his mother had awakened him at approximately
8    7 a.m. to go to work.  He stated he told her he was not going to work
9    and that she began to argue with him and told him, "You're going to
10   work."  The defendant indicated that his mother insisted that he go
11   to work and that they argued approximately 15 to 20 minutes.  He
12   reported the argument became physical and that he cannot remember
13   everything that transpired.  He stated that he does remember wanting
14   to get away from his mother and that "I couldn't handle myself that
15   morning, I was too tired and couldn't stand her yelling at me."  He
16   stated that he backed into the kitchen and picked up a knife that was
17   on the table from the previous evening and told her, "Get out of here,
18   I'm not going to work."  He stated his mother told him, "Quit fucking
19   around," and that she proceeded to try and get the knife away from
20   him.  The defendant stated that he backed up to the wall and his
21   mother attempted to wrestle the knife from his hand.  He stated that
22   after he hit the wall a mirror fell on his foot and that he bent down
23   and fell and somehow cut his mother's side.  He stated that she
24   screamed and that he, at this time, threw the knife away.  He stated
25   his mother began beating him with her hands on the face and he
26   initially did not react.  He stated, "Something upset me and I went
27   for her neck, I don't know why."  He stated he choked her with both
28

1   hands as they were on the ground and that she ultimately did not

2   move.  He stated that not knowing if she was dead or not, and after

3   thinking about it, decided that if she was not dead, that he would

4   "put her out of her misery".  He stated that he subsequently took a

5   necktie that he had worn a few evenings before and knotted it around

6   her neck.  He stated he subsequently dragged her to her bedroom when

7   he realized she was dead and covered her face with clothing as he

8   "couldn't stand to look at her eyes", which he described as bulging

9   out of her head.  He stated that he gathered some of his belongings

10  and left for Los Angeles in his mother's car.  He stated he looked for

11  a friend who ultimately advised him to go to Mexico.  He stated

12  after spending some time in Ensenada he decided to return in order to

13  turn himself in.  He stated he was arrested at the border in Tijuana.

14          The defendant reported that, "I wish I could understand the

15  nature of my act," and that he was very remorseful for what he had

16  done.  He stated, "I still can't believe what I did," and that "I hate

17  myself for what I did."  He stated it is his belief that part of

18  the problem was, "I didn't get enough counseling", and that "I really

19  loved my mother."  The defendant stated, "I love my mom so much, she

20  tried to help me so much."  He stated that she meant the world to him

21  and that "She was all I had, I was all she had."  He stated that he

22  intended to kill himself because "I just wanted to die", by swallowing

23  two razor blades.  He stated that part of this act was related to

24  his narcotic usage and the fact that he "grew up on my own".  He

25  stated that he had no supervision and "nobody to teach me things",

26  due to the divorce of his parents and his mother becoming an alcoholic

27  afterwards.  He stated that although he feels he wanted to die, he

28

1  believes that he just wants to "do my time in prison" and ultimately

2  stay away from drugs.  He stated, "I just want to change the kind of

3  person I am," and that he had never previously been a violent person.

4  He stated that no one else was aware of the problems that he  and his

5  mother had because "There was no one else around," and that he was

6  the "only one who cared about mom".

7  STATEMENT OF REFERENCES AND INTERESTED PARTIES:

8         The defendant provided two references for this department

9  to contact on his behalf.  Kerry Mac Meekin, the defendant's brother,

10  contacted the probation officer by telephone.  He indicated that his

11  brother had had a good reputation for honesty and that he was

12  regularly employed.  He indicated he has no knowledge of any narcotic

13  abuse on the part of the defendant, but indicates that he drank

14  alcohol but "wasn't a boozer".  He indicated that the defendant was

15  a fairly ambitious individual and was someone who "wants to make

16  something out of his life".  He described his brother as a "good kid"

17  who suffered heavily from the volatile relationship between their

18  parents.  He stated both parents were "heavy drinkers" and that the

19  defendant was in the worst position of all the siblings, having been

20  the youngest and being witness to the "madhouse" situation at home.

21  He stated that it was his belief that the defendant should have "good

22  therapy" while incarcerated and would not wish to see his brother

23  incarcerated without any positive benefit.  He stated his brother

24  was "never in any real bad trouble", and that he always helped out his

25  mother.  He stated that all the members of the family had a "temper

26  problem", although the defendant never demonstrated this to any great

27  extent.  He related that his mother also had "quite a temper", and that

28

1    it was unlike his brother to be involved in such a violent act.  He

2    stated his brother "is not at fault for what he did", as it was a

3    result of problems that "built up after years of fighting" between

4    the parents.  He stated his brother had to put up with "the constant

5    bullshit at home", and that his brother often received abusive

6    punishment on the part of their father.

7        Attempts to contact William Mac Meekin by mail and by

8    telephone have met with negative results.  Should information be

9    received prior to the court date, it will be attached for the Court's

10   consideration.

11        Katrina Smith, the defendant's girlfriend, was contacted by

12   telephone.  She indicated she has known the defendant since approxi-

13   mately June of 1985, and that they lived in the same apartment complex.

14   She described the defendant as being a very honest individual and

15   that he was regularly employed.  She reported that she was aware the

16   defendant would provide money to his mother to help her with rent and

17   bills and that she was aware the defendant used cocaine heavily, as

18   well as marijuana.  She described the defendant as being "emotionally

19   insecure", and that he often talked about the difficult time he had

20   growing up.  She indicated the defendant reported that he had been

21   emotionally upset by the divorce of his parents, and that he was the

22   type of individual who was "easily influenced by others".  She stated

23   he did not have many friends and described the defendant as a "loner

24   and follower".

25        Don Scoles, Public Defender in this matter, contacted the

26   probation officer by telephone.  He indicated his belief that the

27   defendant should be housed at a California Youth Authority facility

28

MAC MEEKIN, Keith Alan

in order that he be able to take advantage of the educational programs and opportunities to participate in appropriate programs. He indicated that if sent to state prison, the defendant would "just be so much meat", and that the California Youth Authority had more appropriate detention facilities. He described the defendant as being "a very isolated individual" and that the defendant's mother was not supportive of the defendant and was "more of a hindrance than helpful". He reported that the guilt the defendant had to deal with was significant and that the defendant is of a youthful age and has no prior record and is criminally unsophisticated.

Ed Munoz, Deputy District Attorney in this matter, was contacted by telephone. He indicated that there would be no objection to the defendant being held in a Youth Authority facility, should he not be convicted of first degree murder, which would make him ineligible for such a placement. He indicated that this was an unusual matter and that the victim was the only person who had been supportive of the defendant.

A letter was sent to the La Palma Police Department, but at the time of dictation, no response has been received. Should information be received prior to the court date, it will be attached for the Court's consideration.

PRIOR RECORD:

Records of the California Bureau of Identification and Investigation reveal no prior entries for this defendant.

Records of the California Department of Motor Vehicles indicate the defendant's Class III driver's license is valid and expires on his birthdate in 1988. The Department of Motor Vehicles

MAC MEEKIN, Keith Alan

Page 13

1  records indicate the license was returned by the post office as

2  "unclaimed".

3  COLLATERAL INFORMATION:

4       Records of the Orange County Sheriff's Office indicates that

5  on November 8, 1985, the defendant attempted suicide by swallowing

6  two disposable trimming blades.  The defendant was transported to the

7  UCI Medical Center, where he was detained until the blades passed

8  from his body without the need for surgery.

9  PSYCHOLOGICAL INFORMATION:

10       Dr. Seawright W. Anderson examined the defendant pursuant

11  to Section 730 and 1017 of the Evidence Code.  Dr. Anderson concluded

12  the defendant exhibited a typical depression associated with alcohol,

13  cocaine, and marijuana abuse.  He indicated that at the time of the

14  offense, the defendant knew the nature and quality of his actions

15  and knew the difference between right and wrong.  He indicated that

16  he saw no indication of inpatient psychiatric treatment in a mental

17  hospital setting for the defendant unless ideas of suicide return.

18  He indicated that the defendant should continue psychiatric treatment

19  while in custody and to continue psychiatric treatment if sent to

20  a correctional facility.  He indicated that he believed the defendant

21  "would require well-structured and well-supervised outpatient

22  psychiatric treatment, in order to prevent his atypical depression

23  from regressing to a major depression."

24       David M. Pierce, Ph.D., examined the defendant pursuant

25  to Section 1026 of the Penal Code and Section 25 of the Penal Code.

26  Dr. Pierce reported that there was no data "to support an opinion

27  that he was incapable of knowing or understanding the nature and

28

MAC MEEKIN, Keith Alan

1  quality of his act or of distinguishing right from wrong at the time

2  of the commission of the alleged offense.  He indicated that the

3  defendant "is not disposed to violence".  A supplemental report from

4  Dr. Pierce indicates "It is my opinion that if he were to plead

5  guilty, placement in CYA would be preferable to state prison." He

6  reported the defendant would profit from continuing his education, he

7  would not receive treatment in prison, he is not predisposed to

8  violence, and that the Youth Authority "is more likely to be able to

9  bring together multiple resources that will enhance the probability

10 of rehabilitation."

11 SOCIAL HISTORY:

12         The defendant reported he was the youngest of four children

13 born to the union of his parents, which terminated in a divorce in

14 1984.  He stated that he was born in Long Island and raised in

15 California and that his father had worked as a recording engineer

16 in order to support the family.  He stated, however, that his father

17 was an "alcoholic" and that he spent much time out of work.  He

18 stated his father was "self-employed" and that his mother did not

19 begin working until after they separated.  He reported that they were

20 separated approximately five years before the divorce.

21         The defendant reported that as a youngster he participated

22 in Boy Scout activities and that it was his belief that his father

23 allowed him to participate in this in order to "keep him away from

24 the arguments".  He stated that two of his brothers ran away from

25 home and joined the service in order to get away from the turmoil at

26 home, which was almost constant.  He reported that he stopped attending

27 school in the 11th grade because he was "hanging around with friends.

28

1  who were smoking pot and ditching school". He stated that after

2  quitting school he began working and that he had worked in a medical

3  supply warehouse where his mother had gotten him a job. He stated,

4  "She promised to get me a job and she did," and that he had been

5  working there at the time of this incident. He reported that since

6  being in custody he had received his GED certificate in February of

7  1986.

8        The defendant reported that his health has always been good

9  and that he first became involved with marijuana and alcohol at age

10  15. He stated that he first tried cocaine at age 18 and that he

11  always snorted it.   He reported that he is not married and has no

12  immediate plans for marriage at this time. He stated that he never

13  had any family support and that he has "screwed up my whole life".

14  He stated that while in custody he hoped to be able to participate in

15  some correspondence college courses and that he looks forward to his

16  life whenever he is released. He stated that he plans to work while

17  in prison in order to "do my own time". He stated that his act "tore

18  apart my family and life", and that he plans to improve himself. He

19  stated he is trying to become a "reborn Christian", and that he has

20  no enemies in prison and is not a homosexual.

21        The defendant reported that he had attempted to commit

22  suicide in November of 1985 while in custody, by swallowing some

23  trimming blades from a razor. He related that when he was being

24  transported from the Mexican border to La Palma, he asked the detective

25  to "blow me away and get rid of my body", as he had not wanted to live.

26  He stated,"I don't think I deserve to live after what I did."

27  DISCUSSION AND EVALUATION:

28

1      Circumstances in mitigation in this matter relating to the

2   offense include the defendant's contention that the victim was an

3   initiator in the incident (Rule 423(2). Factors in mitigation relating

4   to the defendant in this matter include the defendant has no prior

5   record of criminal conduct (Rule 423b1), the possibility the

6   defendant was suffering from a mental or physical condition caused

7   by his alcohol or cocaine abuse, which may reduce his culpability

8   for the crime (Rule 423b2), and the fact the defendant acknowledged

9   wrongdoing at an early stage of the criminal process (Rule 423b3).

10      Circumstances in aggravation relating to the offense in

11   this matter include the fact the crime involved great bodily harm

12   and death, whether or not charged or chargeable as an enhancement

13   under Section 12022.7 (Rule 421a1), the fact the unarmed victim was

14   particularly vulnerable (Rule 421a3), and the fact the defendant

15   took advantage of a position of trust or confidence to commit the

16   offense (Rule 421a12). There would appear to be no factors in

17   aggravation relating to the defendant in this matter.

18      Criteria affecting the decision to grant or deny probation

19   in this matter include statutory provisions limiting or prohibiting

20   the grant of probation (Rule 414a), the nature, seriousness and

21   circumstances of the offense (Rule 414c1), the vulnerability of the

22   victim and  the degree of harm to the victim (Rule 414c2), whether the

23   defendant inflicted bodily injury (Rule 414c4), whether the crime was

24   committed because of an unusual circumstance, such as great provocation,

25   which is unlikely to recur (Rule 414c6), whether the defendant took

26   advantage of a position of trust or confidence to commit the offense

27   (Rule 414c8), the defendant's age, education, health, mental faculties

28

and family background and ties (Rule 414d4), the defendant's employment
history and financial condition (Rule 414d5), the danger of addiction
to or abuse of alcohol, narcotics, dangerous drugs or other mood or
consciousness altering substances (Rule 414d6), and the fact the
defendant has verbalized remorse for his actions (Rule 414d9).

It would appear that should the defendant plead guilty or
be found guilty as charged, that he would be statutorily ineligible
for probation, except in unusual cases, pursuant to Section 1203(e)(3)
of the Penal Code, in that he committed a felony aggravated by great
bodily injury. A perusal of the criteria affecting probation in
unusual cases would indicate that although the defendant is of youthful
age and has no significant record of prior criminal conduct, the
very nature of the offense would call for probation to be denied in
this matter. The defendant acknowledges culpability for the murder
of his mother and indicates that not knowing whether she was initially
dead or not, decided to "put her out of her misery" by strangling
her with a necktie. Psychiatric information would indicate the
need for ongoing psychiatric treatment of the defendant, which would
be available during his incarceration. Although information would
indicate the defendant may have been subjected to a "less than
desirable" upbringing, the defendant chose to continue living with
his mother of his own volition, rather than moving away and extricating
himself from a volatile living arrangement. Had the defendant
chosen to separate himself from the situation, this tragic, senseless
murder may not have occurred. It would appear the defendant's
immaturity and substance abuse may have contributed to the defendant's
aberrant behavior in this matter. It would be recommended at this time

MAC MEEKIN, Keith Alan                                              Page 18

1   that probation be denied for this defendant.  It is noted that

2   Section 1731.5 of the Welfare and Institutions Code allows for the

3   Court to refer the defendant to the California Youth Authority,

4   rather than send him to the state prison.  However, it is noted that

5   if the defendant were to be convicted of first degree murder, he would

6   not be eligible for such a detention commitment.  Were he to be found

7   guilty of a lesser offense, and probation be denied, it is possible

8   the defendant could be held at a Youth Authority facility through age

9   25, at which time he would be transferred to state prison should

10  there still be time left on his sentence.

11          Considering the gravity of the offense and the death of

12  the victim in this matter, it would appear that a Restitution Fund

13  fine in the amount of $10,000 would be appropriate.

14  RECOMMENDATION:

15          It would appear that should the defendant plead guilty or

16  be found guilty as charged, that probation be denied and that pursuant

17  to Section 13967 of the Government Code, the defendant be ordered

18  to pay a Restitution Fund fine in the amount of $10,000.00.

19                                  Respectfully submitted,

20                                  MICHAEL SCHUMACHER
                                    Chief Probation Officer
21

22

23                                  Albert Garcia
                                    Deputy Probation Officer
                                    834-4296
24  Dated this 25th day of April, 1986.

25  I have read and considered the foregoing
    report of the Chief Probation Officer.
26

27  JUDGE OF THE SUPERIOR COURT

28

# EXHIBIT 4

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
SEPTEMBER 2005 CALENDAR


MAC MEEKIN, KEITH                                            D-30728


I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Murder 2nd, PC 187, Orange County #C58263, sentence 15 years to
      Life; Received by CDC on 6/10/86; MEPD is 12/27/94. Victim: Virginia
      Madeline MacMeekin, age unknown.

1.    **Summary of Crime:** According to the records of the Las Palmas Police
      Department (DR85-1207), on September 24, 1985 at approximately 9:30
      a.m., officers responded to Apartment 3404 at 5600 Orangethorpe Avenue
      to check on the welfare of Virginia MacMeekin. Officers were previously
      informed about sounds of a struggle and of a woman screaming had been
      heard coming from the apartment. Maintenance personnel and the
      apartment manager had knocked on the door without a response and had
      subsequently called the police. The officers arrived about 9:35 a.m. and
      were informed that a seventeen year old boy and his mother lived at that
      location, and that they had been very quiet tenants. After knocking several
      times without response and discovering that the dead bolt was in place, the
      officers obtained a pass key from the manager and entered the apartment.
      They observed signs of a struggle in the entry foyer and living room. The
      officers opened the door to the master bedroom and observed the victim
      lying supine on the floor with her head and upper torso covered with
      loosely piled clothing. Blood and lacerations were on both of her hands.
      High-heeled shoes were still strapped to her ankles, but they were off the
      soles of her feet. Lifting the clothing from off of her face, the officers
      observed blood in her mouth, noted that her eyes were closed and puffy,
      and that there was a man's necktie around her neck. Homicide
      investigations were called to the scene.

      An Autopsy revealed the cause of death to be strangulation. The palms of
      both hands had shallow cuts, and the victim's left middle finger was
      broken. Subsequent investigation revealed the victim's 1979 Volkswagen
      Rabbit was missing and that the victim's son, Keith Alan Mac Meekin had
      not reported to work. As reported in the POR on page 5, a witness who
      had been dating the victim for about four months contacted the police after
      reading in the newspaper of her death. He indicated that the victim had
      been having problems with her son regarding his cocaine usage and his

COPY TO INMATE ON
June 13, 2005

alcohol abuse. He indicated that the victim had kicked her son out of her apartment about a month before, but had let him come back. The witness stated that the victim and her son each had a bad temper, that they would argue and have fist fights.

On 9/26/85, officers of the Immigration and Naturalization Service stopped MacMeekin as he attempted to return to the United States from Mexico. He was detained and subsequently transported to the Las Palmas Police Department, where he gave a written confession. (Source: P.O.R. pages 3-5).

2.    **Prisoner's Version:** In an interview for this report, MacMeekin indicated that his version remains the same as that provided for his 9/93 Initial Parole Consideration Hearing. In that report, MacMeekin provided the following account:

...between the hours of 7:00 p.m. on 9/23/85 and 5:00 a.m. on 9/24/85, he had consumed sixteen 8 ounce bottles of beer, had smoked two joints of marijuana and had snorted one and a half grams of cocaine. MacMeekin and his mother argued daily, particularly about his abuse of drugs and alcohol, his broken-down car, her alcoholism, her boyfriends and her sexual behavior regardless of his presence. On this particular morning, he had returned at 5:00 a.m. to sleep on the couch. He could not get to sleep until about 6:00 a.m. His mother awakened him at about 7:00 a.m., urging with him to go to work. After about fifteen to twenty minutes, the argument became physical. He stated that he was too tired and couldn't stand her yelling at him. He backed into the kitchen, picked up a knife from the table, warned her to back off and again stated that he wasn't going to work. She tried to take the knife away from him. He backed up against the wall, and a mirror fell down on his foot. He bent down and somehow cut into his mother's side. She screamed and he threw the knife away. She began beating him on the face. He said at this point, "I went for her neck. I don't know why." He stated that he choked her with both hands and, not knowing if she was dead yet, decided "...to put her out of her misery..." He therefore took a necktie, knotted it around her neck and strangled her until she no longer moved. He then dragged her to her bedroom and, after realizing that she was dead, covered her face with clothing. He stated that he then went to her purse and took her wallet, grabbed some clothes and disconnected the phone in order to prevent her from calling the police if she was still alive. He went out the front door, locking it behind him, and took her vehicle. He went looking for a friend in Los Angeles, who ultimately advised him to go to Mexico.

After spending some time in Ensenada, he decided to return to the United States in order to turn himself in. He was arrested at the border at Tijuana.

MAC MEEKIN, KEITH          D30728                    CTF-SOLEDAD          **SEPT/2005**

MacMeekin explained for the CYA report that he had had difficulty getting along with his mother, adding that he escaped from her on a daily basis by going to see a friend. He stated that even though they couldn't stand each other, he couldn't leave her on account of her bad knees and the assistance she sometimes required. He was the youngest of her sons around, and there was very little contact with other family members. He described his relationship with his mother as one of being very argumentive. They also rode to work together because they worked in adjacent buildings, this also provided more time for arguing. In an interview for the POR, MacMeekin stated, "I wish I could understand the nature of my act." He indicated remorse for what he had done.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**

1. Victim was particularly vulnerable.
2. Prisoner had opportunity to cease but continued with crime.
3. Murder was senseless and served no purpose in completing the crime.
4. Nature of crime exhibited viciousness, cruelty or callousness.
5. The inmate had a special relationship of trust with the victim, in that she was his mother.

b.    **Mitigating Factors:**

1. Prisoner has minimal history of criminal behavior.

B.    **Multiple Crime(s):** N/A.

1.    **Summary of Crime:** N/A.

2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** In an interview for the CYA Offense History, MacMeekin indicated that he had been arrested twice as a juvenile: First, at age 16 for possession of marijuana and then about six months later for joy riding. Both incidents were adjudicated under "Counseled and Released".

MAC MEEKIN, KEITH          D30728                    CTF-SOLEDAD          SEPT/2005

**B.**     <u>Adult Convictions and Arrests:</u>   The instant offense is the only arrest.

**C.**     <u>Personal Factors:</u> Inmate MacMeekin, the youngest of four children, was born in Long Island, New York on 11/4/66 to William and Virginia MacMeekin. Between the ages of 2 and 3, MacMeekin and his family lived in Tennessee. In 1969, they moved to California. The father was an alcoholic who physically abused his wife and children. The parents argued daily, and every one of MacMeekin's brothers described the home scene as a "madhouse". To escape this abusive home life, the two older sons joined the military; one joined the Air Force, and the other joined the Navy. After 25 years of marriage, the parents separated in 1980 and legally divorced in 1984. After the separation in 1980, Mrs. MacMeekin also became an alcoholic. MacMeekin, his mother and his immediate older brother moved to Orange County in 1985. Inmate MacMeekin's perception was that he grew up pretty much on his own. With an absent father and working mother, he had no supervision and no one to teach him how to do things. Additionally, no close relationships existed between MacMeekin and his brothers. Inmate MacMeekin and his mother became mutually inter-dependent, each apparently resenting the dependence needs of the other. Inmate Mac Meekin indicated that his mother began dating and would bring boyfriends to the house. Inmate Mac Meekin mentioned incidents in which he observed his mother and boyfriends having sex on the living room couch, incidents which he resented. He also stated that he often discussed this with her, and voiced his objections to her alcoholism. Since he had supported his mother in her decision to leave his father, he felt obligated to stay with her. He dropped out of high school in 1984, after completing the 11th grade at Canoga Park High. His work history prior to incarceration is minimal. His last employer was Pro Pak in Santa Fe Springs from September 1984 to September 1985. Inmate MacMeekin passed and obtained his GED while in the Orange County Jail in February 1986. Records of the Orange County Sheriff's Office indicate that on November 8, 1985, Inmate MacMeekin attempted suicide by swallowing two disposable trimming blades. He was transported to the UCI Medical Center, where he was detained until the blades passed from his body without the need for surgery. The file contains no evidence of sexual deviation or mental disorder.

## III.    POSTCONVICTION FACTORS:

**A.**     <u>Special Programming/Accommodations:</u>   N/A.

**B.**     <u>Custody History:</u> MacMeekin was received at CTF on 11/11/87 and has remained at CTF in the general population with Medium A custody. MacMeekin has been assigned as a culinary worker, porter, and teacher's aide since his last Board Hearing. (See Post Conviction Progress Report).

    **C.**    <u>**Therapy and Self-Help Activities:**</u>  Since MacMeekins's last BPT Hearing he has not participated in any activities.  (See Post Conviction Progress Report).

    **D.**    <u>**Disciplinary History:**</u>  Since MacMeekin's last BPT Hearing he has remained disciplinary free.

    **E.**    <u>**Other:**</u>  MacMeekin attended his Subsequent #7 Parole Consideration Hearing on 9/9/04.  Parole was denied for 1 year.  The Board recommended that MacMeekin remains disciplinary free; and participate in self-help programs and group therapy.

## IV.    <u>FUTURE PLANS:</u>

    **A.**    <u>**Residence:**</u>  MacMeekin plans to reside with his uncle, Tom Brown, who lives at 843 Sunston Street, Westlake, CA, 91362, phone number 818-597-1971.

    **B.**    <u>**Employment:**</u>  As of this writing, there are no support letters in C-File for future job offers.  MacMeekin has extensive training in Vocational Drafting, in Mechanical Printing and Off-Set Printing.

    **C.**    <u>**Assessment:**</u>  In review of MacMeekin's parole plans, this counselor does not foresee any problems, however, it is recommended that MacMeekin updates his support letters prior to his hearing.

## V.    <u>USINS STATUS:</u> N/A.

## VI.    <u>SUMMARY:</u>

    **A.**    Prior to release the prisoner could benefit from:
        1.  Continuing to be disciplinary free.
        2.  Participation in self-help and therapy programs.

    **B.**    This report is based upon an interview with the prisoner on 5/18/05 lasting approximately 1 hour and a complete review of the Central File lasting 2 hour(s).

    **C.**    Prisoner was afforded an opportunity to examine his Central File on 5/18/05. (Refer to CDC 128-B dated 5/18/05 in the General Chrono Section of the Central File.)

    **D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

---

MAC MEEKIN, KEITH        D30728        CTF-SOLEDAD        SEPT/2005

K. Heinly                          6-8-05
Correctional Counselor I           Date

J. Soares                          6/8/05
Correctional Counselor II          Date

M. Guerra    FC (A)                10/8/05
Facility Captain                   Date

D. S. Levorse    C&PR              6-13-05
Classification and Parole Representative    Date

MAC MEEKIN, KEITH          D30728                    CTF-SOLEDAD                **SEPT/2005**

BOARD OF PRISON TERMS                                                                      STATE OF CALIFORNIA
# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:   DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:   FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
| --- | --- | --- | --- |
| YEAR | BPT | PBR | REASONS |
| 10/1/03 to 9/30/04 | | | **PLACEMENT:** Remained at CTF-Central in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** MacMeekin was assigned to the culinary since 10/8/03 through 3/23/04. He received satisfactory to above average ratings verified by CDC 101 dated 3/1/04. On 3/23/04, MacMeekin was reassigned as a Porter. **GROUP ACTIVITIES:** MacMeekin did not participate in any group activities this period. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** MacMeekin remained disciplinary free during this period. **OTHER:** N/A. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                            DATE

                                          6-8-05

MACMEEKIN                    D30728                    CTF-SOLEDAD                    SEPT/2005

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/1/04 to 5/31/05 | | | **PLACEMENT:**  Remained at CTF-Central in the general population.<br>**CUSTODY:**  Medium A.<br>**VOC. TRAINING:**  None noted this period.<br>**ACADEMICS:**  None noted this period.<br>**WORK RECORD:**  MacMeekin has been assigned as a Porter since 3/23/04 through 3/1/05.  He has no CDC 101's for this period.  On 3/1/05, MacMeekin was re-assigned as a Teacher's Aide.  He has no CDC 101's for this period.<br>**GROUP ACTIVITIES:**  MacMeekin did not participate in any group activities this period.<br>**PSYCH. TREATMENT:**  None noted during this period.<br>**PRISON BEHAVIOR:**  MacMeekin remained disciplinary free during this period.<br>**OTHER:**  N/A. |

ORDER:

☐  BPT date advanced by      months.          ☐  BPT date affirmed without change.
☐  PBR date advanced by      months.          ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

MAC MEEKIN                    D30728                    CTF-SOLEDAD                    SEPT/2005

BOARD OF PRISON TERMS                                                                                                    STATE OF CALIFORNIA

# EXHIBIT 5

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**NOVEMBER 2003 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**OCTOBER 2, 2003**

**NAME:** MACMEEKIN, KEITH ALAN      **CRIME:**      Murder, Second Degree
**CDC #:** D-30728                              **TERM:**      15 years to life
**DOB:**      11/04/66                              **OFFENSE DATE:**   09/24/85
**AGE:**      36                                       **ARREST DATE:**    09/26/85
**RACE:** White                                   **SENTENCE DATE:** 04/25/86
**SEX:**      Male
**MARITAL:** Divorced
**RELIGION:** None stated
**EVALUATION DATE:** 10/02/03

**EVALUATOR:**    J. Steward, Psy.D.
                          Clinical Psychologist
**INSTITUTION:** Correctional Training Facility, Soledad, CA

This is the sixth psychological evaluation for the Board of Prison Terms for inmate
MacMeekin. Consequently, the psychosocial assessment in the prior report of 12/04/00
remains accurate, unless noted below. The current evaluation is based upon a personal
interview with the inmate, and a review of the Central file and medical records.

## PSYCHOSOCIAL ASSESSMENT

IV.    **FAMILY HISTORY:**

Inmate MacMeekin stated that his mother and father cheated on one another, and
when he was young, his mother took him to a man's house so she could sleep with
this other person. When 18 years old, he entered the apartment, only to
inadvertently and shockingly find his mother having sex with a man on the living
room couch. He immediately shut the door, and left the apartment area.

Inmate MacMeekin also reported how his father was such an alcoholic that it
destroyed his career as a recording engineer. Inmate MacMeekin's earliest
memory is coming home from school when six years old, being terrified because
he knew his father's alcoholic drinking would lead to him being at the peak of his
anger in the afternoon. His father attempted to help him with homework, but
became frustrated, yelling at inmate MacMeekin, then hitting him, at which time
he would run to his room. While remaining in his room, he could hear his parents
arguing, and a thumping sound that appeared to be his father hitting his mother.

MACMEEKIN, KEITH
CDC NUMBER:  D-30728
BPT MENTAL HEALTH EVALUATION
PAGE TWO

When 12 years old, inmate MacMeekin recalled his mother repeatedly and intensely yelling at his father until he snapped and threw a plate at his mother. Then his father would grab his mother, and at one time inmate MacMeekin ran up behind him to stop it, but his father pushed him away, attacking inmate MacMeekin verbally, and returning to hitting his mother.  Inmate MacMeekin never experienced this intense amount of yelling in anger from his mother until that day when he stabbed and choked his mother to death.  He describes his mother as "just snapping at him," implying she lost control of herself.  Of course, as the criminal reports attest, inmate MacMeekin similarly snapped into a murderous rage against his mother.

When 14 years old, inmate MacMeekin pleaded with his mother to divorce his father, because he "could not stand the arguments and the fights anymore.  I just had to hold in the anger."  Sometimes, his mother would drive them to the park, and sleep in the car to remove themselves from the home where his father was a hostile, angry threat.  The first time inmate MacMeekin felt "good about himself" was when he stayed at friends' homes whose parents and family were happier, kinder, and more caring than his own.  Apparently, his father maintained an iron fist in the home by restricting inmate MacMeekin's activities so he was unable to visit with friends.  However, after the divorce, when he was 14 years old, he began to experience a new sense of freedom and happiness.

When 15 to 16 years old, he reports he ran away from home because of his mother's drunkenness and repeated berating of him.  At about this time, he reports his mother would have "a number of guys over to the apartment to see her, and to stay the night."

In light of this crime, it is quite obvious parricide is, at the very least, without excuse.  However, in the interest of understanding the psychodynamics, one can see the emotional depravation, intense hostility, bitterness and vengeance that arose form this cacophony of distrust, perpetual conflict, brutality, and terrifying environment.  At the same time, this does not abnegate inmate MacMeekin for his choice to cope by using drugs, and eventually by killing his mother.

NOTE:  Inmate MacMeekin's maternal grandmother, with whom he had become close following the murder of his mother, died within approximately the last year. He greatly grieves her loss, possibly because she offered him comfort, understanding, and support after the crime, and also, this was the final link to his own mother, whom he murdered.

VI.    **MARITAL HISTORY:**

Inmate MacMeekin divorced his wife in 1999 because she was alone, and they lost conjugal visits.  She desired to pursue her own life, with which inmate MacMeekin agreed would be in her own best interest.

MACMEEKIN        D-30728        CTF-CENTRAL        10/02/03        gmj

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE THREE

IX.    **SUBSTANCE ABUSE HISTORY:**

Inmate MacMeekin's last substance abuse occurred before his arrest on 09/26/85.

XI.    **PLANS IF GRANTED RELEASE:**

Inmate MacMeekin considers one of the more viable options to be near his uncle Tom's house in Westlake Village. However, he does not want to parole anywhere where there are drugs or alcohol, because "I have had enough of that." He plans to pursue his vocation of printing, for which he is accomplished, or drafting. He has multiple skills in this area, and has even taken the responsibility of looking at classified ads. However, inmate MacMeekin states, "If I could find a job stapling books for five dollars an hour, I would do it."

## CLINICAL ASSESSMENT

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate MacMeekin presents as his stated age of 36, and was appropriately dressed and groomed for the interview. His speech was coherent, and his attitude was one of calm alertness and cooperativeness. He maintained good eye contact, and was thoughtful in his presentation. He was only mildly frustrated when asked questions during part of the interview because he had yearned and planned to share his childhood experiences with the psychologist. This soon became apparent, so the interviewer allowed inmate MacMeekin to relate all of the information he has been wanting to tell an evaluator. Much of the information, if not all of the information, is included in Section IV, Family History.

Inmate MacMeekin's flow and rhythm of speech was within the normal range. His thoughts were rational, well organized, deliberate, and presented with solemnity. His affect is within the normal range. His estimated intellectual functioning is within the average range. There is not any evidence of a mood or thought disorder. Inmate MacMeekin's judgment is good, and he showed insight into his crime. His impulse control is adequate.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

AXIS I:    Cocaine Dependence and Alcohol Abuse, in remission.
AXIS II:    Deferred.
AXIS III:    Deferred.
AXIS IV:    Incarceration.
AXIS V:    GAF = 85.

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

## XIII. REVIEW OF LIFE CRIME:

The psychological evaluation of 11/16/00 describes inmate MacMeekin's views, emotional reaction, and attitude towards the crime, which he continues to feel great grief, remorse, and astonishment over.

As mentioned in the last psychological report, inmate MacMeekin admitted his mother did not attack him, but that he, in rage, stabbed her with a steak knife, at which time she scratched him in an effort to defend herself. As they struggled, he either forced her to the ground, or she lost her balance, and he began choking her at this time. However, she was not dead at this point, and could have been saved, but he retrieved the necktie, and completed the strangulation so that she died.

Inmate MacMeekin is a man who, prior to this crime, and subsequent to it, states that he cannot stand violence and confrontation, and though he yelled at his mother, he would not consider "raising a hand to her or anyone." As stated above, he continues to feel sadness and remorse, as tears welled in his eyes during the interview.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.   Inmate MacMeekin has been exemplary in not receiving any CDC-115 violations during his incarceration. His only CDC-128A counseling chrono in 1991 was for not reporting to the central textiles garment factory. Given this reputation for compliance and following regulations, inmate MacMeekin presents a well below average risk for violence when compared to the general Level II inmate population.

B.   If released to the community, inmate MacMeekin's potential for violence is most likely equal to that of the average citizen. The reason for this conclusion is that the object of his rage, his mother, is the sole primary maternal figure in is life since one can realistically only have one mother. Furthermore, this murder was committed after repeated and derelict use of marijuana, cocaine, and alcohol with significant sleep depravation. In addition, the degree of remorse, grief, and sadness appears to be genuine, and a significant deterrent to further violent displays. Lastly, he has been incarcerated for most of his adult life, and without becoming involved in the criminal lifestyle in prison, this has been a unique and very memorable 16 years of his life which has caused him great caution in ever considering violence.

On the other hand, inmate MacMeekin seems to have grown and matured in his ability to express his frustration or anger without losing control. On the surface, when one sees his anger expression, one may think he is on the verge of committing a violent act. However, his expression of anger, whether intense or mollified, does not—and probably would not—lead to violent aggression.

MACMEEKIN        D-30728        CTF-CENTRAL        10/02/03        gmj

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

    **C.**    The most significant risk factor which could be a precursor to violence for inmate MacMeekin is the return to alcohol or cocaine abuse.

**XV.**  **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

    **A.**    Inmate MacMeekin is competent and responsible for his behavior. He has demonstrated excellent impulse control, judgment, and coping strategies within a demanding institutional environment to remain without CDC-115s, and, conversely, to abide by institutional standards and regulations.

    **B.**    If released to parole, inmate MacMeekin might find it helpful to be involved in support groups for those who have abused alcohol/drugs, and he may also find it helpful to participate in counseling. This need not be a requirement of parole, but something that he could seek through his parole officer if he felt the need to do so.

    **C.**    Inmate MacMeekin, though he has abstained from alcohol and cocaine for 16 years, should undergo random urine testing for alcohol and/or drug use. This is not intended as a statement regarding the likelihood of his abusing drugs and/or alcohol, but merely creating a system of accountability for him.

J. STEWARD, Psy.D.
Clinical Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BILL ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JS/gmj

D: 10/02/03
T: 10/07/03

MACMEEKIN    D-30728    CTF-CENTRAL    10/02/03    gmj