# EXHIBIT 8
# Part 1 of 2

Name  Keith MacMeekin

Address  P.O. Box 689/F-221-L

Soledad, CA  93960-0689

Correctional Training Facility

CDC or ID Number  D-30728

COURT OF APPEAL-4TH DIST DIV 3
**FILED**

FEB 0 2 2007

Deputy Clerk

## FOURTH DISTRICT COURT OF APPEALS, DIV. III
*(Court)*

| | |
|---|---|
| KEITH MacMEEKIN, | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No. **G038189** |
| A.P. KANE, Warden, et al., | *(To be supplied by the Clerk of the Court)* |
| Respondent | |

## INSTRUCTIONS — READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

---

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

**ORIGINAL**

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. January 1, 1999)

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

[ ] A conviction                 [XX] Parole

[ ] A sentence                   [ ] Credits

[ ] Jail or prison conditions    [ ] Prison discipline

[XX] Other *(specify):*  state and federal violations of constitutional rights

1. Your name:     Keith MacMeekin

2. Where are you incarcerated?  California Training Facility-Central, Soledad, CA 93960

3. Why are you in custody?    [XX] Criminal Conviction   [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      homicide of the second degree

   b. Penal or other code sections:     § 187

   c. Name and location of sentencing or committing court:    Orange County Superior Court

      700 Civic Center Dr. West, Santa Ana, CA 92702

   d. Case number:    C 58263

   e. Date convicted or committed:    1985

   f. Date sentenced:    1986

   g. Length of sentence:    fifteen (15)-years-to-life

   h. When do you expect to be released?  long past due; E.P.R.D: 12-27-94

   i. Were you represented by counsel in the trial court?   [XX] Yes.   [ ] No.  If yes, state the attorney's name and address:

      Orange County Public Defender's Office

      14 Civic Center Plaza, Santa Ana, CA 92701

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty  [XX] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6. GROUNDS FOR RELIEF

Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS
AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED
TO HIM THE INDIVIDUALIZED CONSIDERATONS MANDATED AND REQUIRED BY
STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what *time (when)* or place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On March 14, 2006, the Board of Parole Hearings (BPH), heard Petitioner in absentia for the sixth (6th) time, (previously appearing for three (3) hearings), during which Ms. T. St. Julien was Presiding Commissioner and Mr. R. Mejia was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A".

Petitioner was represented by Mr. D. Spowart and, Dr. J. Steward, Psy.D., a staff psychologist at C.T.F.-Central (CTF-C), testified as to his professional opinion of petitioner, by utilizing a filed Report dated: 10-2-03, which is a part of the permanent Records, a copy of it, the 2000 and 1996 Reports are attached as Exhibit "B". A copy of the Counselor's Report is attached as Exhibit "C", and was prepared and filed but not cited to at the hearing. Copies of the previous 2004 and 1993 Hearings Decisions are attached as Exhibit

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

1   <u>Ground 1</u>, (continued from first page):

2   "D" and are incorporated by reference. Also present at the Hearing

3   was Orange County D.D. A., T. Burnett, parole division.

4       In <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, 655 (Rosenkrantz),

5   the Supreme Court explained that parole release decisions "entail

6   the BPH's attempt to predict by subjective analysis whether the

7   inmate will be able to live in society without committing additional

8   antisocial acts." Such a prediction requires analysis of individual-

9   ized factors on a case-by-case basis and the BPH's discretion in

10  that regard is "'"almost unlimited."'" Notwithstanding that the

11  BPH's discretion is exceedingly broad, it is circumscribed by the

12  requirements of procedural due process.  (Ibid; California Consti-

13  tution, article I, §7, subd. (a), and statutory directives.)

14      Absent evidence of the presence of unsuitability factors,

15  there must be some evidence that petitioner is otherwise unsuitable

16  for parole, such as by his having failed to meet the suitability

17  criteria listed under California Code of Regulations (CCR), title

18  15, Division II, §2402, subd.(d); §§1-4, 6-9). And, while the BPH

19  has exceedingly broad discretion in its parole decisions, the Deci-

20  sions must reflect an <u>an individualized consideration of the speci-</u>

21  <u>fied criteria and cannot be arbitrary or capricious</u>. Rosenkrantz,

22  p.677; "[t]he liberty interest is created, not upon the grant of

23  a parole date, but upon the incarceration of the inmate." <u>Biggs</u>

24  <u>v. Terhune</u> (9th Cir.2003) 334 F.3d 910, 914-15.

25      The failure to properly consider the post-incarceration factors

26  highlights the inherent misunderstanding and application of the

27  "some evidence" standard and triggers the required scope of judicial

28  review of the federal questions presented here.

1    There are two sets of parole criteria regulations, not one.
2  CCR §§2402, subd.(c) [Circumstances Tending To Show Unsuitability],
3  and 2402, subd.(d) [Circumstances Tending To Show Suitability].
4  It appears that the BPH's focused emphasis has been on, and remains
5  on, subd.(c), with little regard given to subd.(d). Petitioner
6  asserts as a matter of statutory construction, the "public safety"
7  concern in Penal Code (PC) §3041, subd.(b), demands an equal or
8  neutral emphasis at the outset of BPH deliberations and on its
9  Findings under both sets of criteria and any balanced and reasonable
10  interpretation should demand it throughout the entire process due.

11    Factors TENDING to show suitability or unsuitability must
12  be weighed and balanced within the parameters of a standard of
13  proof. Without this critical component, the process is inherently
14  arbitrary, capricious, and defective. This standardless analysis
15  would vitiate the individualized consideration held appropriate
16  in Rosenkrantz. The crux of the matter is that of a standard of
17  proof with an indicia of reliability as set forth below.

18    The "some evidence" standard is NOT the sole standard of
19  evidence to be applied to the BPH's decisions. It is only one aspect
20  of judicial review employed by a habeas court. Edwards v. Balisok
21  (1997) 520 U.S. 640, 647. And, if the Rosenkrantz decision implies,
22  as it does, that the "some evidence" standard should be applied
23  to the BPH Findings, then this is a clear and unreasonable
24  application of well-established federal Constitutional law set
25  forth by the High Court. Nothing in Superintendent v. Hill
26  (Hill),(1985) 472 U.S. 445, 456, implies that it IS a standard
27  of evidence to be applied by any agency outside a disciplinary
28  committee within an exigent-circumstance prison setting.

1    What IS implied by the Rosenkrantz court, when it held that
2    a habeas court can't reverse a decision denying parole even if
3    it determines that the evidence overwhelmingly preponderates towards
4    a finding of suitability is completely unreasonable because it
5    prevents effective habeas relief from an arbitrary and capricious
6    decision, and worse, stymies effective judicial review. This court
7    is not obliged nor compelled to defer to a state decision misapply-
8    ing federal constitutional principles. Hubbart v. Knapp (9th Cir.
9    2004) 379 F.3d 773, 780; referencing Mullaney v. Wilbur (1975)
10   421 U.S. 684, 691; see also Peltier v. Wright (9th Cir. 1994) 15
11   F.3d 860, 862.

12       In Oxborrow v. Eikenberry (9th Cir.1989) 877 F.2d 1395, 1399,
13   the Circuit held that "Our deference to the [state court] is sus-
14   pended only upon a finding that the court's interpretation of [state
15   law] is untenable or amounts to a subterfuge to avoid federal review
16   of a constitutitonal violation." Thus, it is petitioner's contention
17   that respondents seek to avoid federal review by asserting that
18   the "some evidence" standard is 1) applied by the BPH and/or, 2)
19   limits judicial review ONLY to the BPH's ultimate decision and
20   not to a finding of a defective pre-Decision process.

21       If petitioner were the beneficiary of an individualized consi-
22   deration utilizing real evidence with articulable proof, it would
23   have logically flowed that he is now more suitable than his previous
24   hearing wherein he was given specific instructions to meet suitabil-
25   ity criteria. All those laudatory words at his Hearing would have
26   had a consistent ring of truth in that he has progressed towards
27   a more-suitable mien, not the reverse.

28       Please see a copy of the previous Decision denying parole

[3-C]

1  attached as Exhibit "D".

2  Please note: the words denying parole also gave advice; the

3  present denial is almost a carbon copy of the last panel's decision.

4  This "boilerplate" denial of suitability now rises to the level

5  of a federal due process violation. <u>Biggs</u>, supra, 910, 916-917.

6  The High Court in <u>Greenholtz v. Nebraska Penal Inmates</u> (1979)

7  442 U.S. 1, 7, 11-12, and <u>Board of Pardons v. Allen</u> (1987) 482

8  U.S. 369, 373, established that:

9          "while there is no constitutional or inherent right of
10         a convicted person to be conditionally released before
           the expiration of a valid sentence, a state's statutory
11         scheme, if it uses mandatory language, creates a pre-
           sumption that parole release will be granted when or
12         unless certain designated findings are made, and thereby
           gives rise to a constitutional liberty interest."

13  (citing <u>McQuillen v. Duncan</u> (9th Cir.2002) 306 F.3d 895, 901.

14  In the absence of any evidence in the record supporting the

15  BPH's decision, remanding the case back for a new hearing is futile,

16  and the appropriate remedy is to grant the release of the

17  petitioner. <u>McQuillen II</u> (9th Cir.2003) 342 F.3d 1012, 1015-16.

18  A petitioner is entitled to "something more than mere pro

19  forma consideration.", e.g., individual consideration. Not a sham

20  hearing using rote words and repeating boilerplate from a pre-

21  printed form. The only mandate "normally" being followed under

22  3041 (a) is a multi-year denial under §3041(b) to "swallow" the

23  due process required under the 14th Amendment, an ingestion violat-

24  ing the equal protection guarantee and abridges petitioner's civil

25  rights under both state and federal Constitution's proscription

26  against this tactic for all similarly-situated inmates. <u>In re Sturm</u>

27  (1974) 11 Cal.3d 258, 268; <u>In re Ramirez</u> (2001) 94 Cal.App. 4th 549,

28                          [3-D]

1    570; Rosenkrantz at pp. 658, 683.

2         "Judicial oversight must be extensive enough to protect
         the limited right of parole applicants '"to be free from
3        an arbitrary parole decision ... and to something more
         than mere pro forma consideration."'(Citation.) The courts
4        may properly determine whether the BPH's handling of
         parole applications is consistent with the parole policies
5        established by the Legislature. (Citation.) While courts
         must give great weight to the BPH's interpretation of
6        the parole statutes and regulations, final responsibility
         for interpreting the law rest with the courts. (Citation.)
7        Courts must not second-guess the BPH's evidentiary find-
         ings. (Citation.) However, it is the proper function
8        of judicial review to ensure that the BPH has honored
         in a "practical sense" the applicant's right to "due
9        consideration." (Citation.) In re Ramirez, at 564.

10        Since it is clear that parole should be the rule and not the

11   exception, a moderate or average risk cannot be construed as "un-

12   reasonable." Were an average risk grounds for parole denial, then

13   the exception would "operate so as to swallow the rule that parole

14   is 'normally' to be granted. Rosenkrantz at p.683.

15
         "All violent crime demonstrates the perpetrator's
16       potential for posing a grave risk to public safety ...
         [However] the BPH "shall normally set a parole release
17       date." (citation.) The BPH's authority to make an
         exception ... should not operate so as to swallow the
18       rule that parole is "normally" to be granted. ...
         Therefore, a life term offense must be particularly
19       egregious to justify the denial of a parole date. In
         order to comply with the parole policy established by
20       the Legislature in PC §3041, the BPH must weigh the
         inmate's criminal conduct not against ordinary social
21       norms, but against other instances of the same crime
         or crimes." Id. at p.570, (disapproved on other grounds,
22       emphasis added as usual in published cites.)

23        The applicability of this standard to the review of decisions

24   applies and petitioner's right to due consideration does not appear

25   to have been honored in any practical sense by the BPH in this

26   case and their Decision is facially and legally deficient. In the

27   instant case the BPH made no effort to comply with the controlling

28                                [3-E]

1  rules and seems to have merely stated its "predetermined conclusion."

2  (See In re Caswell (2001) 92 Cal.App.4th 1017, 1030.)

3      In In re Smith (2003) 114 Cal.App.4th 343, 369, the Sixth

4  District Court of Appeals found that there was not some evidence

5  that Smith's crime was more callous than the average second degree

6  murder. There was nothing to "distinguish th[e] crime from other

7  second degree murders. ... the record provides no reasonable grounds

8  to reject, or even challenge, the findings and conclusions of the

9  psychologist and counselor concerning [Smith's] dangerousness."

10  Surely the same must appear to be true here.(See 2002 Counselor's Board

11  Report attached as Exhibit "E".) The Second District Court of

12  Appeals, in the case of another life term inmate named Smith,

13  similarly found no evidence to support a parole denial based on

14  the commitment offense. In re Smith (2003) 109 Cal.App.4th 489.

15      Compare In re Scott (2004) 119 Cal.App.4th 871, 876-77, where

16  the First District reversed the BPH's standard statement of reliance

17  on the gravity of the offense because in truth "the relevant evidence

18  show[ed] no more callous disregard for human suffering than is shown

19  by most second degree murder offenses." (governor's recision of

20  Scott's parole unanimously reversed 10-18-05, 133 Cal.App.4th 573.)

21  On 5-18-05, in Coleman v. BPT, E.D. Cal. no.96-0783, Honorable Judge

22  Karlton adopted the Findings & Recommendations in full wherein it

23  was found that ex-governor Davis' BPT panels had a sub rosa "no

24  parole" policy and were carrying it out. The courts there chose

25  the appropriate remedy and Ordered accordingly to meet the ends

26  of justice. (Please see Coleman and Order attached as Exhibit "F").

27      It is beyond debate that neither a state agency interpreting an

28                                [3-F]

1  enabling statute nor any court of the state can construe a statute
2  contrary to Legislative intent or the ordinary meaning of the words
3  used in a statute. Our Court, in the entire history of the statute,
4  has never construed it adequately according to the plain meaning
5  to create guidance and instill compliance by the BPH and Governor.

6      Instead, this lack of judicial construction has led to the many
7  years of overwhelming denials that do not reflect in any clear way
8  the presumptions of §3041. Nor does it reflect instruction as to
9  what the agency's burden of proof is or the legal significance of
10 relevant, reliable, or material evidence. This lack of judicial
11 guidance has left unfettered discretion in the hands of lay appoint-
12 ees to determine the legal import of evidence although these persons
13 are arguably unqualified by lack of professional standing to make
14 these determinations upon which a federal liberty interest rests.

15     Determining the legality and weight of evidence requires some
16 legal training in evidentiary law; not by lay persons, and which
17 lack of training is visibly evident in the incongruously inapposite
18 findings thus made. (McQuillen I, supra, 907-912; Rosenkrantz II,
19 supra, p.680; Rosenkrantz I (2000) 80 Cal.App.4th 409, 424-26; Smith,
20 supra, p.361; Smith, supra, p.501-06. These are only a few of the
21 published cases but unpublished absurdities exponentially abound!

22     The Sixth District held for the proposition in Smith, supra,
23 at 361, that "[t]he weight given the specified factors relevant to
24 parole suitability lies within the discretion of the BPT"; a court's
25 determination "of whether the prepondence of the evidence supports
26 a finding of suitability is irrelevant." (emphasis added.) This is
27 the first time a published decision on the BPH has even mentioned

28                                    [3-G]

1  a burden of proof. This reference infers the BPH must honor this

2  evidentiary standard as faithfully to the letter as legally possible.

3      Yet there is no settled brightline rule for a court to determine

4  if the BPH has met that standard. Just the opposite, in fact, since

5  <u>Smith</u> strongly suggests that even if a reviewing court finds the

6  agency did not meet the standard, an allegation of "some evidence"

7  is sufficient to automatically require judicial deference.

8      The Third District Court of Appeals stated the following:

9      "It is without doubt that a blanket no-parole policy would
       be contrary to the law, hich contemplates that persons
10     convicted of murder without special circumstances may
       eventually become suitable for parole and that, when
11     eligible, they should be considered on an individualized
       basis. Thus, blanket policies have long been deemed to
12     be improper.¶ In <u>Roberts v. Duffy</u> (1914) 167 Cal.629 a
       decision that predates the enactment of our state's old
13     indeterminate sentencing law, the Court condemned a blanket
       parole policy that was contrary to the statutory parole
14     scheme then in place. It appeared that the statutory law
       <u>allowed a prisoner to apply for parole after serving ONE</u>
15     <u>YEAR</u> but that, CONTRARY TO THE STATUTE, THE PAROLE
       AUTHORITY ADOPTED A RULE PRECLUDING APPLICATION until
16     one-half the sentence was served.

17                  (does this sound familiar?)

18          The Court held that, '"while the prisoner had no
       right to release on parole at any time, HE WAS ENTITLED
19     TO APPLY AND HAVE HIS APPLICATION DULY CONSIDERED ON AN
       INDIVIDUALIZED BASIS."' <u>Id.</u> at 640-641.

20

21     "With respect to persons sentenced to indeterminate terms,
       the purpose of punishment is satisfied by the requirement
       of service of a minimum period before eligibility for
22     parole and, when suitable for parole, by determination
       of a release date in a manner that will provide uniform
23     terms for offenses of similar gravity and magnitude with
       respect to their threat to the public. (PC §§3041, 3041(a),
24     3041.5) (emphasis added to original) citing <u>In re Morrall</u>
       (2002) 102 Cal.App.4th 280, <u>291-292</u>.)

25  The arbitrary or capricious misapplication of statutory law

26  violates state and federal due process. <u>Hill v. U.S.</u> (1962) 368

27  U.S. 424, 428; <u>Gordon v. Duran</u> (9th Cir.1990) 895 F.2d 610, 613;

28

                          [3-H]

1    In re Edsel P. (1985) 165 Cal.App.3d 763, 779. "The touchstone of

2    due process is protection of the individual against [the] arbitrary

3    action of government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

4        These principles apply in equal force to incarcerated prisoners.

5    (In re Jones (1962) 57 Cal.2d 860, 862 ["a convicted felon, although

6    civilly dead is nevertheless a 'person' entitled to the protection

7    of the 14th Amendment."]; In re Price (1979) 24 Cal.3d 448, 453

8    [acknowledging PC §2600 limits a prisoner's deprivation to only

9    such rights "as is necessary in order to provide for the reasonable

10   security of the institution in which he is confined."].)

11       In interpreting a prisoner's rights of substantive due process

12   the High Court has held that a prisoner may derive a due process

13   liberty interest from administrative regulations, as well as state

14   law and the U.S. Constitution. Sandin v. Conner (1995) 515 U.S.

15   472, 484; Hewitt v. Helms (1983) 459 U.S. 460, 469, receded from

16   on p.484, fn.5; Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff,

17   supra, at p.557. Applying these standards here, the BPH violated

18   petitioner's right to constitutional due process but he is not

19   challenging the BPH's right to conduct professional psychological

20   assessments as part of the parole evaluation process, but does chal-

21   lenge their "normal" practice of patently ignoring their own experts.

22       Predictions of future conduct necessarily relate to public

23   safety concerns but Judge Karlton in Irons v. Warden (2004) 358

24   F.Supp.2d 936 (9th Cir. Review filed 5-18-05, no.05-15275), discussed

25   this conundrum and noted that the propensity analysis is flawed:

26       "To a point, it is true, the circumstances or the crime and
         motivation for it may indicate a petitioner's instability,
27       cruelty, impulsiveness, violent tendencies and the like.
         However, after 15 or so years in the caldron of prison life,
28       not exactly an ideal therapeutic environment to say the least,

                                 [3-I]

1   and after repeated demonstrations that despite recognized
    hardships of prison, [petitioner] does not possess these
2   attributes, the predictive ability of the circumstances of
    the crime is near zero." ( Irons, supra, at p.947, fn.2.,
3   (this dicta was also cited as Headnote 10 at p.937; see discus-
    sion on "need for more therapy" Id. at p.948.)

4       PC §3041(a) governs parole suitabilty determination processes

5   and does not define more than one class of persons. The statute

6   generalizes that its focus is "any prisoner" who is serving an in-

7   determinate term. Through application, however, the agency's dis-

8   crimination amongst the class serving indeterminate sentences is

9   in violation of the right to equal protection ensconced in the Four-

10  teenth Amendment. Equal protection is "[in essence] a direction that

11  [a person] similarly situated should be treated alike." (City of

12  Cleburne v. Cleburne Living Ctr. (1985) 473 U.S. 432, 439 (citing)

13  Plyler v. Doe (1982) 457 U.S. 202, 216).) "To state a claim ... for

14  violation of the Equal Protection Clause of the Fourteenth Amendment

15  a plaintiff must show that the defendants acted with an intent or

16  purpose to discriminate against the plaintiff based upon membership

17  in a protected class." Barren v. Harrington (9th Cir.1998) 152 F.3d

18  1193, 1194, cert. denied, 525 U.S. 1154 (1999).) Strict scrutiny,

19  alternatively, is utilized if the government distributes benefits

20  or burdens in a manner inconsistent with fundamental rights. (See

21  Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969) 394

22  U.S. 618.) The fundamental right here is the due process right to

23  parole. McQuillen I, supra, 900; McQuillen II, supra, 1012.

24      This Honorable Court should grant the writ and Order all

25  appropriate relief including a complete discharge from custody.

26      WHEREFORE, petitioner respectfully submits that the writ should

27  be granted in full and all available remedies leading to his immed-

28  iate release from custody be Ordered at the earliest moment.

[3-J]

7   Ground 2 or Ground _____ (if applicable)

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE
VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF
REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI-
TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a   Supporting facts:

Nowhere is there any codification that avers petitioners must
prove his or her suitability. Only if an inmate is found unsuitable
does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz
at 658, 683.) Evidence must be specific, articulable, and have "some
indicia of reliability." Respondents have the burden of proof to
demonstrate, in the Record, why an inmate is not suitable and a
denial of more than one year requires that the BPH panel state for
the Record why it isn't likely that petitioners would be found suit-
able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to
the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041
(a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior
examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature
intended that some inmates will be suitable at an initial hearing
otherwise why would such a gratuitous mandate exist? Govenor's-
level review presumes a neutral, well-defined, professional body
that will follow all the state and federal laws. Only this practice

b.  Supporting cases, rules, or other authority:                    (continued on attached pages)

(SEE ATTACHED POINTS AND AUTHORITIES)

1  Ground 2, continued:

2  would meet the constitutional burden under the discretionary methods

3  needed to quickly resolve an uncertain matter.

4      The "some evidence" relied on to deny parole must be relevant

5  and reliable in establishing Petitioner is a <u>current</u>, unreasonable

6  threat to public safety and must not be grounded in an incomplete

7  or unreasonable assessment of the relevant factors.

8      In explaining what the "some evidence" standard meant, the

9  Court in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 at 677, stated

10  that "[o]nly a modicum of evidence is required." On its face, this

11  standard could thus be seen as remarkably broad--that a scintilla

12  of evidence (or the BPH's assessment of it)--would be enough to

13  completely immunize BPH decisions from judicial review. However,

14  such a reading would effectively serve to nullify the <u>Rosenkrantz</u>

15  court's holding rejecting the Executive's position that factual

16  decisions rejecting parole were immune from examination by the courts

17  and in point of fact were required.

18      A disection of the "some evidence" standard itself--both

19  conceptually and through a review of the application of the

20  <u>Rosenkrantz</u>' standard (and its progeny)--makes clear that this is

21  the meaningful standard. Properly understood, it strikes an

22  appropriate balance between judicial deference to difficult BPH

23  decisions and the protection of constitutional liberty interests.

24      The "some evidence" standard of review is laid out here:

25      "[W]e conclude that the judicial branch is authorized
        to review the factual basis of a decision of the [BPH]
26      denying parole in order to ensure that the decison comports
        with the requirements of due process of law, but that
27      in conducting such a review, the court may inquire only
        whether some evidence in the record before the [BPH] sup-
28      ports the decision to deny parole, <u>based upon the factors</u>

                              [4-A]

specified by statute and regulation. Rosenkrantz, 658.
"[a]s long as the [BPH] decision reflects due consideration
of the specified factors as applied to the INDIVIDUAL
PRISONER in accordance with applicable legal standards,
the court's review is limited to ascertaining whether
there is some evidence in the record that supports the
[BPH] decision." Id. at 677. (emphasis added).

Thus, the inquiry into whether there is "some evidence" is
more complex than it might otherwise seem, as the standard MUST
be applied within the context of the statutory framework in which
it arises. This framework imposes at least 3 requirements on the
"some evidence" standard if it is used to deny parole.

First, the BPH must base their decisons only on evidence that
serves to establish that the inmate will or will not pose a
continuing, "unreasonable risk of danger to society if relesed from
prison." CCR, title 15, §2402(a), and PC §3041(b).

Second, the evidentiary basis for parole decisions must be
based on the factors specified in the regulations after
individualized considerations of all of the factors. Rosenkrantz
at 677 ("The precise manner in which the specified factors relevant
to parole suitability are considered and balanced lies within the
discretion of the [executive branch], but the decision must reflect
an individualized consideration of the specified criteria and CANNOT
BE ARBITRARY AND CAPRICIOUS."); see also In re Stanley (1976) 54
Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the
prisoner's record of crime. We abstain from any argument over the
relative primacy of various parole factors. It is enough to say
that the Adult Authority must apply all the factors.") (citing In
re Minnis (1972) 7 Cal.3d 639). These factors naturally all relate
to whether the inmate poses a continuing, unreasonable risk of danger
to society if relesed from prison. (emphasis added).

[4-D]

1    Third, the evidence upon which the BPH relies must be relevant

2  and reliable. CCR §2402(b) ("All relevant, reliable information

3  available to the panel shall be considered in determining suitability

4  for parole.") (cf. CCR §§2402(d)(1-9).

5    In sum, a court examining parole decisions must determine

6  whether, after all consideration of all the factors enumerated in

7  the statute and regulations, the decison was based on: 1) some

8  evidence; 2) a reasonabe consideration of all the factors specified

9  by the statutory guidelines; 3) evidence that is both relevant and

10  reliable; and 4) factual determinations that suggest an inmate poses

11  a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

12    A review of the post-Rosenkrantz legal panorama reveals that

13  California courts of appeals and federal courts have routinely

14  applied the above boundaries and checkpoints of relevance,

15  reliability and reasonableness to the "some evidence" standard.

16  The California Supreme Court has so far utterly failed to establish

17  a brightline Plimsoll mark to define the full depth of the inquiry.

18    The courts continue to assess the reasonableness of the BPH's

19  interpretation of the facts and circumstances used to legally sus-

20  tain a finding of parole suitability denial. The court in In re

21  Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the

22  BPH was reasonably able to conclude that there was some evidence

23  of the inmate's need of continuing therapy and her dangerousnes

24  to the public. Though it found in the affirmative, the court took

25  a close look at whether the BPH "could reasonably conclude that

26  [her] defense, that Manson's influence overwhelmed [her], was

27  exagerated such that she is fully responsible for the LaBianca

28  murders" and whether "[t]he BPH could infer with sufficient

[4-C]

1  reasonableness to satisfy a minimal 'some evidence' standard that
2  [she] is a danger to the public and in need of continued therapy
3  and programming." Her denial was affirmed with instructions.

4      Judicial inquiry into the stated reasons for parole denial
5  have their place and numerous state and federal courts--in a wide
6  range of contexts--have similarly held the judicial inquiry into
7  the reasonableness of BPH determinations and conclusions is
8  appropriate, even when such determinations and conclusions are
9  accorded broad deference. (See, e.g., In re Farley (2003) 109
10 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody
11 determination is limited to determining whether the classification
12 decision is arbitrary, capricious, irrational, or an abuse of the
13 discretion granted those given the responsibility for operating
14 prisons. While we must uphold respondent's classification action
15 if it is supported by "some evidence" and we must afford great
16 deference to an administrative agency's expertise, where the agency's
17 interpretation of the regulation is clearly arbitrary or capricious
18 or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT."

19  Federal courts likewise require parole decisions to be
20 reasonable. As an example, in a parole rescission case, a federal
21 court in this state held: "the Court of Appeals conclusory findings
22 that there was 'some evidence' to support the rescinding, the BPH's
23 decision that parole was improvidently granted to petitioner, are
24 contrary to clearly established federal law and, to the extent they
25 are fact-based, represent unreasonable determinations of the facts
26 in light of the evidence presented in the state court preceedings."
27 Stockton v. Hepburn (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at
28 43; see also Irons v. Warden (N.D. Cal 2004) 358 F.Supp.2d 936,

[4-D]

1  948 ("Clearly, a conclusion by lay BP[H] commissioners that
2  petitioner has not yet acheived required therapy for insight OR
3  OTHER REASONS is not reasonably sustainable, and a state court's
4  conclusion to the contrary is patently unreasonable.")

5      The federal liberty interest is made an adjunct to the state
6  requirements of due process by and through the 14th Amendment to
7  the U.S. Constitution and the substantial evidence of the federal
8  standard must be overcome to meet federal guarantees to its citizens
9  who, before they became entitled to state civil rights, were first
10 bestowed by operation of their federal citizenship. A state cannot
11 lawfully deny any federal right to its citizens but that is exactly
12 what respondents are demanding of their agents in the BPH, and will
13 no doubt now ask this Honorable Court to signoff on. That must not
14 be allowed if the judiciary is to be truly separated from the
15 Executive charades disguised sa legitimate exercise in freedom.

16     The goal of indeterminate sentences and the parole system is
17 not only to punish, but also to provide for reformation and
18 rehabilitation as the CDC's renaming suggests:

19     "The belief no longer prevails that every offense in
       a like legal category calls for an identical punish-
20     ment without regard to past life and habits of a parti-
       cular offender. ... Retribution is no longer the domi-
21     nant objective of the criminal law. Reformation and
       rehabilitation of offenders have become important goals
22     of criminal jurisprudence."

23 People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams
24 v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discus-
25 sion of this topic, the Supreme Court stated the following:

26     "[T]he purpose of the indeterminate sentence law, like
       other modern laws in relation to the administration
27     of criminal law, is to migitate the punishment which
       would otherwise be imposed upon the offender. These
28     laws place emphasis upon the reformation of the offender.

[4-E]

1  They seek to make the punishment fit the criminal rather
2  than the crime. They endeavor to put before the prisoner
   great incentive to well-doing in order that his will
3  to do well should be strengthened and confirmed by the
   habit of well-doing. [...] [The] interests of society
4  require that under prison discipline every effort should
   be made to produce a reformation of the prisoner. ...
5  The legislative policy [was to provide a system whereby]
   a hope was to be held out to prisoners that through
6  good conduct in prison and a disposition shown toward
   reformation, they might be permitted a conditional liber-
7  ty upon restraint under which they might be restored
   again to society. ... Although good conduct while in-
8  carcerated and potential for reform are not the only
   relevant factors, this court has acknowledged their
9  significance. Furthermore, the Authority has declared
   that these factors are among those of 'paramount impor-
   tance.' In re Minnis, 7 Cal.3d 644-45.
10
11  The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12  these principles: "[E]ven before factors relevant to parole de-

13  cisions had been set forth expressly by statute and regulations,

14  we concluded that '[a]ny official or board vested with discretion

15  is under an obligation to consider all relevant factors [], and

16  the [BPH] can't, consistently with its obligation, ignore post-

17  conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18  Minnis at 645; emphasis added for illumination).

19  Petitioner has a Constitutional liberty interest in parole

20  decisions and "[P]arole applicants in this state have an expectation

21  that they will be granted parole unless the BPH finds, in its

22  reviewable discretion, that they are unsuitable for parole in light

23  of the circumstances specified by statute and regulation."

24  Rosenkrantz at 654 and at 659-61 this liberty interest is an

25  expectation protected by due process of law. (holding that the

26  California Constitution Art. V, §8(b) and PC §3041 "give rise to

27  a protected liberty interest" in that "a prisoner granted parole

28  by the BPH has an expectation that the Governor's decision to affirm

[4-F]

1  modify, or reverse the BPH's decision will be based upon the same
2  factors the BPH is required to consider," and that "this liberty
3  interest underlying a Governor's parole review decision is protected
4  by due process of law.").

5      Federal courts have also unequivocally held that California's
6  parole system gives rise to a liberty interest constitutionally
7  protected by due process. See: <u>Allen</u>, infra at 376-78; <u>Greenholtz</u>
8  <u>v. Inmate of Neb. Penal & Corr. Complex</u> (1979) 442 U.S. 1, 11-12
9  (holding a state's statutory parole scheme that uses mandatory
10 language may create a presumption that parole release will be
11 granted upon certain circumstances or findings, thus giving rise
12 to a constitutionally protected liberty interest); <u>McQuillen</u>, supra
13 at 902-3 n.1 (holding that because parole scheme uses mandatory
14 language and is largely parallel to the schemes found in <u>Allen</u>
15 and <u>Greenholtz</u> do give rise to a protected libety intrest in RELEASE
16 ON PAROLE, "California's parole scheme gives rise to a cognizable
17 liberty interest in release on parole.") <u>Biggs v. Terhune</u> (9th
18 Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest
19 is created, not upon the grant of a parole date, but upon the
20 incarceration of the inmate."

21     <u>Rosenkrantz</u> specifically rejected any position that a court
22 may not properly examine the factual basis of parole decisions
23 at 667, "[W]e conclude that the courts properly can review a
24 Governor's decisions whether to affirm, modify, or reverse a parole
25 decision by the BPH to determine whether they comply with due
26 process of law, and that such review properly can include a determi-
27 nation of whether the factual basis of such a decision is supported
28 by some evidence in the record that was before the BPH.

1    Post-Rosenkrantz, courts have reaffirmed the concepts of broad
2  executive deference but vigilent judicial review, by engaging care-
3  ful analysis, will ensure that the boundaries of due process are
4  respected and upheld. "[t]he exceedingly deferential nature of
5  the "some evidence" standard of judicial review set forth in
6  Rosenkrantz does not convert a court reviewing the denial of parole
7  into a potted plant." In re Scott (119 Cal.App.4th 871, 898, re-
8  cently affirmed).

9    The Court, in In re Dannenberg (2005) 34 Cal.4th 1061 at 1095
10  n.16 reaffirmed that effective judicial review is critical to due
11  process. Rejecting the dissent's suggestion that the opinion "per-
12  mits untethered pro forma parole denials that are insulated from
13  effective judicial review, thus contravening California life in-
14  mates' due process rights to individualized parole consideration,"
15  the majority made clear that the [BPH] must apply detailed standards
16  in evaluating individual inmates' suitability for parole on public
17  safety grounds, and that the Executive's broad discretion is subject
18  to meaningful judicial oversight.

19    There is no question that the discretion afforded to the BPH
20  with respect to parole decisions is great. However, the parole
21  system's very purpose is to provide for the reentry into society
22  of inmates who no longer pose a danger or unreasonable threat to
23  public safety, and those rights afforded thereunder are
24  constitutionally protected.

25    The BPH must abide by due process considerations, and the
26  courts are entrusted with ensuring that such considerations are
27  adequately respected and thus protected. Neither Rosenkrantz or
28  Dannenberg permits respondents to immunize themselves from re-

[4-4]

1  view by unreasonable and possibly unlawful assertion that certain
2  facts support a denial of parole. On the contrary, <u>Rosenkrantz</u>
3  and <u>Dannenberg</u> make clear that the courts have a vital and therefore
4  important role to play in ensuring that parole decisions are
5  actually supported by "some evidence" having a basis in fact, and
6  an indicia of reliability supported in the record.

7       Petitioner submits that there is a real danger that, improperly
8  understood, the guidelines articulated in <u>Rosenkrantz</u>, <u>Dannenberg</u>,
9  and the court of appeals will serve to provide respondents with
10 de facto immunity from judicial review, a result anathema to state
11 and federal due process protections. Properly understood, the "some
12 evidence" standard provides a fair and proper framework for review
13 of parole decisions in any venue, one that provides respondents
14 with an appropriate level of deference in making extremely difficult
15 decisions relating to inmates' liberty interests and public safety
16 concerns, while ensuring that statutory and constitutional liberty
17 interests are being adequately and lawfully safeguarded through
18 judicial review. And, when this standard is properly applied to
19 this case, there should be no doubt but that the BPH's denial of
20 suitability seems unsustainable and must be reversed, a new hearing
21 granted, and an Order with instructions issued.

22      WHEREFORE, Petitioner prays that the writ be granted in full
23 and all available relief be accorded to Petitioner to comply with
24 and comport to the state and federal Constitutions and the legal
25 adversarial process and resolution of a judicious nature in this
26 most important matter herein. Petitioner hereby incorporates by
27 reference, as though fully set forth, all papers, pleadings,
28 transcripts, exhibits and matters of record in the instant matter.

[4-7]

7. Ground 2 or Ground __3__ *(if applicable):*

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING UNDER STATUTORY CRITERIA AND RESPONDENTS BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petition-er's fifteen (15) years-to-life sentence by seeking an Order from this Court granting the writ to discharge petitioner from state prison, or alternatively, compelling the BPH to conduct a new parole consideration hearing and correctly weight their statutory findings to view suitability and consequent release to parole for petitioner.

The issues raised are of constitutional dimension, comporting to petitioner's federal constitutional rights, and questioning the legality of petitioner's continued confinement in the face of over-whelming evidence of legally-sustainable proof of suitability and unquestioned state-hired professionals and their proffered opinions of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having an indicia of reliabilty that petitioner poses an unreasonable risk of danger to the public and PC §3041(a) and California Code of Regulations (CCR), title 15, division II §2042(d)(1,2,3,4,6,7,8 & 9) parole suitability criteria all make it clear that there IS a mandate, based on a legally-sufficient standard, and that standard is subject to judicial review

b. Supporting cases, rules, or other authority: (continued on additional attached pages)

SEE ATTACHED POINTS AND AUTHORITIES

1   Ground 3, continued:

2   for abuse of discretion under a federal due process and equal
3   protection umbrella with safeguards required in a review of the
4   "evidence" of unsuitability that is burdened upon respondents.

5       The California Supreme Court recognizes that prisoners have
6   procedural due process protections in connection with parole
7   determinations. A legitimate expectancy of release to parole is
8   created by PC §3041. If the statute creates the legitimate expectancy
9   of parole, it is not legally sufficient to answer that the BPH may,
10  in its broad discretion, deny parole suitability.

11      This argument, that the BPH's broad discretion swallowed peti-
12  tioner's liberty interest and expectation of release was squarely
13  rejected by the High Court in Board of Pardons v. Allen (1987) 482
14  U.S. 369. Additionally, the Court stated in Rosenkrantz: "[P]arole
15  applicants in this state have an expectation that they will be
16  granted parole unless the BPH finds, in its discretion, that they
17  are unsuitable for parole in light of the circumstances specified
18  by statute and regulation." Id. 654. And, "[O]ur past decisons also
19  make clear that the requirement of procedural due process embodied
20  in [Article I, §7, subd.(a)], places some limitations upon the broad
21  discretionary authority of the BPH." Id. at 655.

22      Therefore, it is inherently clear that the presence of discretion
23  held by the BPH does not, under either state or federal law, diminish
24  nor extinguish the expectancy of release to parole nor Petitioner's
25  due process rights. It thus follows that a liberty interest has
26  existed under §3041 that is embodied in and protected by the 14th
27  Amendment's Due Process Clause.

28      Also, CCR regulations use the "shall/unless" language (§2401-

                                [5-A]

1   2402) and recognize all available rights to petitioners. Further,

2   these regulations, AS ORIGINALLY WRITTEN, made it even clearer that

3   parole was to normally be granted. This remained so until political

4   operatives, presumably with a criminal bent, manipulated the executive

5   and legislative branchs to repeal this proviso and substitute a

6   "Willie Horton" revision that was never fully explained to the public

7   nor openly voted on for acceptance.

8       For respondents to abrogate this federal liberty interest they

9   must provide relevant, reliable evidence having some indicia of

10   reliability that Petitioner poses a CURRENT unreasonable threat to

11   public safety. Something they have patently failed to do as testified

12   to by their own witness as noted on page 10 of attached Exhibit "B",

13   which was generated BY RESPONDENTS and provided to all concerned

14   parties prior to Petitioner's BPH hearing and ignored.

15       Unreasonable risk evidence must be drawn from an individualized

16   analysis of 15 factors identified by regulations: CCR §2402(b);

17   Rosenkrantz at 653-4. "Such information shall include circumstances

18   of the prisoner's social history; past and present mental state;

19   past criminal history; [] the base and other commitment offenses;

20   past and present attitude toward (sic) the crime; any conditions

21   of treatment or control ...; and any other information that bears

22   on THE PRISONER'S SUITABILITY FOR RELEASE." (emphasis added).

23       This extensive list of factors, including other relevant reliable

24   information that must be considered, makes clear the Legislature

25   did not intend for any single factor to initially or consistently

26   trump all the others. This is exactly what is happening here however.

27   Decisions upon decisions by the BPH suggests the focus is exclusively

28   on the offense, a sub-factor among the total. The BPH insistently

1  attempts to insulate their failure to individually consider cir
2  cumstances of suitability using makeweight exceptions to state b
3  rote that, although post-conviction behavior was DULY CONSIDERE
4  and the inmate is otherwise suitable for parole, the offense wa
5  so "especially heinous, atrocious or cruel" that Petitioner is
6  ineligible for a finding of suitability. "The evidence underlying
7  the BPH's decision must have some indicia of reliability." Jancsek
8  v. Ore. Bd. of Parole (9th Cir. 1987) 833 F.2d 1389, 1390.
9      The reduction of the parole assessment process to an occluded
10  myopic consideration of the one factor and it alone--unerringly as
11  an unwritten general rule practiced in all circumstances--was never
12  intended by the Legislature and cannot be permitted nor allowed to
13  continue and comport with Rosenkrantz; see also: Environmental Defense
14  Ctr., Inc. v. EPA (2003) 344 F.3d 832, 858 n.36 (holding a federal
15  agency has acted in an arbitrary and capricious fashion, if "the
16  agency has relied on factors that Congress has not intended it to
17  consider, entirely failed to consider an important aspect of the
18  problem, and offered an explanation for its decision that runs counter
19  to the evidence before the agency, or is so implausible that it could
20  not be ascribed to a different view or the product of agency
21  expertise."); Arizona Cattlegrowers' Ass'n v. U.S. Fish & Wildlife,
22  BLM (9th Cir. 2001) 273 F.3d 1229, 1236 (holding judicial review
23  under the "arbitrary and capricious" standard is "meaningless ...
24  unless we carefully review the record to ensure that agency decisions
25  are founded on a reasoned evaluation of the relevant factors ...[;]
26  while reviewing courts should uphold reasonable and defensible
27  constructions of an agency's enabling act, they must not rubber-stamp
28  ... administrative decisions that they deem inconsistent with a

[5-C]

1  statutory mandate or that frustrate the congressional policy
2  underlying a statute.")

3  Second degree murder is not a crime automatically deemed un-
4  suitable for parole. And, given the above directive in Rosenkrantz
5  and Dannenberg, there must be a base set of factors upon which a
6  second degree murderer would have to be paroled or the BPH would
7  risk violating due process. To determine what would qualify as more
8  than the minimum necessary for a conviction, the courts must first
9  consider what is required, at the minimum, for a conviction of second
10  degree murder.

11  The Sixth District Appellate Court has explained that "[s]econd
12  degree murder requires ... malice--i.e., the perpetrator must kill
13  another person with the specific intent to do so; or he or she must
14  cause another person's death by intentioanlly performing an act,
15  knowing it is dangerous to life and with conscious disregard for
16  life." In re Smith (2003) 114 Cal.App.4th 343, 366, citing PC
17  §§187-189; and CALJIC No. 811. (noting "all second degree murders
18  by definition involve some callousness--i.e., lack of emotion or
19  sympathy, emotional insensitivity, indifferece to the feelings and
20  suffering of others" and that the facts of the instant crime were
21  callous, but not exceptionally callous) 366-67.

22  From this, the limits on the "minimum necessary to sustain a
23  conviction" of second degree murder can be defined. There must be:
24  1) a killing of another, 2) malice, 3) no premeditation or planning,
25  lying in wait, torture, etc., as would be present in a first degree
26  murder. Having doubts as to these elements the People accepted a plea
27  bargain to second degree murder and there has never been any contention
28  otherwise. The unique elements present here were duly recounted: (by

[5-D]

1  Ms. Fisher) "However, on the morning of the murder, the inmate had
2  been previously impaired either by drugs [and/] or alcohol. ... They
3  got into an argument, it became physical." (Exhibit "4", p. 42). This
4  tragedy should not mean second degree life without parole suitability.

5      Now that the crime is defined, the question must be what evidence
6  indicates that any particular second degree murder was somehow "beyond
7  the minimum necessary to sustain a conviction. In sum: what evidence
8  indicates the commitment offense was "especially heinous" or
9  "exceptionally grave" given that there typically must be a finding
10  of some level of heinousness, callousness and gravity in order for
11  an inmate to have had his second degree murder sustained by the courts
12  in the first place?..

13      The use of a weapon does not reasonably demonstrate that this
14  crime was "beyond the minimal elements" of a second-degree murder
15  conviction, and is in no way some evidence establishing that he is
16  currently an unreasonable threat to public safety. Indeed, were the
17  BPH able to rely on "weapon of choice" evidence in every case, every
18  second degree murder would be "beyond the minimal elements" and there
19  would be no way to commit a second degree murder in California that
20  did not qualify as an "especially" heinous crime and justify
21  imprisonment for life without parole. This is not what the Legislature
22  wrote the enhancement statutes for nor intended, and exceeds the
23  bounds of common sense in every conceivable manner.

24      This rendition illustrates further the importance, (given the
25  short tenure of the suggestion that "some evidence" may be found
26  in facts "beyond the minimum elements" of the commitment offense),
27  of courts providing enhanced guidance regarding what set of facts
28  are sufficient to support a denial of parole suitability. Invariably,

1  any such guidance should summarily relate to the relevance of the
2  evidence, its reliability, and the reasonableness in being able to
3  conclude that the evidence substantiates that the petitioner is a
4  CURRENT UNREASONABLE THREAT to the safety and security of the
5  community even in the face of professional opinions to the contrary.
6      Sole reliance on the commitment offense to deny parole not only
7  augurs the serious risk of being arbitrary and/or capricious but
8  is also almost always counter-instructive. In the parole determination
9  process, the Executive body is tasked with determining if the
10 petitioner is a CURRENT threat to public safety. This determination
11 is, in total, the only decision that the BPH must make, i.e., all
12 interpretations of mitigating and aggravating factors, and the weight
13 given if there are special circumstances of the offense which merely
14 go to instruct this final conclusion. "A determination of
15 unsuitability is simply shorthand for a finding that a prisoner
16 CURRENTLY would pose an unreasonable risk of danger if released at
17 this time." Smith, supra at 370 (CCR §2402(d)) (emphasis added.)
18     Petitioner asks forebearance to elaborate on the qualifications
19 regarding determination of suitability and how the crime is viewed
20 as a matter of opinion. Opinion which is not really based on evidence
21 having "an indicia of reliability." Evidence of clarity follows.
22     WHEREFORE, Petitioner respectfully prays this Court and its
23 Honorable Justices will grant the writ and Order Petitioner's rehear-
24 ing under instructions to individualize his complete suitability
25 consideration; without bias or political, personal or tenurial consi-
26 derations, and in accordance with the statutory mandate of PC
27 §3041(a), and any further relief as this Court may deem just and
28 proper to protect Petitioner's civil rights.

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____

   b. Result: _____ N/A _____ c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Result: _____ N/A _____ b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   _____

   THESE ISSUES ARE BEING TIMELY MADE FOR THE FIRST TIME ON THIS APPEAL

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   _____

   THERE IS NO ADMINISTRATIVE REMEDY AVAILABLE TO PURSUE

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.
      *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _____ **Orange County Superior Court**

    (2) Nature of proceeding (for example, "habeas corpus petition"):  **habeas corpus petition**

    (3) Issues raised: (a)  **denial of due process and equal protection**

      (b) **failure to meet federal standards of evidence to deny parole**

    (4) Result (Attach order or explain why unavailable):  **denied**

    (5) Date of decision:  **7-25-06**

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

      (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
**Orange County Superior Court, Show Cause Hearing on 8-23-06**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
**THERE WAS NO DELAY IN FILING THE WRIT IN SUPERIOR COURT BUT THERE HAS BEEN A DELAY IN NOTIFICATION OF DENIAL TO PETITIONER (see attached)**

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
**VENUE IN THIS COURT IS LAWFUL AND PROPER**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  **January 19, 2007**

_(signature)_
(SIGNATURE OF PETITIONER)

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

Case Number  M-10959 X A

## People Vs Macmeekin, Keith

| Report Request Criteria | |
| --- | --- |
| 1. Docket Date Range | : Date filter |
| 2. Sequence Number Range | : Sequence filter |
| 3. Docket Category | : Category filter |

| Docket Dt | Seq | Text |
| --- | --- | --- |
| 8/23/2006 | 1 | **Hearing held on 08/23/2006 at 09:00 AM in Department C5 for Chambers Work.** |
| | 2 | Officiating Judge: Kazuharu Makino, Judge |
| | 3 | Clerk: L. Hoyle |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearances. |
| | 6 | Order denying Habeas Corpus signed and filed. |
| | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 07/25/2006. |
| | 8 | As ordered, the clerk this date has mailed a copy of this minute order to the Petitioner at CDC # D-30728<br>F-221-L<br>P.O. Box 689<br>Soledad, CA 93960-0689. |
| | 9 | The clerk this date has forwarded a copy of this minute order to the District Attorney's Office. |

I hereby certify the foregoing instrument consisting of _1_ page(s)
is a true and correct copy of the original on file in this court.

ATTEST: (DATE) _1/10/07_
ALAN SLATER, EXECUTIVE OFFICER AND CLERK OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _Laura J. Hoyle_ , DEPUTY

# EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: ) CDC Number D-30728
)
KEITH MACMWEEKIN )
)
_____)

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MARCH 14, 2006

8:55 A.M.

PANEL PRESENT:

Ms. Tracey St. Julien, Presiding Commissioner
Mr. Rolando Mejia, Deputy Commissioner

OTHERS PRESENT:
Mr. David Spowart, Attorney for Inmate
Mr. Ted Burnett, Deputy District Attorney,
Orange County

Mr. Keith Macmweekin, Inmate, not present

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No    See Review of Hearing
_____ Yes   Transcript Memorandum

J. Farncomb              Peters Shorthand Reporting

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 3 |
| Pre-Commitment Factors | 8 |
| Post-Commitment Factors | 18 |
| Parole Plans | 10 |
| Closing Statements | 21 |
| Recess | 35 |
| Decision | 36 |
| Adjournment | 44 |
| Transcriber Certification | 45 |

--oOo--

1

1          P R O C E E D I N G S

2          PRESIDING COMMISSIONER ST. JULIEN:   It is

3    8:55 A.M.   This is a Subsequent Parole

4    Consideration Hearing for Keith Macmweekin,

5    M-A-C-M-W-E-E-K-I-N.   Oh, do you want to turn it

6    off for a minute?

7          DEPUTY COMMISSIONER MEJIA:   Just one

8    minute, I have to --

9                    (Off Record)

10         DEPUTY COMMISSIONER MEJIA:   We're back on

11   record.

12         PRESIDING COMMISSIONER ST. JULIEN:   Okay,

13   and Mr. Spowart just left the room for a minute,

14   too, I guess to retrieve some items.   Okay.

15   Mr. Macmweekin's CDC Number is D, as in dog,

16   30728.   Today is March 14, 2006, and we are at

17   the Correctional Training Facility in Soledad.

18   Mr. Macmweekin was received on June 10, 1986,

19   life-term starting the same day.   Count one,

20   murder-second, case number C58236, and that's

21   from Orange County, violation of Penal Code

22   Section 187.   The term received 15 years to

23   life.   Minimum eligible parole date December 27,

24   1994, and this is murder-second.   And my name is

25   Tracey St. Julien, T-R-A-C-E-Y, S-T, capital

26   J-U-L-I-E-N, Commissioner.

27         DEPUTY COMMISSIONER MEJIA:   Rolando

2

1   Mejia, M-E-J-I-A, Deputy Commissioner.

2           PRESIDING COMMISSIONER ST. JULIEN:

3   Mr. Burnett.

4           DEPUTY DISTRICT ATTORNEY BURNETT:   Ted

5   Burnett, B-U-R-N-E-T-T, Orange County District

6   Attorney's Office.

7           ATTORNEY SPOWART:  David Spowart,

8   S-P-O-W-A-R-T, Attorney for Mr. Macmweekin.

9           PRESIDING COMMISSIONER ST. JULIEN:  Okay,

10  and Mr. Macmweekin has exercised right to waive

11  his appearance at the Hearing today, so he is

12  not in attendance.  And Mr. Macmweekin signed

13  the BPT Form 1001A, and that is signed and dated

14  today.  Mr. Macmweekin has signed it along with

15  his attorney Mr. Spowart, and the box that is

16  checked says, "I do not personally wish to

17  attend my Hearing but I do wish to be

18  represented by Counsel at the Hearing."  Okay,

19  and Mr. Spowart, Mr. Macmweekin did not waive

20  his appearance because of any ADA issues?

21          ATTORNEY SPOWART:  No, no.

22          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

23  because if there are any ADA issues we would

24  want to make sure that those have been

25  accommodated.

26          ATTORNEY SPOWART:  There is none.

27          PRESIDING COMMISSIONER ST. JULIEN:  Okay,

3

1    thank you.  And in regards to that I am looking
2    at Mr. Macmweekin's BPT Form 1073 and that was
3    signed on May 18, 2005, and that the boxes that
4    are checks are "no disabilities identified from
5    the file review and I do not need any help for
6    my Parole Hearing."  Okay, I will read the
7    Summary of the Crime, as it appears in the
8    September 2005 Board Report.  And it states:
9                According to the records of the
10               Las Palmas Police Department, on
11               September 24, 1985, officers
12               responded an apartment on
13               Oglethorpe [phonetic] Avenue, to
14               check on Mrs. Virginia Macmweekin.
15               Officers were previously informed
16               of sounds of a struggle and of a
17               woman screaming have come from the
18               apartment and maintenance
19               personnel and the apartment
20               manager had knocked on the door
21               without any response and had
22               subsequently called the police.
23               Officers arrived at 9:30 in the
24               morning and were informed that a
25               17 year-old boy and his mother
26               lived at that location and that
27               they had been very quiet tenants.

4

```
1          After knocking several times
2          without response and discovering
3          that the deadbolt was in place,
4          officers obtained a passkey and
5          entered the apartment.  They
6          observed signs of a struggle.  The
7          officers opened the door to the
8          master bedroom and observed the
9          victim lying supine on the floor
10         with her head and upper torso
11         covered with loosely piled
12         clothing.  Blood and lacerations
13         were on both of her hands.  High
14         heel shoes were still strapped to
15         her angles but they were off the
16         soles of her feet.  Lifting the
17         clothing from off of her face,
18         officers observed blood in her
19         mouth and noted that her eyes were
20         closed and puffy and that there
21         was a man's necktie around her
22         neck.  Homicide investigators were
23         called to the scene and an autopsy
24         later revealed the cause of death
25         to be strangulation.  The palms of
26         both hands had shallow cuts and
27         the victim's left middle finger
```

5

```
 1              was broken.  A subsequent
 2              investigation revealed the
 3              victim's car was missing and that
 4              the victim's son, Keith Allen
 5              Macmweekin, and that's K-E-I-T-H,
 6              had not reported to work.  A
 7              witness later indicated that the
 8              victim had been having problems
 9              with her son regarding his cocaine
10              use and his alcohol abuse.  The
11              witness stated that the victim had
12              kicked her son out of her
13              apartment about a month before,
14              but had let him come back.  The
15              witness stated that the victim and
16              her son each had a bad temper and
17              that they would argue and have
18              fistfights.  And then on
19              September 26, 1985, immigrations
20              officers stopped Macmweekin as he
21              attempted to the United States
22              from Mexico.  He was detained and
23              subsequently transported to the
24              Las Palmas Police Department where
25              he gave a written confession.
26   And the confession follows.  In the prisoner's
27   version of the Board Report the prisoner stated:
```

6

```
 1          Between the hours of 7:00 and
 2          5:00 A.M., on September 23 and 24,
 3          1985, the inmate had consumed 16
 4          eight-ounce bottles of beer, smoked
 5          two joints of marijuana and snorted
 6          one and a half grams of cocaine.
 7          Macmweekin and his mother argued
 8          daily, particularly about his abuse
 9          of drugs and alcohol, his broken
10          down car, her alcoholism, her
11          boyfriends and her sexual behavior
12          regardless of his presence.  On
13          that morning he returned at about
14          5:00 A.M. to sleep on the couch.
15          He could not get to sleep until
16          about 6:00 A.M.  His mother
17          awakened him about 7:00 urging him
18          to go to work.  They had an
19          argument. The argument became
20          physical.  He was very tried and
21          angry at his mother for yelling at
22          him.  He backed into the kitchen
23          and picked up a knife from the
24          table, warned his mother to back
25          off and stated again that he wasn't
26          going to work.  His mother tried to
27          take the knife away from him.  He
```

```
 1          backed up against the wall and a

 2          mirror fell down on his foot.  He

 3          bent down and somehow cut into his

 4          mother's side.  She screamed and he

 5          threw the knife away.  She began

 6          beating him on the face.  He said

 7          at this point, quote, I went for

 8          her neck; I don't know why, end

 9          quote.  He stated he killed her

10          with both hands not knowing if she

11          was dead yet and decided to put her

12          out of her misery, and that's also

13          in quotes.  He therefore took a

14          necktie, knotted it around her neck

15          and strangled her until she no

16          longer moved.  He then dragged her

17          to her bedroom and after realizing

18          that she was dead covered her face

19          with clothing.  He stated then that

20          he went to her purse and took her

21          wallet, grabbed some clothes and

22          disconnected the phone in order to

23          prevent her from calling the police

24          if she was still alive.  He went

25          out the front door, locking it

26          behind him, and took her vehicle.

27          He went looking for a friend in Los
```

```
 1          Angeles, who ultimately advised him
 2          to go to Mexico.  And at some later
 3          point he decided to turn himself
 4          in.
 5  Okay, and Mr. Macmweekin's family life.
 6          ATTORNEY SPOWART:  Commissioner, before
 7  you go any further, --
 8          PRESIDING COMMISSIONER ST. JULIEN:  Uh
 9  huh.
10          ATTORNEY SPOWART:  -- my client gave me a
11  statement regarding the crime.
12          PRESIDING COMMISSIONER ST. JULIEN:  Oh,
13  okay.
14          ATTORNEY SPOWART:  He said that he has
15  read this (indiscernible).
16          PRESIDING COMMISSIONER ST. JULIEN:  Okay,
17  would you like to read that.
18          ATTORNEY SPOWART:
19          "For correction of record, I would
20          like to provide to this Panel
21          today with a correction of
22          Statement of Facts for the crime
23          which I committed.  I was awoken
24          that morning by my mother while I
25          was sleeping on the couch.  A
26          verbal argument took place between
27          she and I.  It was during this
```

9

1          argument which I became very upset
2          with her and I went to the kitchen
3          table, picked up the knife and
4          assaulted her with a knife.  The
5          remaining statements, which I made
6          for the record are accurate."
7    That's it.
8          **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.
9    So, in terms of personal factors, Mr. Macmweekin
10   had been arrested twice as a juvenile, for
11   possession of marijuana and then joy riding, and
12   he was counseled and released.  And
13   Mr. Macmweekin doesn't have any other adult
14   offense other than the commitment crime.
15   Mr. Macmweekin was the youngest of four
16   children.  He was born in 1966.  Apparently
17   Mr. Macmweekin's father William was very
18   abusive, he was an alcoholic and physically
19   abused his wife and children and the parents
20   argued daily.  And all of the inmate's brothers
21   had described the home scene, as a quote
22   unquote, mad house.  Two of the older brothers
23   joined the military and subsequently the parents
24   did divorce.  And the inmate's mother, who he
25   continued to live with, also had a drinking
26   problem and became an alcoholic.  The inmate
27   his mother and another brother moved to Orange

10

1    County in 1985. And apparently he felt that he
2    did not have any parental supervision by his
3    mother. It bothered the inmate that his mother
4    was dating and would bring her boyfriends to the
5    house that they shared. And apparently they had
6    constant arguments with each other. The inmate
7    dropped out of high school in 1984 in the 11th
8    grade, and apparently worked at various jobs for
9    about two years. And then in 1985, when he was
10   in the Orange County Sheriff's custody, he
11   apparently tried to attempt suicide by
12   swallowing two disposable trimming blades, and
13   he did, however, recover from that incident. In
14   terms of parole plans, the inmate would like to
15   reside with an uncle, Tom Brown, who lives in
16   Westlake, California. And I'm not sure if this
17   is a viable option, we don't have any letters in
18   the file on behalf of Mr. Macmweekin. And is
19   that correct, sir?
20        **ATTORNEY SPOWART:** No. He was going to
21   live with his brother, but he says that his
22   brother is constantly moving, and he doesn't
23   have -- he has three brothers, and one of them
24   won't talk to him at all and he doesn't know
25   where the other is. His older brother has
26   always kept in communication with him, but he is
27   constantly moving. He did provide me with some

11

1  places where he has written for guidance and we
2  might be able to --
3         PRESIDING COMMISSIONER ST. JULIEN:  Okay.
4  And you know bringing that up --
5         ATTORNEY SPOWART:  There was one -- he
6  has looked into the CDC Parole System --
7         PRESIDING COMMISSIONER ST. JULIEN:  Uh
8  huh.
9         ATTORNEY SPOWART:  -- that they have set
10  up.
11         PRESIDING COMMISSIONER ST. JULIEN:  Uh
12  huh.
13         ATTORNEY SPOWART:  Which states right in
14  there that nobody should be denied a parole
15  because he doesn't have a place to live, because
16  they will provide it.
17         PRESIDING COMMISSIONER ST. JULIEN:
18  Right.
19         ATTORNEY SPOWART:  And a --
20         PRESIDING COMMISSIONER ST. JULIEN:  Yeah,
21  I think they do --
22         ATTORNEY SPOWART:  -- he's looked into
23  all this stuff.
24         PRESIDING COMMISSIONER ST. JULIEN:  Okay.
25  And, you know, that reminds me that there is
26  some preliminary questions that I had neglected
27  to ask.  Do you have any additional documents?

12

1        ATTORNEY SPOWART:  Just those in front of

2    you.

3        PRESIDING COMMISSIONER ST. JULIEN:  Okay.

4    And --

5        ATTORNEY SPOWART:  He's given me a

6    closing stmt, which he wants me to read.

7        PRESIDING COMMISSIONER ST. JULIEN:  Wants

8    you to read, okay.  And then I noticed that you

9    passed the Exhibit One to --

10       ATTORNEY SPOWART:  I have all of those.

11       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12   And, Mr. Burnett, do you have all of those as

13   well?

14       DEPUTY DISTRICT ATTORNEY BURNETT:  I

15   believe so, yes.

16       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

17   And, Commissioner Mejia, will we be using any

18   confidential --

19       DEPUTY COMMISSIONER MEJIA:  No, no

20   confidential information.

21       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

22   So these letters are -- the first one is from

23   the Communication Workers of American, CWA,

24   Local 14904, and this is the Southern California

25   Typographical Mailer Union, M-A-I-L-E-R.  And it

26   says that -- I guess Mr. Macmweekin wrote to the

27   Union asking for information about getting work

13

1  in the printing industry, and perhaps an
2  apprenticeship program, because the letter says
3  "I must be honest in telling you that an
4  apprenticeship program are presently non-
5  existent as such.  However, this is what I would
6  recommend:  if possible work with a staff person
7  who is an expert in getting a person employed on
8  the outside.  Put together a one-page resume of
9  your printing training and experience that
10  stresses your stronger skills.  Consider finding
11  initial employment in a small shop that is
12  looking for a person, even part-time."  And he
13  says that a small establishment might be the
14  best bet at this point in time for him.  Okay,
15  and then as you mentioned, Mr. Spowart, there is
16  a letter from the Department of Corrections,
17  Parole and Community Services Division, and this
18  letter is giving information on, as you said,
19  the various services that are provided to people
20  on parole.  They have a Community Base Program
21  that provide lodging and meals, counseling, and
22  job services, and substance abuse services.  And
23  I don't know -- does it talk about housing?
24  Lodging, yeah, the Community Base Program
25  provides lodging.  Okay.  And then there is
26  another document that lists many locations of
27  career centers, one-stop centers, and transition

14

1  services.  And there is another document that
2  lists, specifically, Orange County addresses.
3  Now, also for the inmate suggestion would be for
4  him to, and I don't know if he has done this or
5  not, but would be to contact transitional living
6  centers, residential treatment programs, that
7  type of a thing, because he can identify a home
8  that he might want to go to and see what they're
9  procedure is for getting on a waiting list, a
10  bed, or whatever, and how long the program is.
11  I know there are some that are, you know, six
12  months a year, a year and a half, that type of
13  thing, until the individual can get back on his
14  feet and try to rent an apartment on their own.
15  But I would definitely suggest that he needs to
16  have some type of identified transitional home
17  or halfway house that he is intending on going
18  to, because, you know, we naturally don't want
19  to have him not, you know, be paroled without
20  any place to go to. And it is actually part of
21  the decision review that they pretty much insist
22  on the inmate knowing where he is going upon
23  release.
24       ATTORNEY SPOWART:  Well, I -- it is my
25  impression that the CDC Program is designed to
26  take care of that.  They state right in there
27  that no one should be denied parole because they

15

1    don't have a place to live or work, because they

2    will --

3              PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

4         ATTORNEY SPOWART:   -- make sure that he

5    does.

6              PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

7    but then I think the key word is should.  And if

8    -- I guess these places are, you know, they are

9    fairly easy to contact and get some idea of the

10   services that they offer.  But we need to have

11   some idea of where he is going to go.

12        ATTORNEY SPOWART:  Well, this will be on

13   the record and he will read the record.

14             PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

15   yeah, that's why I'm saying --

16        ATTORNEY SPOWART:  I told him that.

17             PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

18        ATTORNEY SPOWART:  He did -- in regards

19   to that I asked him about AA and NA and he said

20   yeah he knows --

21             PRESIDING COMMISSIONER ST. JULIEN:   Uh

22   huh.

23        ATTORNEY SPOWART:   -- that he is going to

24   have to do that.  He has written them, but he

25   says that he has never gotten an answer.  But he

26   said that this --

27             PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

16

1    and actually in a lot of these homes they do

2    offer substance abuse counseling, as, you know,

3    mentioned in there.  But we would need to see

4    something a little more specific, number one so

5    that the Panel is assured that, as I mentioned

6    before, Mr. Macmweekin isn't, you know, given a

7    parole date and he has no where to go.  And I

8    don't think he goes from the prison gates to the

9    parole officer's office on the same day.  So, he

10   needs -- and there is, you know, a certain

11   amount of work that he needs to do on his own

12   for his own well-being, you know, for his own

13   peace of mind.  I wouldn't think that the inmate

14   would want to be paroled to nowhere.  You know,

15   he has to set up a life for himself as well.

16   And in terms of the employment situation,

17   Title 15 requires that he have a marketable

18   skill.

19           ATTORNEY SPOWART:  He has three.

20           PRESIDING COMMISSIONER ST. JULIEN:  And

21   we will get into that in a minute.

22           ATTORNEY SPOWART:  Okay.

23           PRESIDING COMMISSIONER ST. JULIEN:  He

24   doesn't -- the law does not require him to have

25   a job offer; however, as I'm sure you know and

26   I'm sure he knows, the Panel likes to see job

27   offers, as does the Decision Review Unit and as

17

1    does the Governor.  So whatever he can do to,

2    you know, secure a future for himself, a solid

3    future, I think it will only work in his best

4    interest.  And I know that these things are hard

5    to do from prison and they are very hard,

6    especially if doesn't have any family support

7    out there, but nevertheless any efforts that he

8    makes on his own behalf should only work in his

9    favor.  Commissioner Mejia, do you have anything

10   to add to those comments?

11          DEPUTY COMMISSIONER MEJIA:  Yeah, I would

12   suggest that he attend the Pre-Release Program

13   also.  That would give him some more

14   information.

15          PRESIDING COMMISSIONER ST. JULIEN:  And I

16   will, also, note for Mr. Macmweekin, that he

17   does not necessarily have to parole in the

18   county of last legal residence.  I notice that

19   he does have letters from places in Orange

20   County.  If he wants to parole to Orange County

21   that's fine; if he can identify other

22   residential options or other employment options

23   that would be more viable for him in another

24   county that's also acceptable by the Board.  The

25   Board wants people on parole to succeed, and if

26   that means paroling to another county then we

27   usually will definitely take that into

18

1  consideration.  So he shouldn't feel that he
2  limited to geographically, but he has to stay,
3  of course, in California.  But if he can
4  identify another county where he would have
5  better success then we would certainly entertain
6  that.  But anyway in response to our notices, we
7  don't have any letters from individuals in
8  support of Mr. Macmweekin's release.  We do send
9  out 3042 Notices and those are notices that go
10 to law enforcement and the Courts and others.
11 And we have a letter signed by Mr. Burnett from
12 the District Attorney Office of Orange County,
13 and Mr. Burnett is going to speak shortly about
14 their position.  Okay.  I'm not sure that I have
15 anything else right now.  Okay, Commissioner
16 Mejia, do you want to cover post-conviction?
17        **DEPUTY COMMISSIONER MEJIA:**  The last
18 Board Report, Board appearance was September 9,
19 2004.  There was a one-year denial given to him.
20 Recommendations were for him to remain
21 disciplinary free and get self-help.  His
22 custody level is 19 -- classification score is
23 19, custody level is Medium A.  He is currently
24 working as a teacher's aid with an exceptional
25 work reports.  He has a GED.  I've seen some
26 college credits, but I don't know if he got his
27 AA.  He has two Certificates on file:

19

1    Vocational Drafting and Offset Printing.  They
2    were both completed and certification.  Self-
3    help since 1991 in AA, and it's current to 2006.
4    He has done some life skill, and Anger
5    Management.  There are no 115s.  There is one
6    128 in 1991.  No validation or gang affiliation
7    noted.  The psych report dated October 2, 2003,
8    by Dr. Steward.  Steward, S-T, as in Tom,
9    E-W-A-R-D, as David.  And Clinical Assessment in
10   2003, Diagnostic Impressions:  Axis I, cocaine
11   dependence and alcohol abuse in remission;
12   Axis II, deferred; Axis III, deferred; Axis IV,
13   incarceration; GAF of 85; no evidence of mood or
14   thought disorder.  Assessment of Dangerousness,
15   "Mr. Macmweekin presents a well below average
16   risk for violence when compared to the Level II
17   general population of inmates, and if released
18   to the community his potential for violence most
19   likely to be equal to that of the average
20   citizen.  Most significant risk factors which
21   could be a precursor to violence would be if
22   inmate Macmweekin is to return to alcohol or
23   cocaine abuse.  Inmate Macmweekin is competent
24   and responsible for his behavior.  He has
25   demonstrated excellent impulse control, judgment
26   and coping, despite his being in a demanding
27   institutional environment, by remaining without

20

1    a CDC 115s, and conversely, to abide by

2    institutional standards and regulations.    If

3    released to parole, Mr. Macmweekin might find it

4    helpful to be involved in support groups of

5    those who have abuse of drugs and alcohol, and

6    may also find it helpful to participate in

7    counseling.    This need not be a requirement of

8    parole but something that he could seek through

9    the parole officer, if he felt the need to do

10   so.    Inmate Macmweekin, although he has

11   abstained from alcohol and cocaine for 16 years,

12   should undergo random urine testing for alcohol

13   and drug use.    This is not intended as a

14   statement regarding the likelihood of his

15   abusing drugs or alcohol, but creating a system

16   of (indiscernible) for him."    Any additions,

17   Counsel, with regards to presentation?

18          ATTORNEY SPOWART:    I think you have

19   covered it.    Did you get that he has upgraded

20   educationally?

21          DEPUTY COMMISSIONER MEJIA:

22   (indiscernible - speaking at the same time as

23   the attorney.)

24          ATTORNEY SPOWART:    Yeah, and with an

25   honor roll and got his GED.    Okay, I think you

26   covered it all.

27          DEPUTY COMMISSIONER MEJIA:    Did he get

21

1    his AA?

2              ATTORNEY SPOWART:   I --

3              DEPUTY COMMISSIONER MEJIA:   I didn't --

4              ATTORNEY SPOWART:   I didn't see it.

5              DEPUTY COMMISSIONER MEJIA:   I didn't

6    think he did, I didn't see it.  But he did have

7    some college courses in early 1990s.

8              ATTORNEY SPOWART:   Yeah, I saw the thing

9    regarding where he was on the honor roll, but I

10   didn't see anything where he got his --

11             DEPUTY COMMISSIONER MEJIA:   I don't think

12   he's got it.

13             ATTORNEY SPOWART:   -- got the AA degree.

14             DEPUTY COMMISSIONER MEJIA:   I'll return

15   back to the Chair.

16             PRESIDING COMMISSIONER ST. JULIEN:   Okay.

17   Mr. Macmweekin is not here, so we are not able

18   to ask him any questions, either the Panel or

19   the District Attorney or the inmate attorney.

20   So, Mr. Burnett, do you have a closing

21   statement?

22             DEPUTY DISTRICT ATTORNEY BURNETT:

23   Certainly, thank you.  First of all I would just

24   like to point out a little bit about the

25   psychological reports, and they always sort of

26   bug me a little bit by the way they word them a

27   lot.  I will note that the inmate when he came

22

```
 1   in was diagnosed as having an explosive
 2   personality disorder, and then that just sort of
 3   vanished over the years.  And now we are up to
 4   he is just a fine guy because the person that he
 5   killed was his mother, and he doesn't have any
 6   more mothers so he's not going to kill anybody
 7   again.  To me that is just silly.  The fact is
 8   that once he is out there he is going to be
 9   facing the same sort of frustrations that
10   happened to him in this instance, it just could
11   be another person, and for them to say that he
12   is not a risk because the object of his rage,
13   his mother, is already dead just strikes me as
14   absurd.  Now to get into more of the particulars
15   that the Board looks for, I will go ahead and
16   cover the standard type of things.  When you
17   look at this commitment offense it truly is a
18   heinous, atrocious, cruel and callous.  I
19   mentioned in my letter that it is almost
20   unconscionable -- well, it is unconscionable to
21   think that somebody could do this to his own
22   mother based on what her problem with him was;
23   he is under age and drinking, he is smoking
24   marijuana.  He is obviously taking people's cars
25   and getting stopped with marijuana and he's
26   snorting cocaine, and he's refusing to go to
27   work.  This is why he choked his mother to
```

23

```
 1   death, after attacking her with a knife and
 2   stabbing her.  It is interesting that he has
 3   finally admitted, and I don't know if Counsel
 4   indicated that he has been admitting for a
 5   while, I guess, I don't know that for sure, but
 6   I was curious as to just how his mother got the
 7   knife wounds on her hands, based on the inmate's
 8   version in the report; it made no sense.  Now he
 9   admits that he did attack her with a knife that
10   explains how she got the knife wounds, the
11   defensive wounds on her hands.  But this is just
12   another indication of just how horrible this
13   crime was.  It certainly was carried out in a
14   manner that exhibited callous disregard for the
15   life of his mother.  He chokes her to
16   unconsciousness, after stabbing her, then he
17   doesn't back up and say, "my God what am I
18   doing," but he goes and gets a knife, I mean a
19   necktie, wraps it on her -- do you need to
20   change the tape?
21           DEPUTY COMMISSIONER MEJIA:  Not yet.
22           DEPUTY DISTRICT ATTORNEY BURNETT:
23   Throttles her and then he starts dragging her
24   around the house, throws some clothes on her
25   and, again, the motive for this crime is because
26   he is upset with her because she is getting on
27   his case about the fact that he won't go to
```

24

1   work.   They obviously had a volatile
2   relationship; lots of people have volatile
3   relationships with their parents and don't end
4   up in this.  So the motive for the crime is very
5   trivial in relationship.  It also, I mean he
6   kills his mother, she is lying dead on the floor
7   and he still doesn't say, "oh, well what have I
8   done," instead what he does is that he goes to
9   purse, steals her wallet, steals her car, splits
10  to Mexico, and we don't know from the Board
11  Report how long he was there, and I don't know,
12  I don't know if he was there for a long time and
13  then came back or if it was short; I don't know
14  if the Board knows.  But that, also, should be
15  considered because murdering her didn't stop him
16  from doing these other criminal acts.  And in
17  particular, I will just draw from the Statement
18  of Facts, as the Board is well aware, he did
19  stab and choke his mother to unconsciousness and
20  then gets that tie and then he unplugs the phone
21  just on the outside chance that maybe he hasn't
22  killed her that he doesn't want her to be able
23  to get help; and this is another despicable
24  thing.  Finally, turning to his previous record,
25  obviously, he was a young man when this
26  happened.  He doesn't have an extensive prior
27  record.  He did have some problems as a juvenile

25

1    with the marijuana and the joy riding, but let's
2    not ignore the fact that even though he didn't
3    have prior convictions, per se, he obviously was
4    behaving in a criminal way, just the fact that
5    he was drinking was criminal, the marijuana was
6    obviously criminal and the cocaine was criminal,
7    which also indicates that he has had this
8    pattern of criminal behavior that commenced at
9    an early age.  Clearly, he is to be commended
10   because he behaves in prison.  It is the Orange
11   County District Attorney's Office's position
12   that he is simply too unstable to be in other
13   than this type of a controlled environment.  In
14   a prison he behaves well, but you let him out
15   and he is a danger and we oppose releasing him.
16   Thank you.
17        **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,
18   thank you.  Mr. Spowart.
19        **ATTORNEY SPOWART:**  Yes.  He has a lot of
20   problems.  Juvenile record, two arrests:  One
21   for possession of marijuana, the second for joy
22   riding, and he was counseled and released, no
23   violence; adult convictions, the incident
24   offense only; a stable social history,
25   definitely not.  He had a lot of problems.  His
26   mother and father were alcoholics.  His father
27   died, he was raised by his mother, and he had

1    constant problems.  I will get to that in a

2    second because the D.A. in his closing makes a

3    lot of statements, but -- in fact, I'm going to

4    address it right now.  Just look the statement

5    in the probation officer's report.  Who knew,

6    who knew -- the D.A. wasn't there, he didn't

7    know any of this, he was just taking this out of

8    that the -- who knew about this relationship?

9    When (indiscernible) information, the probation

10   officer says:  "The probation officer contacted

11   Madeline [phonetic] Brown, mother of the

12   victim," the maternal grandmother.  "Mrs. Brown

13   indicated that her daughter and the defendant

14   were having difficulties."  Now these problems

15   were in relationship to the defendant being into

16   dope, right.  "She related that her daughter did

17   not discuss any particulars, but indicated that

18   they were (indiscernible), but she did not

19   appear overly concerned.  Mrs. Brown indicated

20   that the defendant and his brothers suffered

21   difficult times due to their father and that

22   both the defendant's father and mother abused

23   alcohol.  Mrs. Brown indicated she had no

24   indication that the defendant ever struck his

25   mother in the past, although they had argued.

26   She indicated that the defendant had written to

27   her and apologized for his actions in his

```
 1   letters, and he recognizes what he did wrong.
 2   She indicated that the defendant and his mother
 3   were very close and (indiscernible) dependent
 4   upon.  She stated the victim was a good person
 5   who loved her family.  She stated the defendant
 6   had a rough time growing up and it was her
 7   belief that he needs help."  She knew both her
 8   daughter and her grandson, and she knew -- she
 9   had a good idea of what was happening.  So to
10   say that this was a trivial matter -- my client
11   didn't -- you know why he doesn't come in?  He's
12   embarrassed to face you.  He killed his mother,
13   he just -- it's very difficult for him to live
14   with that.  Remorse, yes, just read the psych
15   report, and I'm going to read it to you in a
16   minute.  Motivation, anger brought on by years
17   of stress, years of stress, constant stress.
18   There is no excuse for killing anybody.  There
19   is no excuse for especially killing your mother.
20   But when you read this relationship and how this
21   came, his mother's actions were truly horrible,
22   she didn't deserve to die over it, nobody is
23   going to say that, and my client has to be
24   punished, and he admits that.  But, you know,
25   when you look at the matrix, it depends on where
26   you sit the term based on did you have a close
27   relationship with the victim or did you not have
```

28

1    a close relationship with the victim.  Did the
2    victim have anything to do with this, the
3    argument and goading him on; these are things to
4    be considered.  It does make a difference; it
5    does make a difference the circumstances of the
6    crime.  He was 18 then and he's 39 now.  He has
7    had -- this is his eight Subsequent, and the
8    last time he was denied one-year, and he has had
9    many stipulations.  I asked him why that, and he
10   just doesn't want to come before the Board, he's
11   embarrassed, and he can't talk about it, why he
12   killed his mother.  He doesn't take this
13   lightly, believe me, he does not.  I tried to
14   talk to him today to come in here and talk to
15   you.  His parole plans, he has no family
16   support.  His grandmother, in years gone by he
17   could have lived with his grandmother, but she
18   died.  His brothers, one of them won't talk to
19   him and the other he never knows where he is,
20   and his older brother is constantly moving.  So
21   he doesn't have a -- in the past he gave that.
22   He has looked for places to live, and I told him
23   today that this is going to be a factor, that
24   the Board is going to be concerned about his
25   parole plans.  The guidelines state that a job
26   offer or skills that he has learned while
27   incarcerated that he can put to use on the

29

```
1    streets.  Now, he has three good vocations:
2    Vocational Drafting, Mechanical Printing, and
3    Offset Printing.  He has ten years in printing.
4    How has he done since he's been down?  The D.A.
5    says that you can't trust him on the outside, he
6    has to be in a structured environment.  Well, a
7    structured environment  -- your right, can he
8    obey the rules in here?  No 115s and only one
9    128A and that was in '91.  He's been in AA with
10   laudatory chronos; he has completed Life Skills;
11   he has completed Anger Management; he has
12   excellent work reports; he got his GED
13   (indiscernible) Orange County Jail; and he has
14   upgraded educationally at Hartnell College.
15   Now, let's go look at this psych report.  The
16   Commissioner covered it very well, but I just
17   want to go over it again.  Axis I, cocaine
18   dependence and alcohol abuse in remission.  No
19   115s for alcohol or drugs the whole time that he
20   has been down.  Axis II, deferred; Axis III,
21   deferred; and a current GAF very good at 85.
22   Now, I'm always amazed, well, I'm not amazed
23   because I use it the other way, if it hadn't
24   been a good psych report the D.A. would have --
25   if it had been a bad psych report for my client
26   the D.A. would have been saying what a great guy
27   these psychs are.  But this is a good psych
```

30

1    report, so he is saying it's terrible, so, I'm
2    going to tell you how good it is.  In view of
3    the life-crime, it pretty much states what
4    happened.  "As stated above, he continues to
5    feel sadness and remorse and tears rolled down
6    his eyes during the interview."  He does feel
7    remorse, and I've talked about that, the psych
8    talked to him.  "Inmate Macmweekin has been
9    exemplary in not receiving any 115s during his
10   incarceration, and only one 128 counseling for
11   not reporting the Central Textile Garment
12   Factory.  Giving this reputation for compliance
13   and following regulations, inmate Macmweekin
14   presents a well below average risk for violence
15   when compared to the general level inmate
16   population."  Okay, the D.A. says that he needs
17   to be in here because he will obey the law.
18   He's below this Level II, which is low to begin
19   with.  But what we're interested in is what is
20   he going to do when he gets out on the streets?
21   "If released to the community, inmate
22   Macmweekin's potential for violence is most
23   likely equal to that of the average citizen.
24   The reason for this conclusion is that the
25   object of his rage, his mother, is the sole
26   primary maternal figure in his life since one
27   can realistically only have one mother."  Now,