# EXHIBIT 8
# Part 2 of 2

31

1    let's not trivialize that.  We are talking is he

2    a danger to the average person in society?  No,

3    they don't -- this was a special on going for

4    years of abuse between the two and that's the

5    issue.  When he gets out he is not going to have

6    another mother; he's not going to -- the average

7    person on the street does not fit the category

8    where he is liable to turn around.  So, that is

9    not a frivolous statement; that describes how

10   this happened.  "Lastly, he has been

11   incarcerated for most of his adult life without

12   becoming involved in the criminal lifestyle in

13   prison."  This is very important.  This has been

14   a unique and very memorable 16 years of his

15   life, which has caused him great caution and

16   never considering violence.  "Inmate Macmweekin

17   is confident and responsible for his behavior.

18   He has demonstrated excellent impulse control,

19   judgment and coping strategies within a

20   demanding institutional environment, to remain

21   without CDC 115s, and conversely to abide by

22   institutional standards and regulations."  Now,

23   he does state, and this only makes sense, and I

24   talked to my client and he intends to be in AA.

25   "He will find it helpful and he should be tested

26   for drugs and alcohol."  Sure, that's what --

27   this is a good solid psych report.  He didn't

32

1    sugar coat it or anything, he says the guy has

2    his problems, and he's overcome them while he's

3    been in here, and if he gets out he has to be in

4    it and he has to be tested. But as far as his

5    dangerousness to the average person on the

6    street he is no more than average. He has done

7    the programs while he's been in, and he has an

8    excellent psych report. Now my client isn't

9    here and he did ask me to read his closing

10   statement --

11            PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12        ATTORNEY SPOWART:  -- which I would like

13   to do. "I wish to convey to this Panel today

14   that I continue to accept full responsibility

15   for the crime that I committed. In regards to

16   the charge, I plead guilty to the second-degree

17   murder with malice of forethought. My feelings

18   toward the crime that I committed is that I am

19   so very deeply sorry and saddened for what I

20   did, as I live with this grief each and every

21   day of my life. I am truly aware that my mother

22   suffered because of my senseless action in which

23   I acted upon an impulse of anger, giving no

24   thought or care to her life or to the pain and

25   grief which I would cause to so many people. I

26   am aware of all the pain that I caused to my

27   family, relatives and each individual who

33

1    enjoyed a personal relationship with my other.
2    I am so deeply sorry to my mother, to my family
3    and to all the victims that I created because of
4    violent actions that I took on that morning.
5    Had I taken a moment to reflect in the situation
6    and make an attempt to calm myself in the
7    argument through constructive dialogue, this
8    senseless crime could have been avoided and my
9    mother would be alive today.  I have done much
10   personal reflection over these past 19 years and
11   looking at my adolescence years I do recognize
12   that I should have taken the corrective steps
13   and sought out individual therapy and family
14   counseling to deal with feelings from childhood
15   that I kept bottled up inside.  However, I
16   failed to take the imitative at all and chose
17   the path in my life that was reckless and
18   irresponsible, not just for myself but to my
19   parents, my brothers, my relatives, and each
20   individual that I shared a personal relationship
21   with.  For this, too, I am sorry.  I have made
22   attempts over the years to make reparations to
23   each individual that I caused pain and grief.
24   Although apologizes and explanations as to why
25   this all happened may not be enough, I have
26   tried to make them aware of my personal change
27   through the rehabilitive efforts and

34

1   opportunities that have been afforded me.   In

2   reference to my application for parole, it is my

3   hope that my rehabilitive efforts are

4   acknowledge: The individual counseling and

5   psychologist, (indiscernible) return to society,

6   disciplinary free, group meetings, high school

7   diploma and two years of college, marketable job

8   skills -- "

9                    (TAPE 1, SIDE A, ENDS)

10                   (TAPE 1, SIDE B, BEGINS)

11          DEPUTY COMMISSIONER MEJIA:  Back·on record.

12          DEPUTY COMMISSIONER MEJIA:  Yeah, now this last

13   statement that I was reading, I believe this letter

14   was the same one that he read last time.

15          PRESIDING COMMISSIONER ST. JULIEN:  It has some

16   additional information.

17          ATTORNEY SPOWART:  (indiscernible) he doesn't

18   have them, letters this time.

19          PRESIDING COMMISSIONER ST. JULIEN:  Uh huh.

20          ATTORNEY SPOWART:  Letters of support from my

21   family, providing housing support, because his brother

22   had moved.  "I am sincere in what I have expressed to

23   this Panel today and I think you for this time in

24   reviewing my application for parole.  Signed Keith

25   Allen Macmweekin."  And with that I would just like

26   to, once again, make the statement how he really has

27   programmed in an excellent manner.  I would ask for no

35

 1    more than -- if you don't give him a date today, I ask

 2    for no more than a one-year denial, because he is

 3    doing everything that he can.  Thank you.

 4         PRESIDING COMMISSIONER ST. JULIEN:  Okay, thank

 5    you very much, sir.  Okay, we will recess for

 6    deliberations.

 7                    R E C E S S

 8                    --oOo--

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

36

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER MEJIA:**  We're back on

4    record for our decision on Mr. Macmweekin's

5    case.  Commissioner, we are on record.

6    **PRESIDING COMMISSIONER ST. JULIEN:**  Okay.

7    All parties have returned to the room.  The

8    Panel has reviewed all the information received

9    from the public and relied on the following

10   circumstances in concluding that the inmate is

11   not yet suitable for parole and would pose an

12   unreasonable risk of danger to society or a

13   threat to public safety if released from prison.

14   Specifically, as it regards the commitment

15   offense, the offense was carried out in a cruel

16   manner, and this was the murderer of the

17   inmate's mother, Madeline Macmweekin.  And the

18   crime occurred on or about September 24, 1985,

19   and September 24th is the day police officers

20   had discovered the body, and apparently she was

21   killed the night before.  Mrs. Macmweekin was

22   living with her 17 year-old-son at the time, the

23   inmate, Keith.  Apparently they had had a

24   tumultuous relationship in that there were often

25   arguments and some of those arguments had

26   actually even led to physical altercations.  And

27   KEITH MACMWEEKIN D-30728 DECISION PAGE 1 3/14/06

37

1   apparently on this day, the inmate had been

2   drinking and using drugs.  He was supposed to go

3   to work that morning and was not inclined to do

4   so.  His mother was trying to encourage him to

5   go to work and there, again, an argument

6   ensured, and apparently the inmate turned -- his

7   attitude turned into a violent rage and he began

8   to struggle with his mother.  He stabbed her; he

9   took a knife from the kitchen and stabbed her.

10  I think, one stab wound was to the waist and

11  there was some defensive wounds on her hands and

12  arms.  And then the inmate proceeded to strangle

13  Mrs. Macmweekin with his hands, and in an effort

14  to, quote unquote, put her out of her misery, he

15  found a necktie, knotted it around her neck and

16  strangled her until she no longer moved.  And

17  this crime, in deed, was carried out in a manner

18  which demonstrates a callous disregard for human

19  suffering, in that to ensure that his mother was

20  dead and could not call for help, the inmate did

21  remove the ability for his mother to use the

22  phone, so that she could not call for any

23  medical help or other types of help, and he left

24  the apartment after taking his mother's money

25  and car.  And the inmate fled to Mexico and was

26  there, I don't think, for very long.  He was

27  KEITH MACMWEEKIN D-30728 DECISION PAGE 2 3/14/06

38

1    arrested on May [sic] 26th, so I think that was

2    probably just a day or so that he went to

3    Mexico.  However, these circumstances of the

4    crime do show that the inmate did act in a

5    violent rage and murdered his mother.  In terms

6    of a previous record, there are two minor

7    juvenile arrests and no prison time or CYA time.

8    The inmate, however, does have a social history

9    that includes alcohol abuse at a very young age

10   as well as illegal narcotics use.  His

11   programming while in the institution has been

12   very good.  His psychological report, dated

13   October 2, 2003, by Dr. Steward, is favorable,

14   favorable, however, conditional.  The

15   psychologist says that "the inmate would pose a

16   low risk of future dangerousness as long as he

17   abstained from alcohol or illegal narcotics."

18   In terms of parole plans, the inmate definitely

19   needs to work on his parole plans.  He needs to

20   develop violable residential plans, whether it

21   be in transitional housing, a halfway house,

22   that type of thing, with a friend or relative,

23   either one of those options, he needs to get two

24   options and that would serve him well.  If the

25   first option doesn't work out, as it hasn't in

26   the past, in review of the record, at one point

27   KEITH MACMWEEKIN D-30728 DECISION PAGE 3 3/14/06

39

1    in time the inmate was going to live with his
2    wife, they are now divorced, so that fell
3    through; he was going to live with his brother,
4    the brother cannot be located, so that fell
5    through. So, I would strongly suggest that the
6    inmate develop two solid residential plans as
7    well as continuing his search for acceptable
8    employment plans.  And those are things, again,
9    that are difficult to do; however, the effort,
10   any effort that he puts in will be to his avail.
11   And I do note that the letters I think he had
12   today in regards from the Union, are the same
13   that he had before, so he needs to constantly
14   and consistently keep up his search not only for
15   a parole residence, but for viable options in
16   terms of a job to support himself.  In regards
17   to 3042 Notice, we note that the District
18   Attorney of Orange County has expressed
19   opposition to a finding of parole suitability.
20   And we find in our findings that we would
21   certainly have liked the opportunity to discuss
22   with the inmate some of the questions that we
23   had, not only about the crime, but more
24   importantly, I think, about his insight into the
25   crime, what were the triggers, because it is
26   only through an exploration of his insight into
27   KEITH MACMWEEKIN D-30728 DECISION PAGE 4 3/14/06

40

1    the causative factors of this crime that the
2    Board can be assured that the inmate has put
3    these factors behind him and is not likely to
4    repeat these actions.  And I, also, noted in the
5    psychological report that the inmate wanted to
6    discuss his life and all these issues with the
7    psychologist and so he apparently does have the
8    need to discuss these things about himself and I
9    would like to let him know that at any point in
10   the future the Board would, also, be interested
11   in talking to him about not only his past but
12   his future.  And I would also like to say that
13   the inmate, in terms of parole plans, if he
14   would also develop a relapse prevention program
15   that that would be beneficial to him as well, so
16   that we can be assured that his alcohol and drug
17   use is behind him as well.  Perhaps there is an
18   outside agency like Friends Outside, something
19   like that, that he can contact in terms of
20   guidance as to how he might want to put his
21   future plans together.  And we do note that the
22   inmate demonstrates an ability to recognize that
23   what he did was wrong; however, we don't know if
24   there is any insight there.  And we, again,
25   would like to examine the facts and
26   circumstances of his life and his crime in a
27   KEITH MACMWEEKIN D-30728 DECISION PAGE 5 3/14/06

41

1  manner that we can be assured that he

2  understands what prompted him to commit the

3  crime and that he will not do that again.  And

4  we would like to give him some commendations for

5  his prison behavior.  Commissioner Mejia.

6      **DEPUTY COMMISSIONER MEJIA:**  Yes.  He

7  should be commended for being disciplinary free,

8  no 115s, administrative 115s, throughout his

9  incarceration, and only one 128, which was in

10  1991.  He has his GED and has college credits

11  that he has earned through the early '90s.  He

12  has an exemplary work report, and has been in AA

13  consistently since 1991.  And he has two

14  vocations:  Vocational Drafting, and Offset

15  Printing.  Nevertheless --

16      **PRESIDING COMMISSIONER ST. JULIEN:**  Okay,

17  however, those positive aspects of his behavior

18  do not outweigh the factors of unsuitability.

19  And we are going to deny parole for two years.

20  And we are going to do so because we have --

21  it's a separate decision, and we find that the

22  inmate has been convicted of murder, and it is

23  not reasonable to expect that parole would be

24  granted at a Hearing during the next two years.

25  Again, specific reasons for this are the

26  commitment offense; this was the murder of the

27  **KEITH MACMWEEKIN D-30728 DECISION PAGE 6 3/14/06**

42

1  inmate's mother.  Apparently there had been a

2  tumultuous relationship between the two.  The

3  mother, apparently, was a heavy drinker;

4  however, by all accounts she was trying to

5  encourage her son to work and to not use drugs

6  or abuse alcohol.  However, on the morning of

7  the murder, the inmate had been previously

8  impaired either by drugs or alcohol.  His mother

9  awakened him to go to work; he refused.  They

10  got into a argument and, apparently, it became

11  physical.  The inmate took a knife and began to

12  stab his mother.  She received stab wounds in

13  the side and then on both hands and she had a

14  broken figure.  The mother was then, at some

15  point in time, dragged into another room.  The

16  inmate strangled her with his hands and then to

17  ensure that the mother was dead and, quote

18  unquote, put out of her misery, the inmate took

19  a man's necktie and strangled her.  And then to

20  ensure that the mother could not call for help,

21  the inmate disconnected the telephone, took some

22  of his own mother's money and car and fled to

23  Mexico.  So, we do find that this was an offense

24  that was carried out in a manner which

25  demonstrates a disregard for human suffering.

26  And in terms of the inmate's past, there were,

27  **KEITH MACMWEEKIN D-30728 DECISION PAGE 7 3/14/06**

43

1    apparently, heavy drinking and illegal narcotics

2    usage at a very young age.  And apparently the

3    inmate has made a tremendous shift.  Earlier

4    records do show that the inmate was quite

5    troubled, depressed and had a suicide attempt.

6    However, hopefully, these issues are behind him.

7    He has been programming very well.  However, do

8    to the severity of this crime, we do find that

9    he does need additional observation and

10   evaluation in a structured environment.

11   Therefore, a longer period of evaluation is

12   required before the Board should find that he is

13   suitable for parole.  We recommend that he

14   remain disciplinary free and, also, if

15   available, he should participate in any self-

16   help programming.  Commissioner Mejia, did you

17   have any comments?

18        **DEPUTY COMMISSIONER MEJIA:**  No further

19   comments, Commissioner.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   KEITH MACMWEEKIN D-30728 DECISION PAGE 8 3/14/06

44

1          PRESIDING COMMISSIONER ST. JULIEN:   Okay,

2    this will conclude the Hearing.   It is

3    10:28 A.M.

4                    --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    PAROLE DENIED TWO YEARS                JUL 1 2 2006

23    THIS DECISION WILL BE FINAL ON:_____

24    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

25    DATE, THE DECISION IS MODIFIED.

26    KEITH MACMWEEKIN D-30728 DECISION PAGE 9 3/14/06

45

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, J. FARNCOMB, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total One in number and cover a total of pages numbered 1 - 44, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KEITH MACMWEEKIN, CDC NO. D-30728, on MARCH 14, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated March 30, 2006, at Sacramento, California.

J. FARNCOMB
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT   "B"

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### NOVEMBER 2003 LIFER CALENDAR

## CORRECTIONAL TRAINING FACILITY, SOLEDAD
### OCTOBER 2, 2003

**NAME:** MACMEEKIN, KEITH ALAN
**CDC #:** D-30728
**DOB:** 11/04/66
**AGE:** 36
**RACE:** White
**SEX:** Male
**MARITAL:** Divorced
**RELIGION:** None stated
**EVALUATION DATE:** 10/02/03

**CRIME:** Murder, Second Degree
**TERM:** 15 years to life
**OFFENSE DATE:** 09/24/85
**ARREST DATE:** 09/26/85
**SENTENCE DATE:** 04/25/86

**EVALUATOR:** J. Steward, Psy.D.
Clinical Psychologist
**INSTITUTION:** Correctional Training Facility, Soledad, CA

This is the sixth psychological evaluation for the Board of Prison Terms for inmate MacMeekin. Consequently, the psychosocial assessment in the prior report of 12/04/00 remains accurate, unless noted below. The current evaluation is based upon a personal interview with the inmate, and a review of the Central file and medical records.

## PSYCHOSOCIAL ASSESSMENT

IV.     **FAMILY HISTORY:**

Inmate MacMeekin stated that his mother and father cheated on one another, and when he was young, his mother took him to a man's house so she could sleep with this other person. When 18 years old, he entered the apartment, only to inadvertently and shockingly find his mother having sex with a man on the living room couch. He immediately shut the door, and left the apartment area.

Inmate MacMeekin also reported how his father was such an alcoholic that it destroyed his career as a recording engineer. Inmate MacMeekin's earliest memory is coming home from school when six years old, being terrified because he knew his father's alcoholic drinking would lead to him being at the peak of his anger in the afternoon. His father attempted to help him with homework, but became frustrated, yelling at inmate MacMeekin, then hitting him, at which time he would run to his room. While remaining in his room, he could hear his parents arguing, and a thumping sound that appeared to be his father hitting his mother.

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE TWO

When 12 years old, inmate MacMeekin recalled his mother repeatedly and intensely yelling at his father until he snapped and threw a plate at his mother. Then his father would grab his mother, and at one time inmate MacMeekin ran up behind him to stop it, but his father pushed him away, attacking inmate MacMeekin verbally, and returning to hitting his mother. Inmate MacMeekin never experienced this intense amount of yelling in anger from his mother until that day when he stabbed and choked his mother to death. He describes his mother as "just snapping at him," implying she lost control of herself. Of course, as the criminal reports attest, inmate MacMeekin similarly snapped into a murderous rage against his mother.

When 14 years old, inmate MacMeekin pleaded with his mother to divorce his father, because he "could not stand the arguments and the fights anymore. I just had to hold in the anger." Sometimes, his mother would drive them to the park, and sleep in the car to remove themselves from the home where his father was a hostile, angry threat. The first time inmate MacMeekin felt "good about himself" was when he stayed at friends' homes whose parents and family were happier, kinder, and more caring than his own. Apparently, his father maintained an iron fist in the home by restricting inmate MacMeekin's activities so he was unable to visit with friends. However, after the divorce, when he was 14 years old, he began to experience a new sense of freedom and happiness.

When 15 to 16 years old, he reports he ran away from home because of his mother's drunkenness and repeated berating of him. At about this time, he reports his mother would have "a number of guys over to the apartment to see her, and to stay the night."

In light of this crime, it is quite obvious parricide is, at the very least, without excuse. However, in the interest of understanding the psychodynamics, one can see the emotional depravation, intense hostility, bitterness and vengeance that arose form this cacophony of distrust, perpetual conflict, brutality, and terrifying environment. At the same time, this does not abnegate inmate MacMeekin for his choice to cope by using drugs, and eventually by killing his mother.

NOTE: Inmate MacMeekin's maternal grandmother, with whom he had become close following the murder of his mother, died within approximately the last year. He greatly grieves her loss, possibly because she offered him comfort, understanding, and support after the crime, and also, this was the final link to his own mother, whom he murdered.

VI.    **MARITAL HISTORY**:

Inmate MacMeekin divorced his wife in 1999 because she was alone, and they lost conjugal visits. She desired to pursue her own life, with which inmate MacMeekin agreed would be in her own best interest.

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE THREE

IX.   **SUBSTANCE ABUSE HISTORY:**

Inmate MacMeekin's last substance abuse occurred before his arrest on 09/26/85.

XI.   **PLANS IF GRANTED RELEASE:**

Inmate MacMeekin considers one of the more viable options to be near his uncle
Tom's house in Westlake Village. However, he does not want to parole anywhere
where there are drugs or alcohol, because "I have had enough of that." He plans
to pursue his vocation of printing, for which he is accomplished, or drafting. He
has multiple skills in this area, and has even taken the responsibility of looking at
classified ads. However, inmate MacMeekin states, "If I could find a job stapling
books for five dollars an hour, I would do it."

## CLINICAL ASSESSMENT

XII.   **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate MacMeekin presents as his stated age of 36, and was appropriately dressed
and groomed for the interview. His speech was coherent, and his attitude was one
of calm alertness and cooperativeness. He maintained good eye contact, and was
thoughtful in his presentation. He was only mildly frustrated when asked
questions during part of the interview because he had yearned and planned to
share his childhood experiences with the psychologist. This soon became
apparent, so the interviewer allowed inmate MacMeekin to relate all of the
information he has been wanting to tell an evaluator. Much of the information, if
not all of the information, is included in Section IV, Family History.

Inmate MacMeekin's flow and rhythm of speech was within the normal range.
His thoughts were rational, well organized, deliberate, and presented with
solemnity. His affect is within the normal range. His estimated intellectual
functioning is within the average range. There is not any evidence of a mood or
thought disorder. Inmate MacMeekin's judgment is good, and he showed insight
into his crime. His impulse control is adequate.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

AXIS I:        Cocaine Dependence and Alcohol Abuse, in remission.
AXIS II:       Deferred.
AXIS III:      Deferred.
AXIS IV:       Incarceration.
AXIS V:        GAF = 85.

MACMEEKIN        D-30728        CTF-CENTRAL        10/02/03        gmj

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

## XIII.   REVIEW OF LIFE CRIME:

The psychological evaluation of 11/16/00 describes inmate MacMeekin's views, emotional reaction, and attitude towards the crime, which he continues to feel great grief, remorse, and astonishment over.

As mentioned in the last psychological report, inmate MacMeekin admitted his mother did not attack him, but that he, in rage, stabbed her with a steak knife, at which time she scratched him in an effort to defend herself. As they struggled, he either forced her to the ground, or she lost her balance, and he began choking her at this time. However, she was not dead at this point, and could have been saved, but he retrieved the necktie, and completed the strangulation so that she died.

Inmate MacMeekin is a man who, prior to this crime, and subsequent to it, states that he cannot stand violence and confrontation, and though he yelled at his mother, he would not consider "raising a hand to her or anyone." As stated above, he continues to feel sadness and remorse, as tears welled in his eyes during the interview.

## XIV.   ASSESSMENT OF DANGEROUSNESS:

A.     Inmate MacMeekin has been exemplary in not receiving any CDC-115 violations during his incarceration. His only CDC-128A counseling chrono in 1991 was for not reporting to the central textiles garment factory. Given this reputation for compliance and following regulations, inmate MacMeekin presents a well below average risk for violence when compared to the general Level II inmate population.

B.     If released to the community, inmate MacMeekin's potential for violence is most likely equal to that of the average citizen. The reason for this conclusion is that the object of his rage, his mother, is the sole primary maternal figure in is life since one can realistically only have one mother. Furthermore, this murder was committed after repeated and derelict use of marijuana, cocaine, and alcohol with significant sleep depravation. In addition, the degree of remorse, grief, and sadness appears to be genuine, and a significant deterrent to further violent displays. Lastly, he has been incarcerated for most of his adult life, and without becoming involved in the criminal lifestyle in prison, this has been a unique and very memorable 16 years of his life which has caused him great caution in ever considering violence.

On the other hand, inmate MacMeekin seems to have grown and matured in his ability to express his frustration or anger without losing control. On the surface, when one sees his anger expression, one may think he is on the verge of committing a violent act. However, his expression of anger, whether intense or mollified, does not—and probably would not—lead to violent aggression.

MACMEEKIN       D-30728       CTF-CENTRAL       10/02/03       gmj

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

C.    The most significant risk factor which could be a precursor to violence for inmate MacMeekin is the return to alcohol or cocaine abuse.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.    Inmate MacMeekin is competent and responsible for his behavior. He has demonstrated excellent impulse control, judgment, and coping strategies within a demanding institutional environment to remain without CDC-115s, and, conversely, to abide by institutional standards and regulations.

B.    If released to parole, inmate MacMeekin might find it helpful to be involved in support groups for those who have abused alcohol/drugs, and he may also find it helpful to participate in counseling. This need not be a requirement of parole, but something that he could seek through his parole officer if he felt the need to do so.

C.    Inmate MacMeekin, though he has abstained from alcohol and cocaine for 16 years, should undergo random urine testing for alcohol and/or drug use. This is not intended as a statement regarding the likelihood of his abusing drugs and/or alcohol, but merely creating a system of accountability for him.


J. STEWARD, Psy.D.
Clinical Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


BILL ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JS/gmj

D: 10/02/03
T: 10/07/03


MACMEEKIN        D-30728        CTF-CENTRAL        10/02/03        gmj

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
NOVEMBER 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 16, 2000

This is the fifth psychological evaluation for the Board of
Prison Terms on inmate Keith MacMeekin, CDC# D-30728.  This
report is the product of a personal interview, conducted on
11/16/00, as well as a review of his Central file and unit
health record.

PSYCHOSOCIAL ASSESSMENT

INMATE COPY

I.    IDENTIFYING INFORMATION:

Inmate MacMeekin is a 34-year-old, married, Caucasian
male.  He has no current religious affiliation.  There
were no unusual physical characteristics noted.  He
denied any history of using nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

Inmate MacMeekin is the youngest of four siblings.  He
was raised by both parents.  He denied any history of
birth defects or abnormalities of developmental
milestones, any history of cruelty to animals or a
history of arson, any significant childhood medical
history, or a childhood history of sexual abuse as
either a perpetrator or a victim.  However, he states
that his father was physically abusive toward him, much
more so than toward his older siblings.

III.  EDUCATIONAL HISTORY:

Inmate MacMeekin was expelled in the ninth grade for
possession of drugs, and dropped out of school in the
11th grade.  He subsequently completed his GED in 1986
while incarcerated.  He also completed 90 college
units.

MACMEEKIN       D-30728      CTF-CENTRAL       12/04/00      gmj

MACMEEKIN, KEITH
CDC NUMBER:  D-30728
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO


IV.  FAMILY HISTORY:

Inmate MacMeekin's father was a recording engineer.
His parents divorced when he was 14 and he then lived
with his mother.  His father is an alcoholic who beat
the inmate's mother.  His mother is also an alcoholic.

V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate MacMeekin states that he is a heterosexual male.
He denied any history of sexual aggression.

VI.  MARITAL HISTORY:

Inmate MacMeekin was married in 1993.

VII.  MILITARY HISTORY:

The inmate denied any history of military service.

VIII. EMPLOYMENT/INCOME HISTORY:

Prior to his incarceration, inmate MacMeekin worked in
printing at age 16 and has also worked in construction.
Since his incarceration, he has taken vocational
printing from 1991 to 1995.  In 1996, he completed
vocational drafting.  More recently, he has been
pursuing training in desk top publishing.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate MacMeekin has abused cocaine, marijuana and
alcohol.  Prior to his offense, he had been snorting
cocaine for three months daily, or, according to
another report, every other day, a habit which cost
$150 to $200 a week.  He was working as a shipping and
receiving clerk at the time and using his wages to buy
drugs.

He has been attending Alcoholics Anonymous meetings
from 1989 up to the present.

X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate MacMeekin was prescribed Elavil in 1985 for
depression and insomnia after swallowing razor blades

MACMEEKIN    D-30728    CTF-CENTRAL    12/04/00    gmj

MACMEEKIN, KEITH
CDC NUMBER:  D-30728
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

as part of a depressive reaction to his crime.  He has
had no history of suicidal ideation or attempts since
1985.  He denied any history of serious accidents,
disabilities or head injuries, or a history of seizures
or other neurological conditions.

XI.   PLANS IF GRANTED RELEASE:

Should inmate MacMeekin be given a parole date, he
states that he would parole to Santa Rosa to live with
his wife.  He would seek employment in the printing
industry.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate MacMeekin appears his stated age of 34.  He was
appropriately dressed and groomed.  He was coherent,
cooperative, calm and alert.  His speech, flow of
thought and affect were all within the normal range.
His intellectual functioning was estimated to be within
the average range.  There was no evidence of a mood or
thought disorder.  His judgment appeared to be intact.
He showed good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Cocaine Dependence, in institutional
           remission.
AXIS II:   No Contributory Personality Disorder.
AXIS III:  No Contributory Physical Disorder.
AXIS IV:   Incarceration.
AXIS V:    GAF = 80.

XIII. REVIEW OF LIFE CRIME:

Inmate MacMeekin described the circumstances
surrounding his commitment offense.  He became visibly
emotional and filled with regret and sorrow as he
talked about his crime.

He described how he had explored his anger and his
family background in therapy with another psychologist

MACMEEKIN     D-30728     CTF-CENTRAL     12/04/00     gmj

MACMEEKIN, KEITH
CDC NUMBER:  D-30728
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR


a number of years ago, and how strongly he was affected
by many experiences in which his mother would scream at
his father, and his father would attack his mother.

He spoke about staying up all night using drugs with a
friend until 5:00 a.m., coming back home, falling
asleep on the couch, and how his mother woke him at
7:00 a.m. to get up in order to go to work.  At that
time, he was employed as a shipping and receiving clerk
in the building next door to where his mother worked.
He told his mother that he refused to go to work.  His
mother screamed at him and insisted that he go to his
job.  He attacked his mother with a knife and strangled
her.  When she recovered a little, he got a neck tie
and finished strangling her.  His mother had told him
that if he did not go to work, he would have to move
out of the house that morning.

He no longer maintains that his mother attacked him and
was scratching him, and that he was only defending
himself.  He now takes full responsibility for his
crime.

He states that after fleeing to Mexico, he recrossed
the border with the intention of turning himself in,
and, in fact, he was detained.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.  This inmate has not received any CDC-115 violations
    during his entire incarceration.  Therefore, it is
    felt that he would pose a less than average risk
    for violence when compared to this Level II inmate
    population.

B.  If released to the community, his violence
    potential is estimated to be somewhat higher than
    the average citizen in the community.

    This assessment is in consideration of the heinous
    nature of his crime.

    On the other hand, this inmate has been very well
    behaved during the past 15 years of incarceration,
    and this indicates a level of maturity beyond his
    adolescent mentality at the age of 18.

MACMEEKIN, KEITH
CDC NUMBER: D-30728
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


    C.  The most significant risk factor which would be a
        precursor to violence for this inmate would be a
        return to the use of alcohol and/or cocaine.

XV.  <u>CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS</u>:

    A.  This inmate is competent and responsible for his
        behavior.  He has the capacity to abide by
        institutional standards and has done so during his
        incarceration period.

    B.  This inmate does not have a mental health disorder
        which would necessitate treatment either during
        his incarceration period or following parole.


*William Gamard, P.S.D.*

WILLIAM GAMARD, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

WG/gmj

D:  11/16/00
T:  12/04/00

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
SEPTEMBER 1996 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JUNE 13, 1996

INMATE COPY

This is the fourth psychological evaluation for the Board of
Prison Terms on inmate Keith Mac Meekin.  This report is the
product of a personal interview, as well as a review of his
Central file and medical record.  In addition, I knew inmate Mac
Meekin previously because of his participation in the
"Lifeskills" program and individual counseling.

His crime consisted of the 1985 strangling death of his mother,
who tried to wake him up to go to work.  He had been using drugs
heavily, staying up late, and he was very irritable in the
morning.  He had a lot of anger from his childhood, and on that
morning, he exploded in a rage.  He expressed his regret for
this.

He has had a good record with the Department of Corrections,
having no CDC-115 infractions.

Prior to his incarceration, he used cocaine, methamphetamines,
marijuana, alcohol and LSD.  He is in Alcoholics Anonymous now.
Educationally, he dropped out of school in the tenth grade and
has since gotten his GED.  He also has completed 90 college
units.  Vocationally, he is trained in the print shop and in
drafting.  His future plans include going to live with his
grandmother in San Diego and work there in printing.

MENTAL STATUS EXAMINATION:  Inmate Mac Meekin is a well
developed, well nourished man of muscular build who appeared to
be his stated age of 29.  He was appropriately dressed and
groomed, and seemed to be fully cooperative during the interview.
His speech was clear and readily understandable.  His affect was
normal.  His flow of thought was normal with no hallucinations
nor delusions noted.  He was fully oriented with normal
intellectual functioning.  His attention and concentration were
good.  His insight and judgment also appear to be much improved
over his earlier years, when he was using drugs so heavily.

MAC MEEKIN
D-30728
Page Two


PSYCHIATRIC DIAGNOSIS - DSM-IV:

AXIS I:    Polysubstance Dependence, in remission.
AXIS II:   Personality Disorder, NOS, improved.
AXIS III:  No contributory physical disorder.

PSYCHIATRIC CONCLUSIONS:  His diagnosed psychopathology appears
to be indirectly related to his offense.  Certainly, his use of
drugs was a contributing factor, but did not directly determine
what he did on that day.  He does not have a psychiatric
condition now which would benefit from mental health treatment
following his release.  He is showing improvement in his
behavior.  If released, I expect him to be able to maintain the
gains he has made, provided he continues in his determination to
avoid alcohol and illicit drugs.

SUGGESTED ACTIONS:  If he is to be continued in his present
program, he should be encouraged to continue his participation in
Alcoholics Anonymous, and to add to his vocational training,
especially in the area of print shop, since he plans to do that
upon his release.  If he is considered for parole, his level of
dangerousness is likely to be less now than for the average
inmate.  Conditions for parole should include no alcohol nor
illicit drugs.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:  Until released, he
should:  1)  Continue to attend Alcoholics Anonymous.  2)  Add to
his print shop training as needed so he will be able to get a
good job upon his release.


*Bruce Bakeman, Ph.D.*
BRUCE M. BAKEMAN, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad

EXHIBIT    "C"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
SEPTEMBER 2005 CALENDAR


MAC MEEKIN, KEITH

D-30728


I.    COMMITMENT FACTORS:

A.    Life Crime: Murder 2nd, PC 187, Orange County #C58263, sentence 15 years to
Life; Received by CDC on 6/10/86; MEPD is 12/27/94. Victim: Virginia
Madeline MacMeekin, age unknown.

1.    Summary of Crime: According to the records of the Las Palmas Police
Department (DR85-1207), on September 24, 1985 at approximately 9:30
a.m., officers responded to Apartment 3404 at 5600 Orangethorpe Avenue
to check on the welfare of Virginia MacMeekin. Officers were previously
informed about sounds of a struggle and of a woman screaming had been
heard coming from the apartment. Maintenance personnel and the
apartment manager had knocked on the door without a response and had
subsequently called the police. The officers arrived about 9:35 a.m. and
were informed that a seventeen year old boy and his mother lived at that
location, and that they had been very quiet tenants. After knocking several
times without response and discovering that the dead bolt was in place, the
officers obtained a pass key from the manager and entered the apartment.
They observed signs of a struggle in the entry foyer and living room. The
officers opened the door to the master bedroom and observed the victim
lying supine on the floor with her head and upper torso covered with
loosely piled clothing. Blood and lacerations were on both of her hands.
High-heeled shoes were still strapped to her ankles, but they were off the
soles of her feet. Lifting the clothing from off of her face, the officers
observed blood in her mouth, noted that her eyes were closed and puffy,
and that there was a man's necktie around her neck. Homicide
investigations were called to the scene.

An Autopsy revealed the cause of death to be strangulation. The palms of
both hands had shallow cuts, and the victim's left middle finger was
broken. Subsequent investigation revealed the victim's 1979 Volkswagen
Rabbit was missing and that the victim's son, Keith Alan Mac Meekin had
not reported to work. As reported in the POR on page 5, a witness who
had been dating the victim for about four months contacted the police after
reading in the newspaper of her death. He indicated that the victim had
been having problems with her son regarding his cocaine usage and his

COPY TO INMATE ON
June 13, 2005

alcohol abuse. He indicated that the victim had kicked her son out of her apartment about a month before, but had let him come back. The witness stated that the victim and her son each had a bad temper, that they would argue and have fist fights.

On 9/26/85, officers of the Immigration and Naturalization Service stopped MacMeekin as he attempted to return to the United States from Mexico. He was detained and subsequently transported to the Las Palmas Police Department, where he gave a written confession. (Source: P.O.R. pages 3-5).

2.    **Prisoner's Version:** In an interview for this report, MacMeekin indicated that his version remains the same as that provided for his 9/93 Initial Parole Consideration Hearing. In that report, MacMeekin provided the following account:

...between the hours of 7:00 p.m. on 9/23/85 and 5:00 a.m. on 9/24/85, he had consumed sixteen 8 ounce bottles of beer, had smoked two joints of marijuana and had snorted one and a half grams of cocaine. MacMeekin and his mother argued daily, particularly about his abuse of drugs and alcohol, his broken-down car, her alcoholism, her boyfriends and her sexual behavior regardless of his presence. On this particular morning, he had returned at 5:00 a.m. to sleep on the couch. He could not get to sleep until about 6:00 a.m. His mother awakened him at about 7:00 a.m., urging with him to go to work. After about fifteen to twenty minutes, the argument became physical. He stated that he was too tired and couldn't stand her yelling at him. He backed into the kitchen, picked up a knife from the table, warned her to back off and again stated that he wasn't going to work. She tried to take the knife away from him. He backed up against the wall, and a mirror fell down on his foot. He bent down and somehow cut into his mother's side. She screamed and he threw the knife away. She began beating him on the face. He said at this point, "I went for her neck. I don't know why." He stated that he choked her with both hands and, not knowing if she was dead yet, decided "...to put her out of her misery..." He therefore took a necktie, knotted it around her neck and strangled her until she no longer moved. He then dragged her to her bedroom and, after realizing that she was dead, covered her face with clothing. He stated that he then went to her purse and took her wallet, grabbed some clothes and disconnected the phone in order to prevent her from calling the police if she was still alive. He went out the front door, locking it behind him, and took her vehicle. He went looking for a friend in Los Angeles, who ultimately advised him to go to Mexico.

After spending some time in Ensenada, he decided to return to the United States in order to turn himself in. He was arrested at the border at Tijuana.

Case 5:07-cv-03741-CRB    Document 4-8    Filed 01/10/2008    Page 33 of 66
LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
SEPTEMBER 2005 CALENDAR

3

MacMeekin explained for the CYA report that he had had difficulty getting along with his mother, adding that he escaped from her on a daily basis by going to see a friend. He stated that even though they couldn't stand each other, he couldn't leave her on account of her bad knees and the assistance she sometimes required. He was the youngest of her sons around, and there was very little contact with other family members. He described his relationship with his mother as one of being very argumentive. They also rode to work together because they worked in adjacent buildings, this also provided more time for arguing. In an interview for the POR, MacMeekin stated, "I wish I could understand the nature of my act." He indicated remorse for what he had done.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:**

1. Victim was particularly vulnerable.
2. Prisoner had opportunity to cease but continued with crime.
3. Murder was senseless and served no purpose in completing the crime.
4. Nature of crime exhibited viciousness, cruelty or callousness.
5. The inmate had a special relationship of trust with the victim, in that she was his mother.

b.    **Mitigating Factors:**

1. Prisoner has minimal history of criminal behavior.

B.    **Multiple Crime(s):** N/A.

1.    **Summary of Crime:.** N/A.

2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** In an interview for the CYA Offense History, MacMeekin indicated that he had been arrested twice as a juvenile: First, at age 16 for possession of marijuana and then about six months later for joy riding. Both incidents were adjudicated under "Counseled and Released".

MAC MEEKIN, KEITH          D30728               CTF-SOLEDAD          SEPT/2005

B.    **Adult Convictions and Arrests:**  The instant offense is the only arrest.

C.    **Personal Factors:** Inmate MacMeekin, the youngest of four children, was born in Long Island, New York on 11/4/66 to William and Virginia MacMeekin. Between the ages of 2 and 3, MacMeekin and his family lived in Tennessee. In 1969, they moved to California. The father was an alcoholic who physically abused his wife and children. The parents argued daily, and every one of MacMeekin's brothers described the home scene as a "madhouse". To escape this abusive home life, the two older sons joined the military; one joined the Air Force, and the other joined the Navy. After 25 years of marriage, the parents separated in 1980 and legally divorced in 1984. After the separation in 1980, Mrs. MacMeekin also became an alcoholic. MacMeekin, his mother and his immediate older brother moved to Orange County in 1985. Inmate MacMeekin's perception was that he grew up pretty much on his own. With an absent father and working mother, he had no supervision and no one to teach him how to do things. Additionally, no close relationships existed between MacMeekin and his brothers. Inmate MacMeekin and his mother became mutually inter-dependent, each apparently resenting the dependence needs of the other. Inmate Mac Meekin indicated that his mother began dating and would bring boyfriends to the house. Inmate Mac Meekin mentioned incidents in which he observed his mother and boyfriends having sex on the living room couch, incidents which he resented. He also stated that he often discussed this with her, and voiced his objections to her alcoholism. Since he had supported his mother in her decision to leave his father, he felt obligated to stay with her. He dropped out of high school in 1984, after completing the 11th grade at Canoga Park High. His work history prior to incarceration is minimal. His last employer was Pro Pak in Santa Fe Springs from September 1984 to September 1985. Inmate MacMeekin passed and obtained his GED while in the Orange County Jail in February 1986. Records of the Orange County Sheriff's Office indicate that on November 8, 1985, Inmate MacMeekin attempted suicide by swallowing two disposable trimming blades. He was transported to the UCI Medical Center, where he was detained until the blades passed from his body without the need for surgery. The file contains no evidence of sexual deviation or mental disorder.

III.    **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:** N/A.

B.    **Custody History:** MacMeekin was received at CTF on 11/11/87 and has remained at CTF in the general population with Medium A custody. MacMeekin has been assigned as a culinary worker, porter, and teacher's aide since his last Board Hearing. (See Post Conviction Progress Report).

C.    <u>Therapy and Self-Help Activities:</u> Since MacMeekins's last BPT Hearing he has not participated in any activities. (See Post Conviction Progress Report).

D.    <u>Disciplinary History:</u> Since MacMeekin's last BPT Hearing he has remained disciplinary free.

E.    <u>Other:</u> MacMeekin attended his Subsequent #7 Parole Consideration Hearing on 9/9/04. Parole was denied for 1 year. The Board recommended that MacMeekin remains disciplinary free; and participate in self-help programs and group therapy.

IV.    <u>FUTURE PLANS:</u>

A.    <u>Residence:</u> MacMeekin plans to reside with his uncle, Tom Brown, who lives at 843 Sunston Street, Westlake, CA, 91362, phone number 818-597-1971.

B.    <u>Employment:</u> As of this writing, there are no support letters in C-File for future job offers. MacMeekin has extensive training in Vocational Drafting, in Mechanical Printing and Off-Set Printing.

C.    <u>Assessment:</u> In review of MacMeekin's parole plans, this counselor does not foresee any problems, however, it is recommended that MacMeekin updates his support letters prior to his hearing.

V.    <u>USINS STATUS:</u> N/A.

VI.    <u>SUMMARY:</u>

A.    Prior to release the prisoner could benefit from:
      1. Continuing to be disciplinary free.
      2. Participation in self-help and therapy programs.

B.    This report is based upon an interview with the prisoner on 5/18/05 lasting approximately 1 hour and a complete review of the Central File lasting 2 hour(s).

C.    Prisoner was afforded an opportunity to examine his Central File on 5/18/05. (Refer to CDC 128-B dated 5/18/05 in the General Chrono Section of the Central File.)

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

MAC MEEKIN, KEITH          D30728                    CTF-SOLEDAD              SEPT/2005

_____          6-8-05
K. Heinly                                 Date
Correctional Counselor I


_____          6/8/05
J. Soares                                 Date
Correctional Counselor II


_____          10/8/05
A. Guerra                                 Date
Facility Captain


_____          6-13-05
D. S. Levorse                             Date
Classification and Parole Representative


MAC MEEKIN, KEITH          D30728              CTF-SOLEDAD          SEPT/2005

BOARD OF PRISON TERMS
**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**
STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/1/03 to 9/30/04 | | | **PLACEMENT:** Remained at CTF-Central in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** MacMeekin was assigned to the culinary since 10/8/03 through 3/23/04. He received satisfactory to above average ratings verified by CDC 101 dated 3/1/04. On 3/23/04, MacMeekin was reassigned as a Porter. **GROUP ACTIVITIES:** MacMeekin did not participate in any group activities this period. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** MacMeekin remained disciplinary free during this period. **OTHER:** N/A. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  6-8-05

MACMEEKIN          D30728          CTF-SOLEDAD          SEPT/2005

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/1/04 to 5/31/05 | | | **PLACEMENT:** Remained at CTF-Central in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** MacMeekin has been assigned as a Porter since 3/23/04 through 3/1/05. He has no CDC 101's for this period. On 3/1/05, MacMeekin was re-assigned as a Teacher's Aide. He has no CDC 101's for this period. **GROUP ACTIVITIES:** MacMeekin did not participate in any group activities this period. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** MacMeekin remained disciplinary free during this period. **OTHER:** N/A. |

ORDER:
- [ ] BPT date advanced by ____ months.
- [ ] PBR date advanced by ____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify

- [ ] Schedule for Progress Hearing on appropriate institutional calendar

| MAC MEEKIN | D30728 | CTF-SOLEDAD | SEPT/2005 |
|---|---|---|---|

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

EXHIBIT    "D"

42

1        CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3            DEPUTY COMMISSIONER HARMON:   Okay, we're

4    back on record.

5            PRESIDING COMMISSIONER FISHER:   All right.

6    I want to note for the record that everyone who

7    was previously in the room and identified

8    themselves, have returned to the room.   The Panel

9    reviewed all information received from the public

10   and relied on the following circumstances in

11   concluding that the prisoner is not yet suitable

12   for parole and would pose an unreasonable risk of

13   danger to society or a threat to public safety if

14   released from prison.   Obviously, we considered

15   this commitment offense, which was certainly a

16   brutal offense.   This was a situation, based on

17   the Statement of Facts, that occurred when the

18   inmate and his mother, who apparently had a

19   difficult relationship, began to argue and the

20   argument escalated to the point where the inmate,

21   who apparently had not been sleeping and who had

22   been abusing substances, just said that he was

23   tired and just didn't want to listen to her yell

24   at him anymore and he attacked her.   Ultimately,

25   after he grabbed a knife and attacked her with the

26   knife, he began to strangle her with his hands.

27   KEITH MACMEEKIN  D-30728   DECISION PAGE 1  9/9/04

43

1    After she had stopped moving, he then went and
2    found a necktie and continued to strangle her with
3    the necktie, until she stopped breathing again, at
4    which point she was dead.  He then took money, he
5    took he car and he went to Mexico.  He also,
6    before leaving the apartment, disconnected the
7    phone, just in case she was still alive, so that
8    she could not call the police.  So honestly, this
9    was a very cruel crime and it certainly indicates
10   a disregard for human suffering.  And the motive
11   for the crime is really very trivial, in relation
12   to the offense.  The prisoner really has an
13   insignificant criminal history.  He does have a
14   couple of times where he was arrested as a
15   juvenile.  First at 16 for possession of
16   marijuana.  Then about six months later, for
17   joyriding.  But both of the incidents were
18   adjudicated and then counseled and released.  He
19   has an unstable social history, some of which was
20   out of his control because of the tumultuous
21   family situation that he was living in, that his
22   brothers all apparently described as a madhouse.
23   However, his unstable social history also includes
24   substance abuse.  And that was one of the factors
25   in the commitment offense.  The prisoner has
26   programmed well.  And he has had no 115s during
27   KEITH MACMEEKIN  D-30728  DECISION PAGE 2  9/9/04

44

1    his incarceration.  He does have parole plans.

2    The hearing Panel notes that in response to 3042

3    Notices, the District of Attorney of Orange County

4    had a representative at the hearing today who

5    spoke in opposition to a claim of suitability at

6    this time.  We do want to commend Mr. MacMeekin

7    for the work that he has been doing.  He, once

8    again, has no 115s during his entire

9    incarceration.  He completed Life Skills in 1996.

10   He completed Anger Management through the Muslim

11   Center in 1992.  He has participated on an ongoing

12   basis in substance abuse programming, specifically

13   AA.  He has had excellent work reports and he has

14   received laudatories for his work.  He received

15   recognition for his contribution and enthusiasm in

16   regards to the Children's Festival in 2003.  And

17   he has completed three vocations, two in Printing

18   and one in Drafting and he has upgraded

19   educationally.  Currently, these positive aspects

20   of behavior do not outweigh the factors of

21   unsuitability, however.  I don't think that I

22   mentioned, and I should have at the beginning of

23   this reading, that this is a one year denial.  And

24   this denial is based largely on the commitment

25   offense.  The Panel recommends that the prisoner

26   remain disciplinary free and continue to upgrade

27   KEITH MACMEEKIN  D-30728  DECISION PAGE 3  9/9/04

45

1   whenever available.  And also continue to

2   participate in self-help and in general to

3   continue his positive program.  And that concludes

4   the reading of the decision.  Do you have any

5   comments, Commissioner?

6            DEPUTY COMMISSIONER HARMON:  Just that Mr.

7   MacMeekin, assuming that you're going to read this

8   transcript, I hope that you understand that it

9   would have helped us tremendously if you could

10  have been here today.  As an example, there were a

11  lot of unanswered questions that probably should

12  be addressed.  An example would be, how you are

13  going to handle future relationships?  The file

14  shows that you're a relatively young man and

15  hopefully with a long future, and I believe that

16  if you could address some of this issues that

17  might be a concern to this Panel, or any Panel,

18  it would only enhance the work that you've already

19  done, which is very positive.  And would leave

20  everyone with a more comfortable feeling that you

21  are ready to be returning to society and I hope

22  you take that seriously.  You've done a lot of

23  good things and you should appear and be able to

24  respond to those questions.  And I hope you take

25  that seriously.  Anyway, good luck to you, sir.

26            PRESIDING COMMISSIONER FISHER:  Okay.  Thank

27  KEITH MACMEEKIN  D-30728  DECISION PAGE 4  9/9/04

46

1    you.   That concludes the hearing.   It's

2    approximately 12:40.

3                              --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON: _____JAN - 7 2005_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    KEITH MACMEEKIN   D-30728   DECISION PAGE 5   9/9/04

47

CERTIFICATE AND

DECLARATION OF TRANSCRIBER

I, JILL PEARSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 46, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of KEITH MACMEEKIN, CDC No. D-30728, on SEPTEMBER 9, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated SEPTEMBER 23, 2004 at Sacramento County, California.

Jill Pearson
Transcriber
CAPITOL ELECTRONIC REPORTING

CALIFORNIA BOARD OF PRISON TERMS

D E C I S I O N

PRESIDING BOARD COMMISSIONER NIELSEN:  The Panel is back on record, having reconvened for the Initial Parole Consideration Hearing for Mr. Keith MacMeekin, D-30728.

Mr. MacMeekin, the Panel has reviewed all the information that has been available to the Panel and all that has been presented on your behalf at the instant hearing, all issues that we have explored today, and we've reached the unanimous conclusion you're not suitable for the granting of a parole date today and that you remain a risk to society and a threat to public safety were you released at this time.

The commitment offense was carried out in a manner exhibiting a callous disregard for the life and suffering of another, and in this case, particularly, you own kin, your mother.  It was carried out in a dispassionate and calculated manner.  The victim was abused, stabbed and strangled two times during the commission of the offense.

These conclusions are drawn from the Statement of Facts wherein the prisoner terminated a long and antagonistic relationship with his mother by deliberately stabbing and strangling her after a night of drugs and alcohol.  The prisoner with cold calculation planned the murder of his mother, proceeded to arm himself with a knife, and then to use it on his mother at a moment in time when she was not provoking him.

KEITH MACMEEKIN  D-30728  DECISION PAGE 1          09/22/93

62

After the initial stabbings and the hand strangulation, the prisoner stopped to ponder the situation. He then retrieved a necktie and strangled his mother again.

The dispassionate manner in which this prisoner killed his flesh and blood connotes deeply buried anger and anxiety that must be addressed in self-help and therapy.

The prisoner's previous record indicates an escalating pattern of criminal conduct [inaudible] incidences of possession of marijuana and joy riding to murder. The prisoner also has a persistent pattern of tumultuous [inaudible] relationships which were a part of his life from an early age.

The unstable social history would be characterized thusly, though the prisoner had a minimal criminal past, with only possession of marijuana and joy riding on his record, his home life was dysfunctional, both his parents had alcohol problems and were seldom around. The prisoner associated with a dopers crowd and became a heavy drug user himself, consuming alcohol and marijuana each day as well as using cocaine on the occasion of every other day.

Institutionally, the prisoner has programmed in a limited manner, failed to develop a marketable skill that can be put to use upon release, has failed to upgrade educationally and vocationally as previously recommended, and has not participated sufficiently in beneficial self-help and therapy.

Specifically, as to N.A., and A.A., those are KEITH

MACMEEKIN    D-30728    DECISION PAGE 2    09/22/93

63

1    critical areas in your life. And they were elements in the

2    commission of the life crime and probably other negative

3    behavior that became a part of your life as you did whatever

4    you did to support your habit. As you admitted here today, in

     fact, even stealing from your mother.

5

6        But as we questioned about A.A., you couldn't talk

7    very much about it as far as content or steps. Now we're not

8    looking for just a recitation of the steps one through twelve,

9    we're looking to discern from you things you have learned in

10   A.A. that can equip you to deal with alcohol and substance

     abuse on the streets.

11

12       So as you are there, even though you have positive

13   chronos for being present, you've got to then be able to talk

14   about what you have learned and what have you applied to your

     own life on a daily basis. Once you have done that, then we

15

16   can have a greater degree of comfort and assurance that you

17   would not repeat that terrible pattern or drug use, abuse, that

     contributed to the negative aspects of your past behavior.

18

19       The psychological reports, the 1993 psychiatric

20   report by Kitt, has a sentence in here the Panel does not agree

21   with. It says you have an accurate understanding of the

22   causative factors [inaudible] stress and anger that you were

     experiencing at the time and has identified most of the factors

23

24   that contributed towards this violent behavior.

25       The Panel doesn't feel that you have sufficiently

26   come to terms with all of these elements. And in fact due to

27   KEITH MACMEEKIN  D-30728   DECISION PAGE 3          09/22/93

28

64

your credit and in your own admission today, did so acknowledge. You have insight above average and that is our impression. And your judgement and problem solving ability is effective and pro-social. But there are underlying concerns that need to be dealt with.

Kitt diagnosed polysubstance dependence in remission in the institution and mixed [inaudible] personality disorder, claiming you have psychiatrically improved moderately.

More [inaudible] to the Panel is the psychiatric evaluation of Bakeman on 04/16/92, where he also diagnosed polysubstance dependence in institutional remission with narcissistic personality disorder with schizoid traits and psychosocial stresses.

Under his conclusions, he notes that you might benefit from mental health treatment following your release, and we would say prior to release. You have a great deal of anger yet that you have not dealt with resulting from the early years. And he claims if released you should remain about the same providing you can avoid alcohol and illicit drugs. Again, those substance abuse elements still pervasive and problematic in your future.

He indicates because of the history of a narcissistic lifestyle and low impulse control he could become dangerous again if he were to take alcohol or cocaine, especially because of lowered sense of self-control resulting

KEITH MACMEEKIN  D-30728    DECISION PAGE 4         09/22/93

65

from the use of these particular drugs.

He further writes that if you were -- prior to release you should continue A.A., gain further education and voc training, learn to have different strategies as far as living following your release, giving some thought as to how you would survive out there and the strategies that you would employ for daily living.

And also this writer recommended Category X and states in conclusion there are unanswered questions which should be answered prior to release, such as his violence potential and degree of impulse control.

Violence potential [inaudible] impulse control and we're not convinced today that you've come to terms with some of those things that have been drip driving you towards negative behavior in the past.

The Panel makes the following findings. That the prisoner needs therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner, and until more progress is made, the prisoner continues to be unpredictable and a threat to others.

The prisoner's gains are recent, actually [inaudible] appear to be around 1991, and he must demonstrate an ability to maintain the gains. I will not say that this applies to disciplinaries, cause you do commendably have a good disciplinary record with just a few 128's. But it does relate to other aspects of your behavior and personality that need to

KEITH MACMEEKIN  D-30728    DECISION PAGE 5         09/22/93

66

be dealt with.  We've just talked about those.

We are commending you for being a very good work in your Print Shop efforts, obtaining a total of 90 college units, and very particularly your disciplinary-free behavior. However, these positive aspects do not outweigh the factors of unsuitability.

We also find that you presented the Panel with a candid -- you provided a candid presentation to the Panel today with a full admission of responsibility and recognition that anger drove you to this life crime and in fact that some of this is yet to be dealt with.  You presented yourself well today.  You seem to be resolved towards rehabilitation.

And we will be watching in the course of the time till the next hearing to see to what degree you are able to come to terms with some of the underlying causative elements that caused negativism in your life, ultimately, the death of your mother, the killing of your mother.  And that you could come to terms with some of the anger and your own [inaudible] begin to heal, heal the wounds of your own past.  Because before you can become good productive member of society, those wounds must begin a process.  And, in fact, evolve towards a [inaudible] the wounds that were inflicted in you.

So, we have denied for two years.  We feel that it's not reasonable to expect that parole would be granted during a hearing in the subsequent, following two years.

Specifically, because you allowed a reservoir of

KEITH MACMEEKIN  D-30728   DECISION PAGE 6          09/22/93

1  anger to overtake you.  This is exacerbated by drug use, abuse,
2  and alcohol.  It resulted in the killing of your murder.
3  Longer observation and evaluation is therefore required.

4  You [inaudible] opinion require more time to be
5  immersed in self help and therapy and evaluated as to the
6  positive benefits derived therefrom, and in subsequent hearings
7  present to the Panel how you've come to terms [inaudible]
8  behavior elements, some of the substance abuse propensities
9  that have graced your past.

10  The psychological report that I just read by
11  Bakeman -- excuse me, psychiatric report I read by Bakeman,
12  also indicates a need for longer observation, evaluation, and
13  treatment.  I would say along the lines of those points I
14  highlighted in Bakeman's evaluation.

15  The prisoner has not completed programming
16  essential to his adjustment and needs additional time to gain
17  and complete such programming.

18  We are recommending, sir, that you remain
19  disciplinary free.

20  Immerse yourself in A.A. and N.A. with dedication
21  and resolve so that you can articulate and daily practice the
22  positive aspects of A.A. and N.A.  The tenets of those programs
23  of self-help must be incorporated into your daily being, you
24  daily activities.

25  You should continue your vocational upgrading so
26  you have a diversity of skills to provide for yourself if you

KEITH MACMEEKIN  D-30728   DECISION PAGE 7          09/22/93

hit the streets.

You need to work towards the completion of that A.A. degree as courses may be available to you. We are understanding that there are some constraints now as far as availability of courses. But you have accrued an [inaudible] record of 90 units already, [inaudible] that you should pursue and complete the A.A., and maybe even consider going on beyond that.

That will conclude the reading of our decision. [inaudible] your copy. This is your tentative copy. As I said, it's tentative. It goes through legal review, becomes official thereafter. You have 90 day right of appeal.

I will tell you from my own observations, Mr. MacMeekin, you seem to be a man with prospect. You did present yourself well here today. Get into those deep recesses of your being and find out some of the things that caused you to go wrong and maintain your course. You are an individual who seems resolved, as I said, to rehabilitate, and you certainly seem capable of it, and you made a good presentation today in this your initial hearing.

Any other comments of Commissioners? Commissioner Giaquinto?

BOARD COMMISSIONER GIAQUINTO: You have potential. You have a lot of potential. I was impressed by the candor which you presented here.

Mr. MacPherson, you know, made some interesting

KEITH MACMEEKIN   D-30728   DECISION PAGE 8         09/22/93

69

points about you not really being criminal that we're used to
seeing. And to some extent, that's true.

You're a murderer, but this was an [inaudible], you
know, probably something that no one could see coming at all.
You did a couple things prior to that, the auto theft, or
whatever it was.

So you're different than the regular criminal. And
the way you've progressed even in the short time that you've
been down -- what is it, since '91, November '91 you came from
C.Y.A.

INMATE MACMEEKIN: [inaudible] '87.

BOARD COMMISSIONER GIAQUINTO: You were in C.Y.A.
till '91, weren't you?

INMATE MACMEEKIN: No, till '87.

BOARD COMMISSIONER GIAQUINTO: Till '87. Okay. I
think you have the ability to have a lot of insight, and I
think that you can help yourself psychiatrically to a large
extent with therapy. You have a lot of potential.

There's another way to look at it, too. And I know
you've probably considered this and look at it from this
perspective. You are a criminal as bad as some of the worst
people in here, from this perspective, and that is, the reason
you're here is because of substance abuse. So many of the
prisoners that are here are here because of substance abuse.
And they went out robbing and doing all types of crimes and
ultimately they murdered somebody. That's what got you here.

KEITH MACMEEKIN  D-30728   DECISION PAGE 9        09/22/93

70

Maybe your head would have been some place else if you hadn't been so immersed in substance abuse.

And some of the things that Mr. Nielsen really strongly articulated relative to A.A. involvement, N.A., therapy, are real [inaudible] point for you.

And you didn't come in here expecting a date today.

INMATE MACMEEKIN:  No I did not.

BOARD COMMISSIONER GIAQUINTO:  And so you need to not let yourself slide back, not to change your pattern in terms of your non-discipline and things like that.  And just go forward.

Get the education, get the therapy, really immerse yourself in anything having to do with helping you identify the substance abuse.

Good luck to you.

INMATE MACMEEKIN:  Thank you.

PRESIDING BOARD COMMISSIONER NIELSEN:  Commissioner Koenig?

BOARD COMMISSIONER KOENIG:  No, [inaudible]

PRESIDING BOARD COMMISSIONER NIELSEN:  All right, the prisoner will be excused.

INMATE MACMEEKIN:  Thank you.

PRESIDING BOARD COMMISSIONER NIELSEN:  Good luck to you sir.

INMATE MACMEEKIN:  All right.

KEITH MACMEEKIN    D-30728    DECISION PAGE 10    09/22/93

71

PAROLE DENIED <u>2</u> YEARS.

1

2

EFFECTIVE DATE OF THIS DECISION _____ FEB 9 1994

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    KEITH MACMEEKIN   D-30728    DECISION PAGE 10

28                                                      09/22/93

72

## CERTIFICATION AND

## DECLARATION OF TRANSCRIBER

I, B. S. CARDENAS, a duly designated transcriber, do hereby declare and certify under penalty of perjury that I have transcribed Tape(s) which total one in number and cover a total of pages numbered 1 - 71 and which recording was duly recorded at Soledad, California, in the Matter of INITIAL PAROLE CONSIDERATION HEARING OF KEITH MACMEEKIN, C.D.C. NUMBER D-30728, on the 22nd day of September, 1993, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above captioned matter and have no interest in the outcome of the hearing.

Dated this 5th day of November, 1993, at Sacramento, California.


B. S. CARDENAS
TRANSCRIBER


-oOo-

EXHIBIT    "E"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
NOVEMBER 2002 CALENDAR

MACMEEKIN, KEITH                                                      D-30728

I.      COMMITMENT FACTORS:

    A.      **Life Crime:**  Murder 2nd, 187 PC, Count 1; Case Number ORA C58263;
    Sentence:  15 years to Life (Life term to start 6/10/86); MEPD:  12/27/94.
    Victim:  Virginia Madeline MacMeekin, age unknown, mother.

        1.      **Summary of Crime:**  Remains the same as stated in the previous hearing.

        2.      **Prisoner's Version:**  Remains the same as stated in the previous hearing.

    B.      **Aggravating/Mitigating Circumstances:**

        1.      **Aggravating Factors:** Remains the same as stated in the previous report.

        2.      **Mitigating Factors:** Remains the same as stated in the previous report.

II.     **PRECONVICTION FACTORS:**  Documents from the previous hearing have been
considered and remain valid.

III.    **POSTCONVICTION FACTORS:**

    A.      **Special Accommodations/Disability:**  None noted.

    B.      **Custody History:**  MacMeekin appeared at the BPT on 11/7/01 at which time he
requested stipulation one year denial due to a need to formulate new parole plans.
BPT granted stipulation and recommended that he remain disciplinary free and
participate in self-help group. On 12/18/01, he was continued in the present
program at an in absentia Annual Review conducted by Unit III UCC.

    C.      **Work, Education, Vocation, Therapy & Self-Help Activities:**    MacMeekin
continued his assignment in Vocational Print Shop as a graphic artist.

    **D.**   **Disciplinary History:** MacMeekin has continued enjoying a disciplinary free record. He has maintained positive relationships with staff.

## IV.   FUTURE PLANS:

    **A.**   **Residence:** MacMeekin's maternal uncle Tom Brown continues to offer a residence with him at 843 Sunston Street, Westlake, CA 91362; the telephone number is (818) 597-1971. His 95 year old grandmother, Madeline Brown (the victim's mother), is also in support of her grandson's release and resides with Tom Brown.

    **B.**   **Employment:** MacMeekin has been given a job offer by 3T Equipment Company, Inc., located in Petaluma, CA. The job offer consists of welding and shipping and receiving. He also plans to seek employment in graphics if need be.

## V.   USINS STATUS: Not applicable.

## VI.   SUMMARY:

    **A.**   Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would pose a low degree of threat to the public safety if released from prison at this time.

In reviewing MacMeekin's history of incarceration, he has completed individual therapy with Bruce Bakeman, Ph. D. as documented on a CDC 128C dated 10/20/95 and 7/1/96. He has participated in the 12-Step program modeled by AA and NA. His disciplinary history has consisted of one CDC 128A counseling chrono dated 1/23/91 in the entire period of incarceration. Initially received at Youth Authority on 4/25/86, he was placed in the Specialized Counseling Program where he remained a year and a month. He did not incur any disciplinaries and was described as having made outstanding progress. Administrative needs forced his removal from YTS Specialized Counseling program. In the following years, MacMeekin remained involved in 12-Step Program.

In discussing MacMeekin with his instructor Mr. Eng, he stated that MacMeekin is an excellent worker and has a high work ethic. Mr. Eng stated that he has watched him grow from a gangly student to a professional. Mr. Eng concluded that MacMeekin has evolved into a professional and has earned high marks as a human being and worker.

MACMEEKIN, KEITH      D-30728         CTF-SOLEDAD      NOV/2002

MacMeekin has had to deal with the breakdown of his marriage to Maria Romero yet he continues to be described as mild mannered by Mr. Eng. Housing staff also describes MacMeekin as being quiet and respectful.

MacMeekin was asked how he would deal with anger provoking or stressful situations. MacMeekin responded that he has learned not to bottle up his feelings and to discuss those issues that do bother him in a calm manner. He has and continues to mentally and emotionally prepare himself for his parole date, recognizing that much has changed in society since his incarceration began. MacMeekin has dealt with losses while in prison (including the end of his marriage) in an appropriate and mature fashion.

In reviewing the subject's Central File, this writer could not help but note that his maternal uncle and maternal grandmother are supportive of his release, in essence, forgiving him for his offense. MacMeekin, too, prays nightly and requests his mother's forgiveness. He is able to articulate the undeniably heinous taking of his mother's life and is extremely remorseful of his actions. Therapy upon release was discussed with MacMeekin at length and he is in full agreement with following through with outpatient therapy. Additionally, continued emotional support from family members is important.

B.    Prior to release, MacMeekin would continue to benefit from remaining disciplinary free and continue participation in his current graphic artist assignment.

C.    This Board Report is based upon a one-hour interview with MacMeekin, incidental contact in the housing unit and a thorough review of his Central File.

D.    MacMeekin received an Olson Review on 8/22/02 per CDC 128B of the same date.

E.    No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan (ARP).

_____
M.Y. Cross
Correctional Counselor I


_____
L. Gibbs
Correctional Counselor II(A)


_____
I. Guerra
Facility Captain


_____
D.S. Levorse
Classification and Parole Representative


MACMEEKIN, KEITH        D-30728                CTF-SOLEDAD        NOV/2002

EXHIBIT    "F"

The Judges Decision
①

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MELVYN COLEMAN,

11            Petitioner,              No. CIV S-96-0783 LKK PAN P

12        vs.

13   BOARD OF PRISON TERMS, et al.,

14            Respondent.                      ORDER

15   _____/

16            Petitioner, a state prisoner proceeding pro se, has filed this application for a writ

17   of habeas corpus.  The matter was referred to a United States Magistrate Judge pursuant to 28

18   U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

19            On December 22, 2004, the magistrate judge filed findings and recommendations

20   herein which were served on all parties and which contained notice to all parties that any

21   objections to the findings and recommendations were to be filed within twenty days.  Respondent

22   has filed objections to the findings and recommendations.

23            In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-

24   304, this court has conducted a de novo review of this case.  Having carefully reviewed the

25   entire file, the court finds the findings and recommendations to be supported by the record and by

26   proper analysis.

                                        1



Accordingly, IT IS HEREBY ORDERED that:

1. The findings and recommendations filed December 22, 2004, are adopted in full; and

2. The petition for habeas corpus will be granted unless, within 60 days, respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice stemming from a gubernatorial policy against parole for murderers.

DATED: May 19, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

2

## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                    ) SS. In re: Keith MacMeekin, on habeas corpus
COUNTY OF MONTEREY )

I, ____ WILLIAM WALKER _____, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I am/am not   a party to the within action.

My   business/residence   address is P.O. Box 689, Soledad, California, 93960-0689.

On _____ January  23 _____, 20 07 ____, I served the foregoing:

PETITION FOR WRIT OF HABEAS CORPUS WITH POINTS AND AUTHORITIES;

WITH ATTACHMENTS THERETO AND EXHIBITS IN SUPPORT THEREOF

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

California Attorney General
P.O. Box 944255
Sacramento, CA  94244-2550

       There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

       I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

       Executed this 23rd day of ____ January _____, 20 07 _____, at

Soledad, California.

/S/ William Walker