# EXHIBIT 9

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
**FILED**

MAR 22 2007

Deputy Clerk

| | |
|---|---|
| In re KEITH MACMEEKIN<br><br>on Habeas Corpus. | G038189<br>(Super. Ct. No. M10959)<br><br>O R D E R |

THE COURT:*

The petition for a writ of habeas corpus is DENIED.

SILLS, P. J.

* Before Sills, P. J., Aronson, J., and Ikola, J.

**ORIGINAL**

G038189
Mac Meekin v.
The Superior Court of California et al.


Superior Court of Orange County

Appellate Defender's, Inc.
District Attorney
Department of Corrections


Keith Mac Meekin
D-30728
P.O. Box 689/F-221-L
Soledad, CA  93960-0689


The Superior Court of California
Attn: Hon. Kazuharu Makino
700 Civic Center Drive West
Santa Ana, CA  92701


Office Of The State Attorney General
P O Box 85266
San Diego, CA  92186-5266


Office Of The District Attorney
Writs & Appeal
401 Civic Center Drive West
Santa Ana, CA  92701

# EXHIBIT 10

ORIGINAL

SUPREME COURT OF CALIFORNIA

RECEIVED

MAR 2 9 2007

CLERK SUPREME COURT

In re:

KEITH MacMEEKIN,

_____ On habeas corpus. /

SUPREME COURT
FILED

MAR 2 9 2007

Frederick K. Ohlrich Clerk

_____
DEPUTY
PETITION FOR REVIEW

Case no. _____

Sup. Ct. no. M 10959
App. Ct. no. G038189

S151336

AFTER DENIAL IN THE CALIFORNIA COURT OF APPEALS,
FOURTH DISTRICT, DIV III; WHICH DENIAL WAS FILED ON 3 /22/07

TO: HONORABLE CHIEF JUSTICE RONALD GEORGE AND THE ASSOCIATE JUSTICES
OF THE CALIFORNIA STATE SUPREME COURT IN SACRAMENTO, CALIFORNIA

INTRODUCTION

Keith MacKeekan, (petitioner), hereby lodges this Petition for Review with this honorable Court after denial in the Fourth District Court of Appeals, Division Three. A copy of that denial is attached hereto as Exhibit "A". Petitioner is seeking to settle important questions of law and secure privileges to which he is entitled under statutory authority and that are fully embodied in both state and federal Constitution's rights pertaining to, but not limited to: Due Process, Equal Protection, and the adequate representation of petitioner's interests during proceedings which respondents have initiated. This is of no small import inasmuch as respondents are the sole provider of the guarantees of which petitioner seeks to avail of in order to attempt to reclaim his liberty interests and release from custody or to have his Hearing reheard with instructions to the panel.

Respondents are not only the sole providers of these guarantees but, by virtue of their position, have sway over the methods and quality of the legal, ethical, and judicious assurance of those rights to comport with federal due process guarantees which have become part and parcel of our legal fabric.

DISCUSSION

Petitioner is an inmate at Correctional Training Facility, Central Facility (CTF-C), in Soledad, California, where he is serving a fifteen (15) years-to-life term for murder of the second degree, Penal Code (PC) §187, after conviction in the Orange County Superior Court. Petitioner is not challenging his conviction in the within action and for the purposes of this matter accepts the decision of the Orange County Superior Court, notwithstanding his longstanding and viable claims in his direct appeal which are not being addressed nor argued herein.

<u>QUESTIONS PRESENTED</u>

1. Does Petitioner's state and federal constitutional rights to due process and equal protection become violated by respondents when they deny to him the individualized considerations mandated and required by statutory authority and all the clearly established laws?

2. Are Petitioner's federal rights to due process and equal protection violated when respondents utilize a lesser standard of legal proof which requires evidence with some indicia of reliability to find Petitioner unsuitable to parole and therefore an unreasonable risk to the public safety although contrary to the professional testimony?

3. Does petitioner's federally-cognizable liberty interests in release to parole created by respondent's statutory scheme and mandatory language of the enabling statute that requires a suitability finding under statutory criteria prevail when respondents "substantial evidence" burden of proof is not met herein by any standard relying on U.S. SUPREME Court case law?

<u>NECESSITY FOR REVIEW</u>

In this case, the Board of Prison Hearings (BPH) refused to set a parole release date, relying on PC §3041(b). This Court's decision in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616, and more recently in <u>In re Dannenberg</u> (2005) 34 Cal.4th 1061, do not appear to establish any limits to the BPH and/or governor whatsoever as to the use of the offense to deny parole in almost all meritorious cases that come before it.

Does PC §3041(b) then, allow the BPH or the governor to convert offenses for which the statutes create a presumption of suitability and term setting at the Minimum Eligible Parole Date (MEPD), into express Life-Without-Parole sentences at their discretion? In a similar fashion, can the California Code of Regulations (CCR), title 15, §2402(c), be used in perpetuity to deny parole, based on only those enumerated circumstances and factors specified in the Regulations focused on, despite the overwhelming and incontrovertible evidence of suitability and lack of danger to the public as expressed in the term matrices? May the BPH's and/or governor's lay opinions and standard-less assessment of the gravity of the offense disregard a jury's and/or court's determination and/or a plea agreement? Does such an interpretation of the statutes violate rules of statutory construction and unlawfully deprive petitioners of a state and/or federal liberty interest in parole release?

In reviewing the BPH's and/or governor's decisions, does the "some evidence" standard of review preclude meaningful judicial review for more than pro forma consideration as opposed to consistent due consideration? Moreover, is the "some evidence" standard an unreasonable application of U.S. Supreme Court authority, given the

obvious qualification as stated in <u>Superintendent v. Hill</u> (1985) 472 U.S. 445, when the hearings are not "exigent

circumstances" and therefore not subject to time constraints?

Petitioner therefore respectfully requests that this Honorable Court and the Justices thereon grant this

Petition For Review with a view towards settling important matters of statewide importance, affecting thousands of

similarly-situated inmates. And, further, to consider whether or not federal constitutional laws have been violated by

respondents and/or their agents of the Executive branch, i.e., BPH staff, California Department of Corrections and

Rehabilitation, named or unknown, et al.


### POINTS AND AUTHORITIES

ARGUMENT

1.

THE BPH'S REFUSAL TO SET PETITIONER'S PAROLE RELEASE DATE, BASED ON THE EVIDENCE PRESENTED, UNLAWFULLY DEPRIVED HIM OF A CONSTITUTIONALLY-PROTECTED STATE AND FEDERAL LIBERTY INTEREST.

A.    California's Statutes Give Rise To A Liberty Interest Protected
      <u>By The Due Process Clauses Of California And U.S. Constitutions.</u>

It has been long established that California's parole statutes contain sufficient substantive predicates to give

rise to a constitutionally-protected liberty interest. <u>McQuillen v. Duncan</u> (9th Cir. 2002) 306 F.3d 895; <u>Biggs v.</u>

<u>Terhune</u> (9th Cir. 2003) 334 F.3d 910; citing U.S. Supreme Court authority: <u>Wolff v. McDonnell</u> (1974) 418 U.S. 539;

<u>Greenholtz v. Nebraska Penal Inmates</u> (1979) 442 U.S. 1; <u>Board of Pardons v. Allen</u> (1987) 482 U.S. 369.

Pursuant to PC §3041 and rules of statutory construction authority petitioner respectfully requests that, if

possible, every word and clause of a statute SHALL be given effect. This becomes crucial-where the statutory

scheme mandates that parole release dates are normally to be set at the *initial* parole hearing which SHALL be held

one year before an inmate becomes eligible. And, construed as closely to its actual meaning as is legally possible

where, one year prior to the MEPD, an inmate SHALL have a parole release date set at that time in a manner that

will provide for uniform terms based on certain criteria specified by statute and/or regulations as indicated by the

matrices of similar crimes, and a date for parole may only be withheld if the BPH makes a reasonable determination

that an extended period of incarceration is required in the interest of public safety due to the gravity of the current

convicted offense, and/or the gravity and timing of a past offense.

This suitability determination, however, may not be arbitrary, capricious, or whimsical. The evidence relied

upon must tend logically and by reasonable inference to establish facts relevant to suitability unless a factual

determination is made of unsuitability. In re Morrall (2002) 102 Cal.App.4th 280, 298-99. Furthermore, that evidence

must bear some indicia of reliability. Jancsek v. Oregon (9th Cir. 1987) 833 F.2d 1389, 1390. CCR, title 15, §§ 2402

and 2281 set forth the criteria and general guidelines implementing the parole statutes and provide standards in

making that determination. (See footnotes to Regulations, citing as authority PC §§ 3041, 3052, and 5076.2).

B.    The Parole Statutes Impose An Affirmative Obligation On The Board
      To Set Release Dates; The Regulations Implement Those Statutes.

The BPH's regulations pursuant to PC §3041(b), state a prisoner may only be found unsuitable if the BPH

determines that the offense or past (convicted) offenses and present timing is of such gravity that a longer period of

incarceration is required in the interest of public safety. The determination is made based on the standards set forth

by the BPH's regulations. The principle guideline in making the determination is CCR §2402(c), et seq., which, as is

the Matrix, are now well-known to this Court. (A copy of those specified criteria are attached as Exhibit "B".)

As will be noted at Exhibit "B", Circumstances (1), (2), and (4) of CCR §2402(c), arguably reflect the subset

of allowable exceptions in the criteria to setting parole release dates; the current or past offense(s). Factor (E) of

subsection (1), however, is a rare circumstance as there is almost always as here, an explanation as to why the

offense occurred. Whether the motive truly was trivial or inexplicable is another matter that, as one court noted, has a

somewhat illusory acceptance:

> "The epistemological and ethical problems involved in the ascertainment and evaluation of motive
> are among the reasons the law has sought to avoid the subject. As one authority has stated, "hardly
> any part of penal law is more settled than that motive is irrelevant." [Hall, General Principles of
> Criminal Law, (2nd ed.1960) at p.88; see also Husak, Motive and Criminal Liability (1989) vol.8,
> No.1 Crim. Justice Ethics 3.]"

The court further explained:

> "The offense committed by most prisoners serving life sentences is, of course, murder. Given the
> high value our society places upon life, there is no motive for unlawfully taking the life of another
> human being that could not be deemed 'trivial'". The Legislature has foreclosed that approach,
> however, by declaring that murderers with life sentences must "normally" be given release dates
> when they approach their Minimum Eligible Parole Dates (MEPD). PC §3041(a)." In re Scott, (Scott
> I) (2004) 119 Cal.App.4th 871, 892-93. (governor's rescission of parole unanimously reversed, Scott
> II (2005) 133 Cal.App.4th 573; 34 Cal.Rptr.3d 905. Review/De-publication denied 12-2-05; see:
> attached copy of Dec. 2, 2005, Los Angeles edition of the Daily Journal, p. 13803, attached hereto
> as Exhibit "C").

It is therefore questionable whether that factor has any evidentiary value in this case. If the motive

was indeed inexplicable, "A person whose motive for a criminal act cannot be explained or is unintelligible is

therefore unusually unpredictable and dangerous." (Scott I, p. 893.) Such is certainly not the case presented

here and warrants close scrutiny by this Court.

The primary circumstances and factors considered when making the determination, CCR §§2402(d)(1)(B) and (D), have been explained by the courts. To qualify for the authorized exception, an offense must be exceptionally egregious or especially grave.

The Court of Appeals characterized this as follows:

> "In re Van Houten (2004) 116 Cal.App.4th 339, illustrates the sort of gratuitous cruelty required. The prisoner in that case was involved in multiple stabbings of a woman with a knife and bayonet. While she was dying, the victim was made aware her husband was suffering a similarly-gruesome fate. As stated by the court, "'[t]hese acts of cruelty far exceeded the minimum necessary to stab a victim to death.'" (Id. At p. 351) Other examples of aggravated conduct reflecting an "exceptionally callous disregard for human suffering", are set forth in BPH regulations relating to the matrix used to set base terms for life prisoners (§2283, subd. (b)); namely, "torture", as where the "[v]ictim was subjected to the prolonged infliction of physical pain through the use of non-deadly force prior to the act resulting in death", and "severe trauma: as where "[d]eath resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in  immediate death or actions calculated to induce terror in the victim." (Ibid., Scott I, supra, at p. 892.)

In this case there is no gratuitous cruelty or torture. Moreover, even in such exceptional cases, the matrix suggests appropriate "extended" terms. CCR §§2402(a), (b).

Circumstance (3) of the unsuitability factors: "Unstable Social History" is inapplicable where petitioner has demonstrated stable relationships with others since incarceration, nor is there a nexus between pre-conviction history and current threat to public safety in this matter.

Circumstance (5), Psychological Factors. "The prisoner has a lengthy history of severe mental problems related to the offense.", is hardly ever a factor to be considered in most parole situations in Level II prisons and is not applicable at all in this case, as indicated by the latest professionally-accepted Psychological Report or by previous reports by very different doctors; mental health experts specifically trained to evaluate and report their analysis. Not one of these experts has found petitioner wanting nor in need of therapy, (which is nonexistent for mainline inmates without a reality-based, professionally prescribed and verifiable need.)

Circumstance (6), Institutional Behavior. "The prisoner has engaged in serious misconduct in prison or in jail." Perhaps, pursuant to CCR §2410, which provides for the granting or denial of 'post-conviction credit', it is reasonable to deny credit to indeterminately sentenced prisoners, but this factor should not be used to substitute for a statutory provision which specifies that **only** the **gravity** of the current or past _convicted_ offense(s) could be grounds for withholding setting of a term, and **only** when the **gravity** is exceptional in light of PC §3041(a), that parole release dates should not **normally** be set. (emphasis added.)

Petitioner submits that the Legislature would not have specified that the **gravity** of the current or a past convicted offense could be a basis of denial if it had intended that the BPH has the broader discretion of PC §3041(b). Therefore, 'misconduct' or any other specious reasoning should not be used to deny parole **continuously**. As a point of fact, these same factors have been considered to be an "intrusion of irrelevant post-conviction factors in the determination of the punishment [that's] proportionate to the offense". In re Rodriguez (1975) 14 Cal.3d 639, 654-55, and those various cases following as its progeny.)

C.    The Board Of Parole Hearings Does Not Have The Almost Absolute
      Discretion It Had Under Determinate Sentencing And Should
      Normally Be Required To Set Parole Terms Within The Guidelines.

Notwithstanding that later decisions continue revising the interpretive gloss of the statutes and regulations, in 1982, immediately after the Determinate Sentence Law enactment and revised PC §3041were enacted in 1977, the newly enacted law was interpreted by this Court as follows:

> "Under the ISL, we previously viewed parole thusly: "'In the general field of criminal law the Legislature has abandoned infliction of fixed terms for certain crimes, and substituted the indeterminate sentence, leaving to the Adult Authority the judgment of the period of incarceration. The Adult Authority does not fix that period pursuant to a formula of punishment, but in accordance with the adjustment and social rehabilitation of the individual analyzed as a human composite of intellectual, emotional, and genetic factors." People v. Morse (1964) 60 Cal.2d 631, 642-43, (footnotes omitted.) ¶ In contrast, by altering the statutory scheme and enacting the Determinate Sentencing, the Legislature recited specifically that it "'finds and declares that the purpose of imprisonment for crime is punishment.'" (PC §1170(a)(1), all subsequent statutory references are to this code.) The new law provides that an inmate's "'release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. **The BPH *shall* establish criteria for the setting of parole release dates** and in doing so *shall* consider the number of victims of the crime for which the prisoner is sentenced and other factors in mitigation or aggravation of the crime.'" (§3041, subd. (a), emphasis added.) The present parole guidelines were promulgated pursuant to the new Act. ***Thus, the guidelines are not mere administrative responses to the BPH's internal shifting discretion but rather reflect basic legislative alterations in the underlying parole scheme.*" In re Stanworth (1982) 33 Cal.3d 176, 182. (**bold** *Italics* added.)

Stanworth noted, "Under both the 1976 [rules] and the current rules, a life prisoner must first be found suitable for parole before a parole date is set." (Id. At p.183.) However, the BPH's discretion in that respect has been limited, as in Montana:

> "**That the Montana statute places significant limits on the BPH's discretion is further demonstrated by its replacement of an earlier statute which allowed absolute discretion ...**" Allen, supra, at p. 369.) (**bold** emphasis added.)

In California, the former PC §3041, which granted the BPH's almost absolute discretion was replaced with the current one that specifies when and why the BPH may act. PC §3041(b) specifies that in consideration of public

safety, with respect to the gravity of the offense or timing and gravity of a past offense, an extended period of incarceration may be required. Rules of statutory construction mandate that PC §3041(b) must be construed in context with PC §3041(a), and the mandate that parole dates **shall** normally be granted one year prior to parole eligibility, which occurs when the MEPD (minus good-time) has been served. "With respect to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole ..." Morrall, supra, at p. 292. An "extended period of incarceration", then, is with reference to that minimum "normal" term. The matrix guidelines provide suggested terms; some "extended" according to the gravity of the specified offenses, in complete accord with PC §3041 read as a whole.

The CCR's §§2282 and 2403 establish the circumstances and victim factors that suggest appropriate terms, but the same circumstances and factors are used instead to make unsuitability determinations of "inmate un- suitable" for parole release. Petitioner submits the guidelines have been, are being, and will be used in an unconstitutional manner. Practices like these have been condemned by Rodriguez, supra, and those condemned practices have resumed. Furthermore, the BPH continues invoking its discretion to disregard the reasonable execution of the statutes, refusing to normally set parole release dates. The Ninth Circuit has inferred that just such a practice could, or already may have, violate(d) due process:

> "The parole board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. [cite] As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and the conduct prior to imprisonment to justify a denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should [petitioner] continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of [his] offense and prior conduct would raise serious questions involving his liberty interest in parole." Biggs, supra, at p.916, citing to Greenholtz.

The minimum statutory term for kidnap for ransom/robbery is seven (7) years; for second degree murder it is ten (10) years with credit reduction; for first degree murder it is sixteen (16) years (8) months with credit reduction. At the other end of the spectrum, the highest matrix on: kidnap for ransom/robbery is seventeen (17) years; second degree murder up to twenty-one (21) years; first degree murder at up to thirty-three (33) years.

The reasonable meaning of "early parole" is the minimum eligible term, and extended terms logically are the highest matrix terms probably exceeding the normal terms due to "exceptional" offense circumstances, prior convictions involving violence, or substantial evidence of current dangerousness. More time could be exacted in accordance with CCR §2410, withholding "post-conviction" credit for failure to participate in self-help or similar programming, and/or avoiding available therapy, or for incurring (a) serious disciplinary infraction(s). Such factors should not be continuously used indefinitely, however, to find unsuitability and certainly not BY ROTE!

In the watershed case opinion leading up to the enactment of the current Determinate Sentence Law (DSL) and PC §3041, the Court explained:

> "Prompt term-fixing will not only serve to alleviate one of those causes of anxiety now affecting inmates, but will also *prevent the intrusion of irrelevant, post-conviction factors in the determination of the punishment that is proportionate to the offense of the particular inmate.*" Rodriguez, supra, 654-55. (emphasis added to accentuate current parole system failure.)

Although the most recent interpretation the statutes by Dannenberg, supra, now holds that proportionality or comparison of like offenses, as part of suitability determinations, is not required, the enactment of the DSL and enactment if PC §3041 was remedial for all similarly-situated inmates. (In re Neal (1980) 114 Cal.App.3d 141, 145.) Even if the state's interpretive gloss has changed, it is clear that because petitioner has a state and federal liberty interest vested by statute as determined by Supreme Court authority, the *constitutional* effect cannot be ignored:

> "While the interpretive gloss on the statute may bind this court as a matter of statutory construction, we are not, however, similarly bound as to the **constitutional effect** of that construction." (McSherry v. Block (1989) 880 F.2d 1053; Aponte v. Gomez (9th Cir.1993) 993 F.2d 705.) (emphasis added.)

The constitutional effect of the current interpretive gloss is that it deprives inmates of the remedial intent of the Legislative changes in PC §3041, and the vested liberty interest that parole dates were to be set one year prior to the eligible date. The words "shall normally" of PC §3041(a) have been omitted by the current construction of the statute section:

> "It is our duty 'to give effect, if possible, to every clause and word of a statute. Montclair v. Ramsdell (1882) 107 U.S. 147; rather than to emasculate an entire section, as the Government's interpretation requires." Minnesota v. Probate Court (1940) 309 U.S. 270, 277.

Lastly, the BPH has stated that the matrices do not apply unless and until an inmate is found suitable. Implementing PC §3041, the regulations state that the base term is to be set *solely* in accordance with the gravity of the offense. (CCR §2403(a).) The circumstances indicating the gravity, or seriousness, of offenses have been established by the matrices, yet the same circumstances and victim factors are used to find inmates unsuitable, continuously, as is "normally" done in virtually all cases.

> "It is simply irrational for [the] seriousness of the offense to be used first to determine the appropriate guideline period and then to be used again as the stated reason for confining a prisoner beyond that guideline." Little v. Hadden (1980) 504 F.Supp. 558, 562 (citing Lupo v. Norton (196_) 371 F.Supp 156, 163.)

The BPH's identical, and arbitrary, use of the Regulations is inconsistent with statutory language and unlawfully deprives similarly-situated inmates like petitioner of a vested liberty interest.

<u>Ground 2.</u>

APPLYING THE "SOME EVIDENCE" STANDARD FOR REVIEWING THE
BPH'S PAROLE SUITABILITY DECISIONS IS AN UNREASONABLE APPLICATION
OF PREVAILING U.S. SUPREME COURT AUTHORITY.

A.    The "Some Evidence" Standard Militates Against The
      Reasonable Execution And Enforcement Of Applicable
      <u>Statutes and Regulations As Decisional Law States.</u>

Petitioner contends that because the language of PC §3041 together with the kidnap/murder statutes'

minimum terms gives rise to a substantial federally-protected liberty interest which may not be abridged by the

institutional "some evidence" standard of judicial review.

The administratively-imposed and judicially-sanctioned minimally stringent "some evidence" standard of

judicial review of the Executive branch's decisions prevents a court from effectively safeguarding California prisoners'

Constitutionally-protected state <u>and</u> federal liberty interests. This is so because, under the present standard, a court's

review is limited to determining only whether "a modicum" of "some evidence" exists to support the BPH's finding of

unsuitability and without substantial evidence or preponderance of the evidence standards as the guidepost, a court

may not reweigh the evidence as it is proffered and thus, review will always fail to give appropriate respect to the

Legislature's clear intent in establishing minimum terms. Cabling these defined standards together with parole statute

language would fulfill the mandate that terms are "normally" to be set, ab initio.

Clear and convincing evidence demonstrates that the BPH and governors have failed to administer the

statutes and regulations in a manner reasonably faithful to the plain language of PC §3041, granting only a mere

token number of parole dates, the vast majority of which are reversed. The BPH's claim of almost absolute discretion

and the "duty to give individualized consideration" to rationalize and justify the fact fails, as is shown below.

B.    Differences Between Disciplinary Hearings And Parole
      Suitability Hearings Precluded The Application Of
      The "Some Evidence" Standard Which Does Not Meet The
      Federal "Substantial Evidence" Standard Of Evidence To
      <u>The Review of BPH's Parole Suitability Hearings.</u>

Although the Ninth Circuit adopted the "some evidence" standard in <u>Jancsek</u>, supra, the issue there

however, WAS NOT PAROLE SUITABILITY. And, this class of cases did not contemplate the qualitative nor

quantitative differences in parole denial, which has a substantial evidence test and credit revocation, which only

requires a preponderance of the evidence. The disparities in their results and magnitude of the respective

deprivations, as <u>Superintendent v. Hill</u> advised with respect to the sufficiency of the evidentiary standard, should not

be compromised.

Prison disciplinary proceedings often do involve "exigent" circumstances that require swift action on the basis of minimal or insubstantial evidence in the interests of prison operations and security, e.g., prevention of riots, assaults, retaliations, or punishing actions that might not be legally provable but reasonably certain to have occurred, similar to the Hill case. Disciplinary proceedings are due to serious rules violations, sometimes involving new charges and court involvement. Disciplinary proceedings are very informal, usually involving only a correctional lieutenant conducting the hearing, and generally involving the loss of not more than six (6) months of credit, but oftener, just days or weeks. Credit loss can usually be regained after a certain period of good behavior, an incentive for better conduct, compliant programming, respect for staff; a legitimate and self-explanatory prison interest backed by all of the interested parties.

By contrast, parole suitability proceedings take place only after an inmate has become eligible for parole and has served a long period of incarceration sufficient to satisfy the MEPD requirement of the law. In the case of second degree murders, ten years is the minimum time required to satisfy statutory requirements. During that period, the prisoner has generally been working to get a high school certificate (GED), vocational/trade completions, attending self-help groups and therapy (if suggested and available). Also, participating in encounter groups such as Alcoholics Anonymous, Narcotics Anonymous, Anger Management and so forth, and generally maturing and staying out of trouble in expectation of receiving a parole in accordance with statutory language.

These hearings, if not as formal as court proceedings, are nonetheless very structured. Parole suitability hearings are scheduled with months (even years, due to systemic delays) of notice to judges, d.a.'s, victims or relatives of the deceased and/or their representatives, and other interested parties, as notice requires. An attorney is usually requested and appointed, the parole applicant is sworn in, put under oath, hearings begin. One or two commissioners and a deputy commissioner conduct different aspects of the hearing, a deputy district attorney is usually present (via video-link) and may participate, ask questions, or make comments as asked through the commissioners. The entire proceedings are audio- and/or video-recorded, later transcribed and copies given to inmates and all concerned parties.

Qualitatively, then, parole suitability hearings do not involve "exigent circumstances", the qualifying consideration articulated by Hill. Reason dictates there are no day-to-day prison management interests at stake, unlike prison disciplinary proceedings. Quantitatively, parole suita- bility proceedings involve denial of parole for up two years, and after the 1994 Amendment to CCR §2270(d) for up to five (but compare §2268(b), §2400). These

years of time, added in the "interests of public safety", cannot be restored nor replaced. Prison disciplinary proceedings generally involve the revocation of up to six months credit which can normally be restored after a disciplinary-free period and is normally granted at the first request.

The deprivation of parole for up to five years, multiple times, hardly seems comparable to a few month's credit loss, which, after restoration, puts an inmate in exactly the same position as before the infraction, unlike parole denial of many years, sometimes doubling the MEPD. These very significant differences illustrates why the High Court in Hill stated that the "some evidence" standard might not be constitutionally sound in "less exigent" circumstances than those involved *in prison disciplinary proceedings*. (Id. at p.455, emphasis added.)

A more recent High Court case addressed a similar issue involving prison administration concerns, Sandin v. Conner (1995) 515 U.S. 472, like Hill, was also concerned with prison regulations, involving "... the language of intricate, often routine prison guidelines", and whether mandatory language of regulations created a protected liberty interest. (Id. at 480.) In Sandin, the Court retreated from its previous approach in Hewitt v. Helms (1983) 459 U.S. 460,(prison regulation regarding administrative segregation), in determining whether a prison regulation created a protected liberty interest, because the ruling in Hewitt has led to "undesirable effects."

The Court noted that Hewitt had "created disincentives for states to codify prison management procedures" and had led to the "involvement of federal courts in the day-to-day management of prisons." Sandin, supra, at p. 482-483. In its decision, the Court explained how, for prison administrators, more flexibility was "warranted in the fine-tuning of the ordinary incidents of prison life." Id. The rule adopted in Sandin was whether the action taken "imposes atypical and significant hardship(s) on the inmate in relation to the ordinary incidents of prison life.", in determining whether due process protections were implicated.

Thus, Sandin, like Hill, involved due process liberty interests with respect to prison regulations and management concerns. It is, of course, not a prison regulation pertaining to prison management or related prison disciplinary proceedings at issue in the present matter, but rather statutes governing parole release, protected by the Due Process Clause because a cognizable liberty interest has been created by statutory language. McQuillen, supra, at p. 902; Biggs supra, at p. 915.

The issue here is a statutorily-mandated proceeding to determine whether, after many years of programming-oriented incarceration, a prisoner's offense was of such exceptional gravity, or whether the prisoner's post-conviction conduct has been so demonstrative of unsuitability, that consideration of public safety requires extended periods of further incarceration beyond the minimum requirements of normal terms. (If structured

proportionality wasn't contemplated by the Legislative branch at the time of the statute's initiation, why was a different term set for the crimes of first, second, and attempted murder, and kidnap for ransom/robbery, and why were specifically-graded recommended matrix terms established? Why is PC §3041(a) worded as it is?).

Although, as previously discussed, both loss of credit and denial of parole both affect the duration of the sentence, the magnitude of the deprivation is much greater when parole is denied after serving a lengthy term and more so when prisoners are repeatedly denied for up to five years, again. Also, because of the fact that no prison interests such as security, discipline or the like are involved, the <u>Hill</u> broadsword, like the <u>Sandin</u> rule, is wholly inappropriate. And, if anything, the "some evidence" standard has led to the necessity of federal court intervention and involvement to review the BPH's decisions because state courts are limited to only reviewing for "some evidence" and almost universally refuse to find federal constitutional violations when confronted with patently obvious violations of the same. As such, the "some evidence" standard has "created disincentives" for the BPH to apply its rules in a manner comporting to federal standards of evidence or in any seemingly reasonable manner and thus requiring federal review.

Even in the context of prison disciplinary proceedings, the High Court has explained that due process requires something more than "some evidence", and that this standard applies *only* to questions of evidentiary sufficiency as an <u>additional</u> requirement of due process, and "is not a substitute for other established due process requirements." <u>Edwards v. Balisok</u> (1997)520 U.S. 641, 648. As the Ninth Circuit has recognized, there will always be material that, under the "some evidence" standard, factors against a grant of parole:

> "[I]ndeed, 'some evidence of unsuitability for parole would exist in virtually *every* parole hearing, exposing every grant of parole to a BPH's subsequent change of heart or political whim." (<u>McQuillen</u>, supra, at p.905; <u>In re Caswell</u> (2001) 94 Cal.App.4th 1017.) (emphasis added).

In <u>Sandin</u>, supra, the High Court expressly reiterated that "states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause." <u>Id</u>. at 483-84, citing <u>Allen</u>, supra. Therefore, it is very clear that the Court did not mean to alter the rules set forth in <u>Greenholtz</u> and <u>Allen</u> with respect to liberty interests that a state's parole scheme may legitimately create. Logically neither, then, did <u>Hill</u> intend that it's "some evidence" decision there should apply to deprive petitioners of liberty interests created by state statutes. Petitioner submits that the application of the "some evidence" standard of review in the context of parole suitability determinations, where a vested liberty interest is at stake, is an unreasonable application of High Court authority and <u>must</u> fail:

> "Second, a state-court decision also involves an unreasonable application of this Court's precedent

if the state court either **unreasonably** *extends a legal principle from our precedent to a new context where it should not apply* or **unreasonably** refused to extend that principle to a new context where it should apply." (<u>Williams v. Taylor</u> (2000) 529 U.S. 362, 407; citing <u>Green v. French</u> (4th Cir.1998) 143 F.3d 865, 869-70.) (emphasis added.)

CONCLUSION

Here, then, the abiding question in this case is whether the evidence will reasonably support a conclusion that petitioner poses an unreasonable risk of danger or a threat to public safety, AT THIS MOMENT. Inherent in this idea of finding "suitability first" as the leading procedure, where the suitability determination precedes any consideration of the already-served term or lengthy period past the MEPD, must not devolve into casting a wide net with the unstated intention of denying all otherwise suitable inmates by reciting a mantra of "some evidence, suitability denied."

This, unfortunately, is essentially what has become the "normal" method currently utilized to deny parole-ready and suitability-worthy petitioners of any semblance of fair play and any court's acquiescence in this charade should be publicly aired and universally castigated as a political solution of the worst sort. Individual freedom is far too important to lie fallow in a politically-driven and inspired climate where such greater minds exist and have an imprimatur of trust.

Though a uniform term is based on historical facts, the issue as to whether petitioner is suitable for parole must be based on whether the inmate is currently a threat to public safety and the state's experts should not be ignored where their opinions are in harmony with a suitable-to-release finding. The question must be asked, "Does the BPH or governor abuse it's discretion when they reject for the most specious of reasons, a professional Report based on an ethical expert's opinion that cannot be contradicted by a lay assessment of alternative 'facts'?" If the answer is "Yes.", then it is incumbent upon a Court of equity to review and, if necessary, reverse whatever damage has been done by these scurrilous attempts to circumvent the legal process and deny a worthy individual a second chance to succeed.

A second related question of importance is whether the "some evidence" standard for judicial review of parole suitability decisions can continue to be considered constitutionally-sufficient in light of the <u>Sandin</u> decision distinguishing liberty interests in the context of prison management and associated flexibility concerns and "the real concerns under girding the liberty protected by the Due Process Clause", citing <u>Wolff</u>, supra; <u>Allen</u>, supra. <u>Sandin</u> made it clear what <u>Hill</u>, supra, alluded to: that one is constitutionally permissible, but the other, not involving "exigent circumstances", is not. <u>Hill</u>, supra, at p.455. This is particularly so given statutory language vesting a liberty interest in

the overall proceedings.

Petitioner respectfully requests review so that this Court may consider these questions of statewide and constitutional importance. Moreover, in light of Sandin, supra, and Irons v. Warden (2005) 358 F.Supp.2d 936, to provide the Court with an opportunity to consider whether the denial by the court of appeals is an unreasonable application of established U.S. Supreme Court precedent and authority, thereby depriving similarly-situated petitioners of a federal liberty interest protected by Due Process and Equal Protection Clauses of both state and federal Constitutions. This Court must now address these issues by way of Review.

Dated: 3 - 2 6 , 2007

Respectfully submitted,

Keith MacMeekin, petitioner

## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                        ) SS.   **In re: Keith McMeekin, on habeas corpus**
COUNTY OF MONTEREY )

I, _____**WILLIAM WALKER**_____, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I am~~xxx~~ not a party to the within action.

My business/residence address is P.O. Box 689, Soledad, California, 93960-0689.

On _March 27_, 20_07_. I served the foregoing:

**PETITION FOR WRIT OF HABEAS CORPUS WITH POINTS AND AUTHORITIES;**
**WITH ATTACHMENTS THERETO AND EXHIBITS IN SUPPORT THEREOF** ( PETITION For REVIEW )

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

```
California Attorney General        Fouth District Court of Appeal
Office of the Clerk                Division Three
P.O. Box 944255                    P.O. Box 22055
Sacramento, CA  94244-2550         Santa Ana, CA 92702-2702
```

There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

Executed this _27th_ day of _March_, 20_07_, at

Soledad, California.

/S/ _William Walke_

# EXHIBIT    "A"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
**FILED**

MAR 22 2007

Deputy Clerk_____

In re KEITH MACMEEKIN

on Habeas Corpus.

G038189

(Super. Ct. No. M10959)

O R D E R

THE COURT:*

The petition for a writ of habeas corpus is DENIED.


SILLS, P. J.

\* Before Sills, P. J., Aronson, J., and Ikola, J.

COPY

EXHIBIT "B"

HISTORY
1. Repealer of former Section 2373 and renumbering of Section 2374 to Section 2373 filed 6–11–79; effective thirtieth day thereafter (Register 79, No. 24). For history of former section, see Register 77, No. 44.

## Article 11.   Parole Consideration Criteria and Guidelines for Murders Committed on or After November 8, 1978, and Specified Attempted Murders

### § 2400.   Scope of Article.

The criteria and guidelines in this article apply to prisoners sentenced to prison for first and second degree murders committed on or after November 8, 1978 and attempted murders where the perpetrator is sentenced for life pursuant to the provisions of Penal Code section 664. The guidelines in this article are based on the public's expressed intent in amending Penal Code sections 190 and 664 that a person convicted of first or second degree murder or attempted murder, as specified, should be incarcerated for an extended period of time.

The prisoner's minimum eligible parole date is established by statute. The amount of good conduct credit that a prisoner sentenced for first or second degree murder may earn to reduce the minimum eligible parole date is established by statute. (Penal Code sections 2930 et seq.) Life prisoners convicted of attempted murder do not earn these credits. The department will determine the minimum eligible parole date. The length of time a prisoner must serve prior to actual release on parole is determined by the board. The amount of postconviction credit a prisoner may earn to reduce the length of time prior to release on parole is determined by the board. This article implements Penal Code section 3041 and concerns only the board's exercise of discretion in determining whether a prisoner is suitable for parole and, if so, when the prisoner should be released on parole.

The standards the department's action in reducing the minimum eligible parole date and the standards for the board's decision whether to reduce the period of confinement are different. The department's decisions pursuant to Penal Code sections 2930 et seq. do not affect the Board's decision concerning postconviction credit pursuant to these rules.

A prisoner committed for first or second degree murder or attempted murder shall have his or her initial parole consideration hearing as provided in § 2268. The prisoner will have documentation hearings as provided in § 2269.1, but no specific amount of postconviction credit will be granted until the board has established a period of confinement.

Although many of the sections in this article are the same as the sections in Article 5, they are repeated in this article to avoid confusion between the rules applicable to prisoners who committed murders on or before November 7, 1978 and these rules which apply to prisoners who committed murders on or after November 8, 1978, and those who committed specified attempted murders. The suitability criteria are the same for both groups. The guidelines for establishing the periods of confinement are different because of the change in the minimum term for first degree murder and the change from a determinate to an indeterminate term for second degree murder and attempted murder. The provisions for adjusting the terms for other offenses are also different because of the change in Penal Code section 669 which permits courts to impose sentences consecutive to life terms (Stats. 1978, Ch. 579, eff. 1/1/79).

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 182, 190, 664, 2930 et seq., 3040, 3041, 3046 and 5076.1, Penal Code.

HISTORY
1. New Article 11 (Sections 2400–2411) filed 9–8–81; effective thirtieth day thereafter (Register 81, No. 37).
2. Amendment filed 6–14–84; effective thirtieth day thereafter (Register 84, No. 24).
3. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).
4. Amendment filed 1–20–88; operative 2–19–88 (Register 88, No. 5).

5. Change without regulatory effect amending article heading and deleting the words "first degree" where they characterized the criminal offense of attempted murder in order to conform the regulation with the decision of the Supreme Court in People v. Bright (1996) 12 Cal.4th 652, 49 Cal.Rptr.2d 732, in which the court determined that the crime of attempted murder is not divided into degrees, filed 2–16–2001 pursuant to section 100, title 1, California Code of Regulations (Register 2001, No. 7).
6. Amendment of article heading, section and NOTE filed 5–13–2004 as an emergency; operative 5–17–2004 (Register 2004, No. 20). A Certificate of Compliance must be transmitted to OAL by 9–14–2004 or emergency language will be repealed by operation of law on the following day.
7. Amendment of article heading, section and NOTE refiled 9–13–2004 as an emergency; operative 9–13–2004 (Register 2004, No. 38). A Certificate of Compliance must be transmitted to OAL by 1–11–2005 or emergency language will be repealed by operation of law on the following day.

### § 2401.   General.

A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.

In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.

The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

NOTE: Authority cited: Section 5076.2, Penal Code. Reference: Sections 3040 and 3041, Penal Code.

HISTORY
1. Amendment filed 8–12–82; effective thirtieth day thereafter (Register 82, No. 33).
2. Amendment filed 11–13–85; effective thirtieth day thereafter (Register 85, No. 46).

### § 2402.   Determination of Suitability.

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution–style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

NOTE: Authority cited: Sections 3041 and 5076.2, Penal Code. Reference: Sections 3041 and 4801, Penal Code.

HISTORY

1. New subsection (d)(5), subsection renumbering, and amendment of NOTE filed 3–16–2001 as an emergency; operative 3–16–2001 (Register 2001, No. 11). A Certificate of Compliance must be transmitted to OAL by 7–16–2001 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 3–16–2001 order transmitted to OAL 7–16–2001 and filed 8–20–2001 (Register 2001, No. 34).

§ 2403. Base Term.

(a) General. The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. If the prisoner has been sentenced to prison for more than one murder committed on or after November 8, 1978, the base crime is the most serious of the murders considering the facts and circumstances of the crime. If the prisoner has been sentenced to prison for murders committed before November 8, 1978 and for murders committed on or after November 8, 1978, the base offense shall be the most serious of the murders committed on or after November 8, 1978.

The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

If the panel finds circumstances in aggravation or in mitigation as provided in §§ 2404 or 2405, the panel may impose the upper or lower base term provided in the matrix by stating the specific reason for imposing such a term. A base term other than the upper, middle or lower base term provided in the matrix may be imposed by the panel if justified by the particular facts of the individual case and if the facts supporting the term imposed are stated.

(b) Matrix of Base Terms for First Degree Murder committed on or after November 8, 1978.

CIRCUMSTANCES

| First Degree Murder | A. Indirect | B. Direct or Victim Contribution | C. Severe Trauma | D. Torture |
|---|---|---|---|---|
| Penal Code § 189 (in years and does not include post conviction credit as provided in § 2410) | Victim died of causes related to the act of the prisoner but was not directly assaulted by prisoner with deadly force; e.g., shock producing heart attack, a crime partner actually did the killing. | Death was almost immediate or resulted at least partially from contributing factors from the victim; e.g., victim initiated struggle or had goaded the prisoner. This does not include victim acting in defense of self or property. | Death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim. | Victim was subjected to the prolonged infliction of physical pain through the use of nondeadly force prior to act resulting in death. |
| I. Participating Victim Victim was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred, e.g., crime partner, drug dealer, etc. | 25–26–27 | 26–27–28 | 27–28–29 | 28–29–30 |

EXHIBIT   "C"

id he "almost certainly relied upon that likelihood" in pleading guilty, the Court held that § 212(c) relief remained available for him. *Id.* at 325, 326.

Unlike St. Cyr, Gonzalez did not have "settled expectations" of relief when he pled guilty in 1994. *Id.* at 321 (internal quotations omitted). The statutory bar to § 212(c) relief, which was triggered by sentences for a term of five years or more, has no such counterpart in § 212(h). Thus, unlike in *St. Cyr*, there is no indication that, as a matter of common practice, aliens have chosen to forego their constitutional right to trial in reliance on maintaining their eligibility for § 212(h) relief by pleading guilty and thus ensuring a particular sentence.

Gonzalez contends that, at the time he pled guilty, he could have applied for adjustment of status to LPR status, pursuant to 8 U.S.C. § 1255(i). Although he was ineligible for adjustment of status because his conviction rendered him inadmissible, he further could have sought a waiver of inadmissibility under § 212(h). There is no evidence in the record, however, that Gonzalez ever applied to adjust his status, that his parents applied for a visa, or that a visa would have been immediately available if an application had been filed on his behalf, as required by 8 U.S.C. § 1255(i)(2)(B). Thus, unlike St. Cyr, whose eligibility for relief was based solely on the exercise of the Attorney General's discretion under § 212(c), the possibility of relief for Gonzalez was remote. In these circumstances, we cannot conclude that he had settled expectations of relief when he pled guilty to the aggravated felony, within the meaning of *St. Cyr.*

We note our holding in *Alvarez-Barajas v. Gonzales,* 418 F.3d 1050 (9th Cir. 2005), that § 348(b) of IIRIRA, the provision that made aliens convicted of aggravated felonies ineligible for § 212(h) discretionary relief, could be applied retroactively to aliens who pled guilty to such felonies prior to the April 1, 1997, effective date of IIRIRA § 348. *Id.* at 1054-55. *Alvarez-Barajas,* however, is not dispositive of the instant case because § 348 expressly applies only to LPRs. *See* IIRIRA § 348(a) (amending § 212(h) by prohibiting the grant of a waiver "in the case of an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence"). This limitation on § 212(h) relief, therefore, does not apply to Gonzalez, who is not and has never been an LPR. *See United States v. Arrieta,* 224 F.3d 1076, 1080 n.2 (9th Cir. 2000) (noting that the § 212(h) limitation on an alien convicted of an aggravated felony did not apply to someone who never was a lawful permanent resident). Our holding thus rests on Gonzalez's failure to establish that § 1228 disrupted his settled expectations.

Gonzalez was ineligible for § 212(h) relief when he was served with a Notice to Appear on December 8, 1997, because of the 1996 amendments to § 1228(b)(5). Therefore, Gonzalez's argument that his waiver was invalid because he was not informed of his eligibility for relief necessarily fails. *Cf. Ubaldo-Figueroa,* 364 F.3d at 1051 (holding that the IJ's failure to inform alien that he was eligible for relief from deportation constitutes a due process violation if alien establishes prejudice). We therefore conclude that Gonzalez's waiver of his right to appeal was valid.

### III. CONCLUSION

Because Gonzalez validly waived the right to appeal the deportation orders underlying his indictment for violation of § 1326, Gonzalez cannot collaterally attack the validity of those underlying deportations. *See Mura/nclan,* 249 F.3d at 182 (explaining that an alien is barred from collaterally attacking the validity of an underlying deportation order "if he validly waived the right to appeal that order" during the

deportation proceedings). Accordingly, the judgment of the district court is

AFFIRMED.

[1] Most of the functions of the INS have since been transferred to the newly-created Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (2002). For convenience, we refer to the agency involved as the INS.

[2] There is no question that § 1228 does not contain express language directing retroactive application. We therefore proceed to the second step of the analysis.

## ORDER

Cite as 2005 DJDAR 13803

SCOTT (GEORGE)
ON H.C.

No. S138430
C.A. 1st, Div. 2, No. A108894
California Supreme Court
Filed November 30, 2005

Petition for review and application for stay denied. The request for an order directing depublication of the opinion is denied. Baxter, J., is of the opinion the petition should be granted.

## ORDER

Cite as 2005 DJDAR 13803

IN RE V. (X)

No. S138370
C.A. 4th, Div. 1; Nos. D045843
D046350
California Supreme Court
Filed November 30, 2005

Petition for review & depublication request denied.

# EXHIBIT   "D"

# ORDER

Cite as 2005 DJDAR 5863

CARL MERTON IRONS, II,
Petitioner-Appellee,

v.

TOM L. CAREY, Warden,
Respondent-Appellant.

No. 05-15275
D.C. No. CV-04-00220-LKK
United States Court of Appeals
Ninth Circuit
Filed May 18, 2005

Eastern District of California,
Sacramento

Before: REINHARDT, NOONAN, and FERNANDEZ,
Circuit Judges.

The parties are ordered to file supplemental briefs, not to exceed 25 pages, within 28 days from the date of this order. The supplemental briefs shall discuss the constitutionality of the standards that Congress has set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1). Specifically, the parties should discuss, in light of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), and *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997), whether AEDPA unconstitutionally prescribes the sources of law that the Judicial Branch must use in exercising its jurisdiction or unconstitutionally prescribes the substantive rules of decision, by which the federal courts must decide constitutional questions that arise in state habeas cases. The parties should consider whether, under the separation of powers doctrine or for any other reason involving the constitutionality of 28 U.S.C. § 2254(d)(1), this court should decline to apply the AEDPA standards in this case.

This court also certifies the above question to the Attorney General of the United States pursuant to 28 U.S.C. § 2403(a). The Attorney General is permitted to intervene and file a brief, not to exceed 25 pages, within 28 days from the date of this order. If the panel determines that further oral argument would be of assistance, it will schedule such argument and inform the parties, the Attorney General, and any amici at that time. This court also invites interested parties to request leave, within 14 days from the day of this order, to file amicus curiae briefs. Should leave be granted, such parties shall have 21 days from the date thereof to file briefs of not more than 20 pages. Judge Fernandez does not join in this order.

## MODIFICATION
## CRIMINAL LAW AND PROCEDURE

*Search of probationer was valid even though guilty plea resulting in probation was later vacated.*

Cite as 2005 DJDAR 5863

THE PEOPLE,
Plaintiff and Respondent,

v.

CHRISTOPHER JOSEPH MILLER,

Defendant and Appellant.

No. G031747
(Super. Ct. Nos. 99SF0643,
02CF2547)
California Court of Appeal
Fourth Appellate District
Division Three
Filed December 6, 2004

ORDER MODIFYING OPINION;
NO CHANGE IN JUDGMENT

The opinion filed in this case on October 26, 2004, and ordered published on November 19, 2004, is hereby modified as follows:

On page 5, in the second sentence of the first full paragraph, the quotation should have internal quotation marks as well as initial quotation marks. Also, the third sentence-- a parenthetical citation—of that same paragraph should be replaced with the following: "(*People v. Leyba* (1981) 29 Cal.3d 591, 597.)"

This modification does not effect a change in the judgment.

SILLS, P. J.

We concur:
RYLAARSDAM, J.
MOORE, J.

# ORDER

*Certiorari Summary -- Disposition*

Cite as 2005 DJDAR 5863

AYOTTE, ATT'Y GEN. OF NH

v.

PLANNED PARENTHOOD

No. 04-1144
United States Supreme Court
Filed May 23, 2005

The petition for a writ of certiorari is granted.

# ORDER

*Certiorari Summary -- Disposition*

Cite as 2005 DJDAR 5863

TIEN F. HSU, ET AL.

v.

CLARK COUNTY NV

No. 04-1282
United States Supreme Court
Filed May 23, 2005

The motion of Pacific Legal Foundation for leave to file a brief as *amicus curiae* is granted. The petition for a writ of certiorari is denied.

# EXHIBIT 11

Court of Appeal, Fourth Appellate District, Div. 3 - No. G038189
S151336

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re KEITH MACMEEKIN on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

MAY 2 3 2007

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice