Keith MacMeekin
CDC # D-30728
P.O. Box 689
Soledad, CA 93960

In Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:                            Case No. C 07-3771 CRB (PR)

   KEITH MacMEEKIN,          PETITIONER'S TRAVERSE TO
                                  RESPONDENT'S RETURN; POINTS AND
on habeas corpus._____/          AUTHORITIES/EXHIBITS THEREON

POINTS AND AUTHORITIES

Issue One

**PETITIONER HAS A LIBERTY INTEREST IN PAROLE.**

   The crucial issue on appeal is whether a federal habeas court may remedy a federal constitutional violation by a state agency; here a decision to deny parole absent a scintilla of evidence that Petitioner's parole would CURRENTLY pose an "unreasonable risk of danger to public safety."

   Petitioner has a liberty interest in parole that is protected by the Due Process Clause. Sass v. B.P.T. (9th Cir. 2006) 461 F.3d 1123, 1129; Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 662; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 915; McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895, 904; In re Rosenkrantz (2002) 29 C.4th 616, 626.

-1-

1    As the above-noted decisions declare, there is no longer any question

2  albeit  Respondents  continue  to  deny  this  well-settled  area  of  law.

3  Petitioner submits that their long-held position is unavailing and benign.

4

5                              .        Issue Two

6      **THE SOME EVIDENCE STANDARD DOES NOT APPLY TO PETITIONER.**

7    Respecting    the    Circuit    Court's    previous    holdings,    Petitioner

8  respectfully _agrees_ with Respondents that the "some evidence" standard

9  of review is appropriate to prison disciplinary matters but an inappropriate

10  standard  to  apply  to these issues.  Thus,  it  is  reasonable  to  encourage

11  this Court to revisit the standard.

12    Evolving from _Superintendent v. Hill_ (1985) 472 U.S. 445, 455; and

13  first applied to a parole matter in _In re Powell_ (1988) 45 C.3d 894, 904,

14  the High Court used the some evidence test to review a prison discipline

15  matter where charges were based on a confidential source. The Court held

16  the prison's need for security and confidentiality diminished the due pro-

17  cess involved. Petitioner's due process is not reduced therefrom because

18  neither a parole determination process nor adjudications of his habeas

19  claims required disclosure of confidential sources and involved no security

20  concern sufficient to lessen its liberty impact.

21    State courts that adapted _Hill_'s some evidence standard of parole

22  decision review held that prisoners didn't have a liberty interest but

23  have since largely applied the previous cites statewide. Because the liberty

24  interest is now well-established, due process commands a finding of some-

25  thing more weighty than "some" (or any?) evidence reliably in the Record

26  to insure and incorporate a vested liberty right protected by the Due Pro-

27  cess Clause of the Constitution's Fourteenth Amendment.

28

1    One could arguably assert that no other state whose parole statutes

2  provide a protected liberty interest allow it to be extinguished by the

3  mere hint of any evidence whether reliable, relevant or ethereal. In con-

4  trast, Minnesota's Supreme Court recently held in Carrillo v. Fabian (2005)

5  701 N.W.2d 763, that Hill's some evidence standard for parole disciplinary

6  matters is inapposite to review an agency's decision affecting an inmate's

7  parole release date where state statutes provide a protected liberty inter-

8  est. Based on the tripartite test prescribed by Hill, the Court there held

9  the "substantial evidence" standard of review protects due process.

10    In Santosky v. Kramer (1982) 455 U.S. 747, the Court explained:

11    "This court has mandated an intermediate standard of proof--'clear
      and convincing evidence'--when individual interests at stake in a
12    state proceeding are both 'particularly important' and 'more
      substantial than mere loss of money.' Addington v. TX (1979) 441
13    U.S. 418, 424. ... the court has deemed this level of certainty
      necessary to preserve fundamental fairness in a variety of
14    government-initiated proceedings that threaten the individual involved
      with 'a significant deprivation of liberty' or 'stigma.' ¶ The extent
15    to which procedural due process must be afforded [to] the recipient
      is influenced by the extent to which he may be 'condemned to suffer
16    grevious loss.' Goldgerg v. Kelly (1970) 397 U.S. 254, 262-63;
      Joint Anti-Fascist Refugee Committee v. McGrath (1951) 341 U.S. 123
17    (Frankfurter, J., conc.). Santosky, supra, at pp. 756, 758.

18    There can be no challenge to the premise that Petitioner's interests

19  at stake here aren't "particularly important" nor don't involve "a signifi-

20  cant deprivation of liberty--or a grevious loss." (Compare: Davis v. B.P.T.

21  (2005) 200 Or.App. 366, 371-373 ["clear and convincing evidence" required

22  in parole cases]; Trantino v. N.J. State Bd. (2001) 764 A.2d 940, 976

23  ["substantial evidence" required]. Of significance is the fact that when

24  reviewing decisions of state agencies for evidentiary support, California's

25  statutory law mandates courts to apply the substantial evidence test. CA

26  Civ.Code §1094.5(c). This Court should set forth why civil law grants such

27  deference without including liberty interests as well.

28

1

Issue Three

2

PETITIONER HAS NOT RECEIVED MEANINGFUL CONSIDERATION AND
PAROLE STATUTES AS APPLIED VIOLATE DUE PROCESS AND EQUAL PROTECTION.

3

The Second District, Div. 7, located in L.A., recently held that:

4
5

(1) factors unrelated to commitment offense did not provide "some
evidence" of unreasonable risk of danger to public;

6

(2) nature of prisoner's offense did not supply some evidence of
unreasonable risk of danger to public; and

7

(3) any predictive value of commitment offense dissipated over time.

8

In re Lawrence (2007) 59 C.Rptr.3d 537. They noted there that state courts

9

are not bound by the AEDPA, state courts are free to apply what they discern

10

to the proper interpretation of federal due process standards .... Id.

11

59 C.Rptr.3d at pp. 557-558. The Sixth District in San Jose found that:

12

[to lawfully deny parole "t]he evidence must substantiate the ultimate
conclusion that the prisoner's release currently poses an unreasonable

13

risk of danger to the public. In re Tripp (2007) 58 C.Rptr.3d 64;
(citing Rosenkrantz, supra, p. 665; conc. In re Lee (2007) 49

14

C.Rptr.3d 931. It violates a prisoner's right to due process when
the board or governor attaches significance to evidence that forewarns

15

no danger to the public or relies on an unsupported conclusion. E.g.,
In re de Luna (2005) 24 C.Rptr.3d 643 [Board concluded, contrary

16

to psychological evaluations, that inmate needed more therapy, ...];
In re Scott (2005, Scott II) 34 C.Rptr.3d 905 [governor was wrong

17

about inmate's history of violent crime and the nature of the
commitment offense]; Lee, supra, [Governor overstated seriousness

18

of commitment offense and wrongly faulted inmate for late acceptance
of responsibility].") In re Tripp at p. 68.

19

20

In what can only be described as an "omnibus ruling", the First Dis-

21

trict in San Francisco held that 1) "some evidence" did not support a find-

22

ing that release on parole would unreasonably endanger public safety; and

23

2) reliance on circumstances no more aggravated or violent than the minimum

24

necessary to sustain convictions violated due process. In re Barker (2007)

25

59 C.Rptr.3d 746. This TRIPLE murder conviction was not sufficient for

26

the BPH to deny parole suitability and the reasoned court noted:

27

"In denying [petitioner]'s habeas corpus petition, the superior court
did not conduct an evidentiary hearing. 'This is therefore an original

28

proceeding in which we independently review the record.'In re Scott

1    (2004) (Scott I); 119 C.App.4th 871, 884; Id., p. 759.

2        Then, discussing the deferential "some evidence" review standard,

3    Judge Richman in Footnote 16, makes an interesting aside which is both

4    instructive and prescient in these proceedings:

5    "The A.G. inexplicably argues that Barker does not have a liberty
     interest in parole and thus the BPH's decision should not be reviewed
6    under the "some evidence" standard. Our Supreme Court has made it
     very clear that 'prisoners possess a protected liberty interest in
7    connection with parole decisions rendered by the BPH,' and that
     imposition of 'a standard of review less stringent than the "some
8    evidence" test would permit the BPH to render a decision without
     any basis in fact' which 'would be arbitrary and capricious, thereby
9    depriving the prisoner of due process of law.' (US Const. Amnd. 14,
     (citing Rosenkrantz, supra, pp. 657, 661.) This holding of Rosenkrantz
10   was cited and confirmed in In re Elkins (2006) 144 C.App.4th 475,
     488, which was filed ... 3 weeks before the [A.G.'s] return here
11   was signed and filed." Ibid. p. 760, (footnote 16).

12       Returning to the L.A. court case of Lawrence, after outlining the

13   3 societal goals of imprisonment: 1) retribution; 2) deterrence; and 3)

14   incapacitation, Judge Johnson found:

15   "California's sentencing structure in murder cases makes it clear
     the denial can only be justified by the third of these purposes ...
16   Unless there is an unreasonable risk the parole applicant will re-
     offend and thus pose a risk to public safety she or he is to be
17   released on parole. Id. p. 559 (Emphasis added.)

18       Just prior to this directive, the Judge observed that the Ninth Cir-

19   cuit and California Supreme Court articulated that:

20   "the commitment crime can lack the power to supply "some evidence"
     supporting a denial of parole because of the interplay of 2 factors-
21   -the nature of that crime and the passage of time since its
     commitment. That is, the fact there is "some evidence" the crime
22   was committed and committed a certain way at a certain time does
     not mean that crime necessarily represents "some evidence" the pris-
23   oner's release on parole will pose an unreasonable risk of danger
     to the public safety at the present time." Id. p. 558.
24

25       Summing up what is really at issue here, the Lawrence court neatly

26   sewed up the various pieces of the "suitability puzzle":

27   "We conclude the Governor's reversal of the Board's decision is there-
     fore not supported by some evidence.
28

¶"The Legislature has made this abundantly clear in [PC §§ 3041, (a) & (b)] which provide the Board 'shall normally set a parole release date ... that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public'. ... As the California Supreme Court emphasized in In re Dannenberg (2005) 34 C.4th 1061, 1098, a prisoner can be found unsuitable for parole only when there is 'some evidence' ... [suggesting] he remains a danger to public safety." Lawrence, supra, at pp. 563–64.

## Issue Four

**RESPONDENTS DO NOT SHOW, BY THEIR OWN EXPERTS, THAT PETITIONER IS A CURRENT THREAT AND THE IRON'S MINIMUM SENTENCE HAS LONG SINCE PASSED.**

A.    **THE COURT'S DECISION IN IRONS SUPPORTS PETITIONER**

1.   **The 9th Circuit's Irons Decision Is On Point.**

Irons, the 9th Circuit's THIRD parole analysis after Biggs and Sass, supra, addressed the issue of whether, when deciding suitability and consistent with due process, the immutable facts of the conviction may be employed repeatedly (and interminably?), to preclude those like Petitioner who unarguably satisfies all parole requirements, are forensically evaluated repeatedly to pose no parole risk, and has served in excess of the appropriate and/or maximum sentence imposed for an offense based on the facts of their conviction.

The 9th Circuit held that the BPH's use of Iron's crime, a particularly brutal murder, BEFORE he had served the mimimum prison sentence imposed by the trial court, satisfied the "some evidence" test sufficiently to uphold the BPH's decision finding he was unsuitable for release. They focused on Iron's egregious murder, specifically reciting the facts, and recognizing the nature of the crime. Irons received the same sentence as Petitioner. By the time this matter is decided Petitioner will have served over eleven years more than that prescribed for his conviction according to the decision in Irons.

1  The Court emphasized that Irons, like Biggs and Sass before him, had
2  not served the "minimum number of years to which they had been sentenced
3  at the time of the challenged denial by the Board." They explained, contrary
4  to the Board's position, why Biggs was **not** overturned by Sass, and
5  re-emphasized that continued use of the commitment offense facts to find
6  such an inmate unsuitable for parole may constitute a Due Process violation
7  AFTER THE MINIMUM TERM HAS BEEN SERVED:

8  "... We note that in all cases in which we have held that a parole
   board's decision to deem a prisoner unsuitable for parole solely on
9  the basis of his commitment offense comports with due process, the
   decision was made **before the inmate had served the minimum number**
10 **of years required by his sentence.** Specifically, in Biggs, Sass,
   and here, the petitioners had not served the minimum number of years
11 to which they had been sentenced at the time of the challenged parole
   denial by the Board. [] All we held in those cases and all we hold
12 today, therefore, is that, given the particular circumstances of the
   offenses in these cases, due process was not violated when these
13 prisoners were deemed unsuitable for parole **prior to the expiration**
   **of their minimum terms.** Irons at pp. 664-65, (emphasis added.)

14

15         **2.   Petitioner Has Been Denied Due Process Under Irons.**

16  Under the Irons standard, at the time of Petitioner's 6th subsequent
17 parole hearing in 2006, he had served (including jail time and credits)
18 twenty-one (21) years in prison, 11 **more years** than the minimum sentence
19 imposed by the trial court. Petitioner calculated that when 7 years and
20 1 months post-conviction credit is deducted (per 15 CCR § 2410, at 4
21 months for eligible disciplinary-free years), he had credit for twenty-eight
22 years, one months (28+.1 ) of confinement at the time of the Hearing.
23 The Board has never disputed these facts. Notably, this District has
24 recently made a similar ruling and has embodied the Irons holding that
25 bears repeating here with the Court's leave:

26  "Another critical difference between this case and Biggs, Sass, and
   Irons is that [petitioner] had served a substantial amount of time
27 beyond his minimum sentence. This court must consider that at some

28

                                    -7-

point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. Irons, supra at p. 665. A decision to revoke parole based solely on an inmate's commit- ment offense that can no longer be considered probative of danger- ousness to society would be arbitrary and not comport with the "some evidence" standard. Hill, supra at pp. 445-55, 557. This is one of those cases ... .

"Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not. .... (Emphasis added).

"The state court's determination that the [Board's] sole reliance on [petitioner's] commitment offense satisfied the 'some evidence' standard was an objectively unreasonable application of Hill. See 28 U.S.C. §2254(d). Brown is entitled to federal habeas relief on his due process claim." Brown v. Kane, 2007 WL 288488 at *6-7 (N.D. Cal. 2007), opinion of Honorable Charles R. Breyer.

See Sanchez v. Kane (C.D. Cal. 2006) 444 F.Supp.2d 1049; Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143; (N.D. Cal. 2006) 431 F.Supp.2d 1038 amended at 448 F.Supp.2d 1143; Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1083-1087.

Of significance is the fact that at the time of Petitioner's 2005 Hearing, he had served substantially more time in prison than the maximum prison term prescribed by the BPH's Regulations for the particular facts of his second degree murder. His prison term at that point was beyond the range prescribed for deliberative premeditated FIRST degree murder. Nevermind his acquittal. This was substantially exceeding the prison terms served by numerous condemned first degree murderers who served sentences of death based on special circumstances but whose sentences were overturned on appeal and reduced to Life when the state's death penalty statute was held unconstitutional. Many of them paroled long ago.

"Although I agree that evidence of premeditation and deliberation supports the conclusion that petitioner's crime was particularly egregious for a second degree murder, it is another matter whether any evidence would support the same conclusion for a first degree murder. Other than felony murders, first degree murders by definition involve premeditation and deliberation. Moreover, there was sufficient

doubt whether premediation and deliberation existed to persuade a jury to acquit petitioner of first degree murder ... . Rosenkrantz, supra, at p. 689, (dissenting Opinion.)

### 3. Petitioner Is NOT A Current Risk To Public Safety.

At this point, according to the California Supreme Court, the continued use of the facts of Petitioner's second degree murder commitment offense to preclude his parole violated Due Process:

"The significance of the above observations is this:

**there will come a point, which may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense."** Rosenkrantz, supra, at pp. 689-90, Moreno, J. disntg., (emphasis added.)

Judge Richland has seen the expert's conclusions for what they are:

"These conclusions, of course, are the opinions of trained experts, all of whom said [petitioner] did not need therapy. We are troubled therefore by a contrary finding, especially in light of the uncontradicted evidence in the record. And we are particularly troubled by the mere presence of this finding, which appears to be, yet again, a boilerplate finding that seems to make its way into every denial of parole, whatever the record--and despite repeated ciriticisms from the courts. The harsh criticism by Division Three of this court in In re Ramirez (2001) 94 C.App.4th 549, disapproved on another ground in Dannenberg, supra, at pp. 1086-87, is illustrative. (Barker, p. 761.)

Respondents discredit the Circuit Court's reasoning in Irons, relying on Rosenkrantz and Dannenberg to submit that Irons countermands the BPH's statutory directive to continue to consider the gravity of the commitment offense to deny suitability, even after the maximum term for the offense has possibly even doubled the mandatory minimum. Petitioner's attached Exhibit "A" is so directly on point as to be astounding.

There are several flaws in the BPH's position. It misuses the definition of the words "minimum terms." Indeterminately sentenced inmates must be granted parole at the first or initial Hearing. If public safety

1  requires a more lengthy TERM based on forensic/professional opinion(s),
2  the inmate "shall" receive a term setting at the next or subsequent meeting.

3      Next, when denying parole, it is their duty to instruct the inmate
4  as to not only why he is being denied a parole term and for how long, but
5  they are to set meaningful guidelines and expectations that will encourage
6  the inmate to work towards becoming suitable through available self-help
7  and education, as well as participation in work, healthy activities, and
8  therapy or counseling if needed to comply with the risk to public safety.

9      Lastly, the BPH is to provide the inmate with all relevant paperwork
10 prior to the Hearing, to secure counsel and an interpreter if requested,
11 and to have professional opinions submitted upon which they can base their
12 term setting, decided upon the "overarching consideration" (see: Barker,
13 supra, p. 753), per decisional law and statutory authority.

14     Further, if the BPH disagrees with the Irons calculation when
15 designating the "minimum term", it is doubtful that they disagree that
16 the Court there failed to include any parole "term-reduction credits" per
17 CCR Title 15, Div. II, § 2410, (McQuillion, supra, p. 898.)

18     Honorable Judge M.H. Patel, of this Court, has held that even the
19 second degree murder of one's own child and a coverup involving disposing
20 of the child is not sufficient, in the face of positive psychological
21 opinions, positive programming, and the remoteness of time after showing
22 remorse and rehabilitation. After a thoughtful and careful reading and
23 a review of the record before the panel, who again refused to adhere to
24 statute and decisional precedent, she made the following conclusions in
25 Willis v. Kane N.D. Cal. 2007) 485 F.Supp.2d 1126:

26 "A California prisoner with a sentence of a term of years to life with
   the possibility of parole has a protected liberty interest in release
27 on parole and therefore a right to due process in the parole suitability-

28

-10-

proceedings. See Sass [supra], at [pp.] 1127-28; [PC] § 3041(b), ¶ "The same evidence standard provides protection against more than fabricated charges or bureaucratic mistakes--the some evidence standard also protects against arbitrary decisions. [Hill, supra], at [pp.] 454-55, 457. ... ¶ "Under these circumstances, the BPH's reliance on the circumstances of the murder to find Willis unsuitable for parole for the seventh time and at least 18 years into his 15-to-life sentence was arbitrary and therefore did not comport with the some evidence standard. It violated due process. The state court's unexplained decision to the contrary was an unreasonable application of [Hill]. Willis is entitled to relief under the standard of 28 U.S.C. § 2254(d). ¶ "Having decided that the petition will be granted, the next issue concerns the proper remedy. Because Willis has never been found suitable for parole, the BPH has never moved past the suitability-finding function in [PC] § 3041(b) to calculate a term and set a release date as required by [PC] § 3041(a). It is now time to do so." Id., at pp. 1129, 1136. (Emphasis added.)

Judge Patel ruled that where the petitioner had repeatedly been denied parole suitablity without some evidence to deny a term, Willis was denied due process in the proceedings and applied the facts before her to Order his term set. Id., at p. 1137. Petitioner has been denied due process.

"The vilest deeds, like poison weeds bloom well in prison air. It's only what is good in man, that wastes and withers there." (Oscar Wilde.)

The literal preposterousness of Respondent's position and their assertions that "[T]he court found that Petitioner had not alleged a 'viable and meritorious argument' supporting his equal protection claim." is evident when, in fact, case law has made it abundantly clear that the ONLY test is whether a CURRENT THREAT exists and when professional opinions states there is NO CURRENT THREAT equal protection attaches.

The Board cited Petitioner's lack of current risk to public safety and any suggestion otherwise is without foundation and patently unreasonable. This is confirmed by Respondents own expert witness, notably, in Petitioner's Exhibit B, at PAGE FOUR: ASSESSMENT OF DANGEROUSNESS:, Petitioner's position is solidly bolstered by the professional opinion not only concerning his present dangerousness, but his future dangerousness as well and the

1  professional opinions are uncontraverted, as recorded in the Hearing
2  Transcript at pp. 19-20: ("Mr. MacMeekin presents a WELL BELOW AVERAGE RISK
3  FOR VIOLENCE ... and if released to the community his potential for violence
4  most likely to be EQUAL TO THAT OF THE AVERAGE CITIZEN.").

5      The doctor had before him copies of all Reports and Chronos and the
6  Board has never disputed these facts. The doctor duly noted Petitioner's
7  avoidance of long-term substance abuse and carefully reviewed the Record
8  BEFORE making his findings and giving his decidedly unqualified opinion.

9      It is well-settled that reams of paper are filled with analysis and
10  attempts to unveil the human element of motive. Criminal rage is tantamount
11  to a legal defense of voluntary manslaughter and no person, acting in their
12  right mind, can be 'chemically enraged' and adhere to society's expectations
13  of normalcy and conform their behavior thereto.

14      Jealousy (of his mother's paramours), is an all too common motive which
15  many jurisdictions further recognize as a mitigating factor.

16      In the Petition at issue here Petitioner included this doctor's Report
17  and previous Reports of 1996 and 2000 to show a years-long substantiation
18  of his lack of current risk. If the Court will please take a moment to review
19  these documents it should comfortably settle the "overarching consideration."
20  (Barker, supra, at p. 753.; Return Ex. 6 at Exhibit "B".)

21      The doctor's findings clearly disputes this fraud and suggests an
22  ulterior motive on someone's part. The doctor read and rationalized,
23  interviewed and reported, and now Respondents seem to cry "Foul." It is
24  hyperbole of the worst sort to demean or cast aspersions upon a stranger
25  and this should be seen as such. All of the matters alleged, even the untrue
26  ones, were known to the various experts over the years who have examined
27  Petitioner's record to prepare a psychological evaluation and they have
28

1 | reported honestly and with strict adherence to their professional oath.

2 |      Respondents have the hiring and firing authority of their own
3 | professionals and it appears, that whenever they disagree with a positive
4 | finding by their experts, they argue and alledge 'make weight' insinuations
5 | then just choose to ignore it and move on to some innocuous conclusion.

6 |      Petitioner is suitable for parole and has been for some time. If
7 | intervening events happen in the fetid aire of prison then Respondents must
8 | accept that they are possibly culpable for the "continuing charade of
9 | meaningless hearings", as Judge Parilli noted in Ramirez, "The Board's
10 | readiness to make a finding so at odds with the record supports Ramirez's
11 | (sic) claim that his parole hearing was a sham. It is not surprising that
12 | the trial court regarded the Board's findings with deep suspicion.", supra,
13 | at p. 571. This Judge still knows all too well what a sham looks like.

14 |      It becomes obvious over many years that the Respondent's position is
15 | to throw as much of their argument behind the committing offense and hope
16 | a reviewing court will see the horribleness of the crime as the only
17 | meaningful criteria to judge a Petition's meritoriousness by but when an
18 | inmate has readily confessed, as here, taken responsibility from the outset,
19 | as here, and programmed well in an acute environment, there is an absolute
20 | need to look beyond the crime to today; now. It cannot be that everybody
21 | has it wrong but the respondents, can it?

22 |      Numerous courts have recently cited just this type of obfuscation and
23 | determined that either the Board, the state court, or both got it wrong
24 | and ordered various forms of relief. There has even been excoriation of
25 | some of the various governor's reversals of suitability findings and cited
26 | the extraordinary youth factors involved.

27 |      Again, Judge Richman, too, made careful note of the above:

28 |

"Last, but by no means incidentally, the Board failed to consider Barker's age at the time he committed the crimes. In Elkins, supra], we agreed with the observations of the federal district court in Rosenkrantz, supra, that 'the general unreliability of predicting violence is exacerbated in [a] case ... by petitioner's young age at the time of the offense [and] the passage of [over] twenty years since that offense was committed.' ([Id.], p. 500.) There, granting the petition for habeas corpus, the district court talked of Rosenkrantz's age, one month past 18. (Rosenkrantz, at p. 1085.) This fact, the district court noted, 'further diminished' the 'reliability of the facts of [Rosenkrantz'] crime as a predictor for his dangerousness.' (Ibid.) Stating that '[w]hile [Rosenkrantz] was not legally a minor, he was very close to being one,' the district court confirmed the recognition by the [U.S.] Supreme Court that the 'evidentiary/predictive value of the conduct of such a young person is diminished.' (Ibid.) Then, after making the statement quoted by us in Elkins, the district court went on to quote various observations of the Supreme Court about young criminals: '"Their own vulnerability and comparative lack of control over their immediate surroundings mean (sic) juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment."' [See Stanford v. KY (1989) 492 U.S. 361, 395; (Brennen, J., dissenting).]. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' Johnson v. TX (1993) 509 U.S. 350, 363; Roper v. Simmons (2005) 543 U.S. 551; Thompson v. OK (1989) 487 U.S. 815, 835 (Stevens, J.) (plurality opinion) ['[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. ... Inexperience, less intelligence and less education make a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.']" Rosenkrantz, p. 1085. These observations are a fortiori applicable to [Barker].

¶ "In sum and in short, the record [TWO 2nd and ONE 1st DEGREE MURDERS] before us contains no evidence Barker poses an unreasonable risk to public safety even under the deferential 'some evidence' standard." Barker, supra, pp. 768-69. (Emphasis added.)

As noted by Respondents in their Return at p. 2, "Police Officers responded to calls ... where a 17-year old BOY and his mother lived."

///
///
///

## CONCLUSION

It is axiomatic that the Penal Code mandates a fair process where an inmate subject to statutory authority is given a just and meaningful opportunity to benefit from his reformation and lack of risk of danger to public safety to gain his parole release. The courts have long been held the last, best bastion of our constitutional freedoms and a bulwark againt their arbitray and capricious abrogation.

We all hold the freedoms of liberty, equality and justice as paramount in value amongst ourselves and to lessen the quality for one is to diminish those same rights to all who deserve to be able to enjoy the right of association and the freedoms embodied therein. This Court has the plenary power inherent in its office and should grant the writ submitted by Petitioner, Order his immediate release from custody or, at the very least, instruct Respondents to provide a new parole suitability hearing that in all ways conforms to the Courts oversight, and maintain original jurisdiction to see that this is so.

WHEREFORE, Petitioner respectfully prays this Honorable Court will grant the writ, Order all available relief prayed for there, and any and further relief as the Court may deem just and proper.

Respectfully submitted this 24th day of January, 2008.

Keith MacMeekin, pro se